BLUE CROSS & BLUE SHIELD OF MICHIGAN v GOVERNOR

Docket No. 68903. Argued October 4, 1983 (Calendar No. 1).—Decided
    April 16, 1985. Rehearing denied *post,* 1206. Appeal dismissed
    by the Supreme Court of the United States on October 7, 1985,
    474 US —; 88 L Ed 2d 33 (1985).

Blue Cross and Blue Shield of Michigan, before the effective date
    of the Nonprofit Health Care Corporation Reform Act, brought
    an action in the Ingham Circuit Court against the Governor,
    the Attorney General, and the Commissioner of Insurance,
    seeking a declaration that the act is unconstitutional and an
    injunction against its enforcement. The court, Jack W. Warren,
    J., enjoined the act's enforcement on the day before the act was
    to take effect and ordered the parties instead to comply with
    the previous acts governing nonprofit medical care and hospital
    service corporations. Upon the request of the Governor, the
    Supreme Court ordered the Ingham Circuit Court to certify the
    controlling questions of public law, to provide a statement of
    relevant facts, and to conduct evidentiary hearings relative to
    the case. Following hearings, the circuit court filed nine certi-
    fied questions and its findings of fact. The plaintiff challenged
    forty-six sections of the act, generally on the grounds that they
    impaired public and private contractual rights, took property
    without due process of law, denied the plaintiff the equal
    protection of the law, were an unconstitutional delegation of
    legislative authority, denied the plaintiff procedural due pro-
    cess, were unconstitutionally vague, and violated the First
    Amendment.

    In an opinion by Chief Justice WILLIAMS, joined by Justices
    BRICKLEY, CAVANAGH, and BOYLE, the Supreme Court sustained
    the constitutionality of the act except with respect to the
    following provisions:

        —the provision for a panel of actuaries to resolve risk
        factor disputes between a health care corporation and
        the Commissioner of Insurance is an unconstitutional
        delegation of legislative authority in that it lacks ade-

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 43 Am Jur 2d, Insurance §§ 11, 18, 21, 270, 289.
    44 Am Jur 2d, Insurance § 1495.

quate standards;

—the restrictions on administrative services only contracts result in arbitrary and discriminatory treatment of health care corporations as compared to commercial insurers and thus violate the right to equal protection of law;

—the provision granting the commissioner authority to issue a cease and desist order based on probable cause against a health care corporation for noncompliance with the act establishes an improper burden of proof.

On five questions or parts of questions the Court found that there was no actual case or controversy, and did not consider the constitutionality of the act with respect to them. The remainder of the act is constitutional. The matter was remanded to the circuit court for dissolution of the injunction and for further proceedings.

1. The plaintiff is a unique statutory creation, distinct from a private insurance company. It does not carry on an insurance business for profit, but rather promotes public health and welfare by assisting persons to budget health care costs. It is not subject to state laws pertaining to insurance corporations generally; its funds and property are not subject to taxation by the state or its political subdivisions. It is managed by corporate officers and a board of directors nominated and elected by the corporate members and by public appointees of the Commissioner of Insurance. The plaintiff has a dominant position in the health care market, providing health care coverage to nearly sixty percent of the population of the state. Despite efforts by the plaintiff to contain the rapidly increasing cost of health care, Michigan's costs rank among the highest in the nation. Under the previous enabling legislation, the Commissioner of Insurance did not have the authority to require specific cost-containment programs. In response, the Legislature passed the Nonprofit Health Care Corporation Reform Act, broadening the commissioner's power to regulate the plaintiff's rates for hospital and physician services and clarifying the standards for exercise of the power. The act also provided for an increase of subscriber and public representation on the plaintiff's board of directors and reorganization of the plaintiff's internal operations to ensure accountability to the public.

2. BCBSM contends that the act unconstitutionally impairs the existing public contract between itself and the state, and also that it impairs private vested contract rights between BCBSM and its members, participating health care providers, and subscribers. Modern construction of the Contract Clause does not prescribe prohibition of a state from exercising its police

power to abrogate private or public contracts if the exercise is reasonably related to remedying a social or economic need of the community. The test is to weigh the degree of the impairment of contractual rights and obligations of the parties against the justification for the impairment as an act of the state's police power to implement legislation for a legitimate public purpose. Critical to a determination of the severity of the impairment is whether the area has been regulated in the past. If the impairment is substantial, it must be further determined whether the regulation serves a significant and legitimate public purpose and whether the means adopted to achieve the purpose are reasonably related to the purpose. Using this test, there is not an unconstitutional impairment of either public or private contracts. In this case, any impairment of contracts between the state and the corporation resulting from restrictions on the power to amend the articles of incorporation, to adopt, amend, and repeal the bylaws, and to select the plaintiff's corporate membership and its board of directors, is not substantial. Nor are prohibitions against packaging related lines of insurance offered by private insurers, such as group life insurance, with health care contracts a substantial impairment. BCBSM is and always has been subject to heavy regulation. The regulation is legitimate and significant, and the means of regulation are reasonable and appropriate. Finally, the power of the commissioner to determine the share of provider reimbursement costs that the plaintiff must pay to the providers presents no significant impairment. The cumulative effect of the sections of the act of which BCBSM complains is not substantial impairment. Even if it were, it would not render the act unconstitutional because it was enacted for a legitimate and significant public purpose.

3. BCBSM asserts that the act deprives it of liberty and property without due process of law by transforming it from a private corporation into an agency of the state government and that the act delegates legislative authority to it and other private persons. The argument is based on erroneous construction of the act. Contrary to BCBSM's position, the act does not establish a statewide health program, nor does it delegate the development and administration of such a program to the plaintiff. The provisions of the act which permit the Governor to appoint members to BCBSM's governing bodies and place the power to amend, adopt, or repeal its bylaws in the board of directors do not amount to a taking. And the provisions that require it to secure the opportunity for access to health care services at fair and reasonable rates and that broaden the

commissioner's regulatory powers do not constitute a takeover of BCBSM.

4. Authority to resolve rate disputes and rate filing disputes in contracts between the plaintiff and health care facilities and professionals is not unconstitutionally delegated to hearing officers. Appeals of determinations of such disputes by the commissioner must be brought before independent hearing officers. The selection and qualifications of the officers are quite detailed, and the officers' role is monitored by the State Court Administrator, by commissioner reports to a legislative committee, and by judicial review of the officers' decisions. The procedure provides sufficient checks to restrain the officers from abusing the delegated power.

5. BCBSM is required to determine the relative probability of loss for each line of its business and to assign a risk factor in accordance with sound actuarial practices. The commissioner must then approve or disapprove the factors. If the factors are disapproved, a panel of three actuaries must determine the risk factor for each line. No guidelines are provided to direct the commissioner's response, and no directions are set forth to guide the panel. No provision is made to allow an administrative or judicial review of either the commissioner's or the panel's decision. Because determination of risk factors is an integral part of actuarial science and guidelines to standardize the determination have been promulgated by professional actuarial associations, the direction that the plaintiff assign risk factors in accordance with sound actuarial practices provides standards to guide and constrain the plaintiff's action. The power of the commissioner to approve or disapprove the factors, however, is completely open-ended. The lack of clear guidelines permits the commissioner to define the powers of the commissioner. The ambiguous nature of the commissioner's power places the panel in a position of being required to establish sound actuarial risk factors or to choose between the factors proposed by the plaintiff or by the commissioner. The lack of standards to guide the commissioner and the panel is unconstitutional.

6. The prohibition against packaging of health care services with related lines of insurance, such as life insurance, provided by private insurers does not violate the plaintiff's right to due process of law. The objective of the state in preventing the plaintiff from monopolizing the health care market and the probability that attractive packaging of health care services with other insurance would increase the plaintiff's share of the market is legitimate and permissible. The prohibition of such

packaging in the act is rationally and reasonably related to that objective.

7. Provisions in the act requiring the plaintiff to accept as a participating facility any facility operated by the state or its political subdivisions that otherwise meets criteria for participation do not deny the plaintiff due process of law. The requirement is reasonably related to the purpose of rectifying past discrimination by the plaintiff. Requiring that the assets of the plaintiff upon dissolution escheat to the state and restricting contracts for reimbursement of health care providers to annual terms do not present actual controversies.

8. Restrictions on the plaintiff's ability to enter administrative services only contracts, under which the health care coverage customer elects to be self-insured, but pays an administrative fee, are arbitrary and discriminate against the plaintiff as compared to regulations that apply to the plaintiff's competitors and violate the plaintiff's right to equal protection of the law.

9. The provision that the commissioner may bring a complaint against the plaintiff where there is probable cause to believe that the plaintiff has or is violating the act and may issue an order to the plaintiff to cease and desist the prohibited activity is unconstitutional because it permits application of an inappropriate standard. In civil cases, including proceedings before an administrative agency, the standard to be applied in determining the burden of the party asserting a claim to prove a violation is a preponderance of the evidence, rather than probable cause. Finally, provisions that give the commissioner power to review decisions made by the commissioner in a prosecutorial capacity and to suspend or limit the plaintiff's certificate of authority do not present an actual controversy nor violate due process guarantees.

10. The provision for the method of selection of each category of subscribers entitled to representation on the board of directors is a limitation on the method of selection which may ultimately be adopted by the board in the bylaws; it is not a limitation of expression.

Justice RYAN concurred in the result only.

Remanded for further proceedings.

Justice LEVIN, writing separately, stated that the provisions of the reform act, which require BCBSM to reincorporate and transfer control from the members who previously were empowered to elect the corporation's directors to subscribers and others whom the act empowers to elect or appoint seventy-five percent of the directors, effect a taking of private property

without just compensation, rendering the provisions invalid under the Michigan Constitution. The governance issue is primary, and if the provisions transforming the governance of BCBSM were valid the remaining provisions challenged by BCBSM would be of less importance. The transformation of the governance of BCBSM under the act as interpreted by the majority means in effect that all members of the corporation's board serve at the pleasure of the Legislature and the Governor.

Implementation of the act would constitute a government takeover of BCBSM, its business, and its property. The purpose of the act is to eliminate control of BCBSM and hence its business and properties by those presently in control and to transfer control to persons appointed by the Governor and elected by the providers and subscribers. While BCBSM would retain legal title, bare legal title without control might well be meaningless. By designating who will exercise control, the Legislature makes BCBSM a subsidiary of the state. By legislative fiat, the properties of BCBSM cease to be private and become public property. However, the state cannot separate legal title and control without effecting a taking of the assets, properties, and business subject to that control.

Whether the assets, properties, and business of BCBSM and control thereof belong to the members of the corporation or to the corporation or are superimposed with a fiduciary obligation requiring that they be used to further the corporate purpose or the public interest or even the interest of subscribers need not be decided. The central point is that those interests in property are private property, and neither the property interest in control nor the assets, property, or business subject to that control belongs to the state. When the state redistributes control, it has gone beyond mere regulation and has taken *both* control and the assets, properties, and business subject to control.

In sum, the assets, properties, and business of BCBSM, including control, are private property protected by the Takings Clause. BCBSM cannot be made a subsidiary of the State of Michigan without an exercise of the power of eminent domain.

Considering the challenges individually, the conclusions to be drawn are that

1. The provisions that transfer from the present members of BCBSM to its subscribers and others the power to select the members and the directors of BCBSM, and from the members to the newly constituted board of directors the powers to amend the articles of incorporation and the bylaws, and that expand the purposes of the corporation to include providing subscribers

reasonable access to, and reasonable cost and quality of, health care services and achieving the statutory goals relative to access, quality, and cost of health care services, that impose on directors a fiduciary obligation to BCBSM subscribers as well as to BCBSM and that provide, upon a dissolution of BCBSM, for the escheat to the state of its assets, are violative of the Due Process Clause;

2. The provisions that provide for a panel of three actuaries to review risk factors disapproved by the Commissioner of Insurance and provide for the appointment of retired circuit court judges to review disapprovals by the commissioner of provider class plans and other appeals arising under part 5 of the act are invalid because they constitute an unconstitutional delegation of legislative authority;

3. The provisions that impose limitations on BCBSM with respect to administrative services only contracts different from those imposed on commercial prepaid health insurers are violative of the Equal Protection Clause, and the provisions that impose limitations on BCBSM with respect to packaging life insurance different from those imposed on commercial prepaid health insurers may be violative of the Equal Protection Clause;

4. The provision that bars BCBSM from limiting or denying coverage or reimbursement on the ground that services were rendered while the subscriber was in a health care facility operated by the state is valid, but the provision requiring BCBSM to accord participation status to such a health care facility is violative of the equal protection component of the Due Process Clause;

5. The provisions that empower the commissioner to issue a cease and desist order and exact a fine on a finding of probable cause and authorize the commissioner to suspend BCBSM's certificate of authority summarily without a hearing are violative of the Due Process Clause;

6. The provision that requires BCBSM to offer to all residents of the state the opportunity to become a subscriber, although somewhat ambiguous, is not facially unconstitutional;

7. The provisions that require BCBSM to provide an informal procedure for subscriber complaints and require BCBSM to submit new or revised subscriber certificates to the commissioner for approval are not unconstitutional;

8. The provision that requires BCBSM to reincorporate under Act 350 is unconstitutional because of the constitutional infirmities in the act.

9. The question whether the valid provisions of Act 350 are

severable and enforceable has not been briefed and should be remanded to the circuit court for briefing and decision.

OPINION OF THE COURT

1. INSURANCE — CONSTITUTIONAL LAW — NONPROFIT HEALTH CARE CORPORATIONS.

The Nonprofit Health Care Corporation Reform Act is constitutional except for the provisions that 1) permit resolution of risk factor disputes between a health care corporation and the commissioner by a panel of actuaries, because it delegates legislative authority without adequate safeguards; 2) restrict the ability of a health care corporation to enter into administrative services only contracts in an arbitrary and discriminatory manner in violation of the right to equal protection of law when compared to the ability of commercial insurers to enter into such contracts; and 3) authorize the Commissioner of Insurance to issue cease and desist orders to a health care corporation for noncompliance with the act on the basis of probable cause rather than proof by a preponderance of the evidence (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1980 PA 350; MCL 550.1104[3], 550.1205[6], 550.1211, 550.1402[7], 550.1414a, 550.1415, 550.1607[1]; MSA 24.660[104][3], 24.660[205][6], 24.660[211], 24.660[402][7], 24.660[414a], 24.660[415], 24.660[607][1]).

SEPARATE OPINION BY LEVIN, J.

2. INSURANCE — CONSTITUTIONAL LAW — NONPROFIT HEALTH CARE CORPORATIONS.

*The provisions of the Nonprofit Health Care Corporation Reform Act which require the health care corporation subject to the act to reincorporate and transfer control from the members who previously were empowered to elect the corporation's directors to subscribers and others whom the act empowers to elect or appoint seventy-five percent of the directors effect a taking of private property without just compensation, rendering the provisions invalid under the Michigan Constitution; also unconstitutional as violative of due process are the provisions that transfer the powers to select members and directors of the corporation and to amend its articles of incorporation and bylaws, that expand the purposes of the corporation, that impose a fiduciary obligation on the directors to the subscribers to the corporation as well as to the corporation, that provide for escheat of the corporation's assets to the state upon dissolution, that require the corporation to accord participation status to a state health care facility, and that empower the Commis-*

*sioner of Insurance to issue cease and desist orders and exact fines with regard to the corporation and to summarily suspend its certificate of authority; unconstitutional as violative of equal protection are the provisions that impose limitations on the corporation with respect to administrative services only contracts and the packaging of health and life insurance different from those imposed on commercial insurers; invalid as constituting an unconstitutional delegation of legislative authority are the provisions for actuarial review of risk factors and appointment of retired circuit judges to review provider class plans and other appeals disapproved by the commissioner (Const 1963, art 1, §§ 2, 17, art 4, § 1, art 10, § 2; MCL 550.1202, 550.1203, 550.1205, 550.1206, 550.1211, 550.1213, 550.1301, 550.1302, 550.1305, 550.1310, 550.1401, 550.1402, 550.1501, 550.1502, 550.1508, 550.1514-550.1516, 550.1518, 550.1605, 550.1701; MSA 24.660[202], 24.660[203], 24.660[205], 24.660[206], 24.660[211], 24.660[213], 24.660[301], 24.660[302], 24.660[305], 24.660[310], 24.660[401], 24.660[402], 24.660[501], 24.660[502], 24.660[508], 24.660[514]-24.660[516], 24.660[518], 24.660[605], 24.660[701]).*

*Butzel, Long, Gust, Klein & Van Zile, P.C.* (by *William M. Saxton* and *Keefe A. Brooks*), for the plaintiff.

*Frank J. Kelley*, Attorney General, *Louis J. Caruso*, Solicitor General, and *Harry G. Iwasko, Jr.*, and *Deborah K. Canja*, Assistant Attorneys General, for the defendants.

Amicus Curiae:

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *John Corbett O'Meara* and *Timothy H. Howlett)* for Chrysler Corporation.

WILLIAMS, C.J. This case presents important questions of first impression regarding the constitutionality and construction of the Nonprofit Health Care Corporation Reform Act, 1980 PA 350, MCL 550.1101 *et seq.;* MSA 24.660(101) *et seq.*

Prior to April 3, 1981, the effective date of the

act, BCBSM brought a complaint for declaratory judgment challenging the constitutionality of the act and sought an injunction against the act's enforcement in the Ingham Circuit Court. On April 2, 1981, the Ingham Circuit Court enjoined the enforcement of the act and further ordered the parties to comply with the existing enabling acts, 1939 PA 108 and 109, as amended.[1] We initially granted leave to appeal from that order but, following BCBSM's motion for reconsideration, we took the matter under advisement.[2]

At the request of the Governor, pursuant to the certified-question rule,[3] we ordered the Ingham Circuit Court to certify the controlling question or questions of public law, to provide a statement of the relevant facts and, if needed, conduct evidentiary hearings. Evidentiary hearings were subsequently conducted over a two-month period, from July 27 to September 24, 1982, generating 4,000 pages of transcript and 194 exhibits.

On November 1, 1982, the circuit court filed its

[1] 1939 PA 108 and 109, MCL 550.301 *et seq.;* MSA 24.591 *et seq.;* MCL 550.501 *et seq.;* MSA 24.621 *et seq.,* were to be repealed effective April 3, 1981 by 1980 PA 350.

[2] *Ins Comm'r v Blue Cross & Blue Shield of Michigan* and *Blue Cross & Blue Shield of Michigan v Governor,* 412 Mich 944 (1982).

[3] The certified-question rule involved here is GCR 1963, 797.1. It provides, in pertinent part:

".1 From Michigan Courts.

"(a) Whenever the judge or judges of any court, or the officers of any tribunal, from which an appeal of right or otherwise may be taken to the Court of Appeals or to the Supreme Court, has pending before him or them any controlling question or questions of public law involved in a pending case or controversy, and such question or questions are of such public moment as to require early determination according to executive message of the Governor addressed to the Supreme Court, the Supreme Court in its discretion may authorize such judge or officers to certify such question or questions to the Supreme Court with a statement of the facts relevant thereto sufficient to make clear the application of such question or questions, and further proceedings relative to such case or controversy shall thereupon be stayed to such extent as the judge or officers shall by order direct, pending receipt of an answer from the Supreme Court."

certified questions of public law and findings of relevant facts, consisting of 562 findings. The parties agreed that the essence of the circuit court's certification of controlling questions of public law is set forth in BCBSM's "Questions Presented." Those questions follow:[4]

I. Does PA 350 unconstitutionally impair the existing contract between BCBSM and the State of Michigan?

II. Does PA 350 deprive BCBSM of liberty and property without due process of law by effectively converting a heretofore private corporation into a public, governmental corporation?

III. Does PA 350 constitute an unconstitutional delegation of legislative authority to BCBSM and other private persons?

IV. Do sections 203, 206(4), 211, 301(7), 302(1), 305(1), 509(4)(b), 510 and/or 516(2)(b) of PA 350 unconstitutionally impair private, vested contract rights between BCBSM and its members, participating providers and customers?

V. Do sections 104(3), 206(4), 211, 217, 401(7), 414a, 415, 502(1)(b) and/or 607(1) of PA 350 deprive BCBSM of liberty and property without due process of law by regulating BCBSM in an arbitrary and discriminatory manner which bears no real and substantial relationship to the objects of PA 350 or to the general health and welfare of the people of this state?

VI. Do sections 104(3), 206(4), 211, 414a, 515 and/or 607(1) of PA 350 deprive BCBSM of the equal protections of the laws by regulating BCBSM in an arbitrary and discriminatory manner which

---

[4] BCBSM's brief includes an additional Question:

"X. Does PA 350 violate article 4, section 29 of the Michigan Constitution of 1963 by creating a corporation by special act?"

We do not address Question X, although it is briefed by the parties, since this was not one of the questions certified to this Court by the circuit judge. In *City of Gaylord v Gaylord City Clerk*, 378 Mich 273, 287, n 1; 144 NW2d 460 (1966), we noted that "[w]henever this unusual procedure is invoked, the parties should address themselves to the questions as certified." GCR 1963, 797.1(a).

bears no rational relationship to the objects of PA
350?

VII. Do sections 402(7), 404(5), 605 and/or 701(5)
of PA 350 deprive BCBSM of liberty and property
without due process of law by providing for admin-
istrative procedures lacking in fundamental due
process guarantees?

VIII. Do sections 106(5), 205(4), 205(5), 310(1),
401(1), 503, 504(1), 509(1), 509(4)(b), 510(1), 511(1)
and/or 513(1) of PA 350 deprive BCBSM of liberty
and property without due process of law by impos-
ing unconstitutionally vague and illusory duties on
BCBSM and the Commissioner of Insurance?

IX. Does section 301(7) of PA 350 deprive BCBSM,
its directors, officers and members of guaranteed
rights of free speech?

We do not agree with BCBSM's challenges to
sections of 1980 PA 350 except in the following
three particulars:

(1) Section 205(6) unconstitutionally delegates
legislative power (Question 3);

(2) insofar as they pertain to administrative
services only (ASO) contracts, §§ 104(3), 211, 414a,
415, and 607(1) violate equal protection (Questions
4, 5, and 6);

(3) § 402(7) establishes an improper burden of
proof (Question 7).

Other sections of the act we do not address
because there is no actual controversy presented:

(1) whether §§ 509(4)(b), 510, and 516(2)(b) impair
the private existing contracts between BCBSM and
its participating providers (Question 4);

(2) whether §§ 217 and 502(1)(b) deprive BCBSM of
due process of law (Question 5);

(3) whether §§ 402(7), 404(5), and 605 fail to
provide for an impartial decisionmaker in viola-
tion of due process of law (Question 7);

(4) whether §§ 106(5), 205(4), 205(5), 310(1),

401(1), 503, 504(1), 509(1), 509(4)(b), 510(1), 511(1), and/or 513(1) impose unconstitutionally vague and illusory duties on BCBSM and the commissioner (Question 8);

(5) whether § 301(7) deprives BCBSM, its directors, officers, and members of free speech (Question 9).

We sustain the act's constitutionality with regard to BCBSM's other challenges.

By way of preface, the length of this opinion is principally attributable to the fact that the nine certified questions contain no less than thirty-two issues, because BCBSM challenged forty-six sections of 1980 PA 350. Furthermore, in responding to BCBSM's multifarious style of attack, the opinion is necessarily somewhat redundant as a number of these sections challenged by BCBSM are attacked on several constitutional grounds, i.e., as an impairment of BCBSM's public and private contractual rights, as a taking without due process of law, as violative of equal protection, as an unconstitutional delegation of legislative authority, as a denial of procedural due process, as unconstitutionally vague, and as a violation of the First Amendment.

## I. HISTORICAL BACKGROUND

Because any new piece of legislation is not created in a vacuum, it will be helpful to examine, from an historical perspective, the critical factors which led to this major legislative reform, 1980 PA 350, in the state's health care delivery system.

Michigan's first health care enabling legislation originated in the 1930s as an outgrowth of the Great Depression where pervasive poverty among the people caused them to forgo needed health care services which, in turn, resulted in financial uncertainty for hospitals and physicians. The main

purpose of the enabling legislation was, through the mechanism of prepaid group health care plans, "to promote a wider distribution of medical care" to those people who otherwise did not have the financial resources to obtain health care services. The special legislation had a secondary purpose of protecting the public from fraud by placing the health care corporations charged with administering the plans under the regulatory authority of the Commissioner of Insurance. See *Blue Cross & Blue Shield of Michigan v Ins Comm'r*, 403 Mich 399, 419-425; 270 NW2d 845 (1978).[5]

The two predecessor corporations of BCBSM were incorporated pursuant to this original enabling legislation, under separate but comparable statutes.[6] A 1974 amendment to the enabling legislation allowed for the consolidation of these two corporations with the provision that the regulatory power of the Insurance Commissioner over the constituent corporations would remain the same with respect to the consolidated corporation.[7] The consolidation occurred in 1975, resulting in the formation of BCBSM.

BCBSM is a unique statutory creation, distinct from a private insurance company in that " 'it is not carried on as an insurance business for profit . . ., but rather it provides a method for promoting the public health and welfare in assisting . . . persons to budget' health care costs." *Blue Cross & Blue Shield of Michigan, supra*, p 418; see also *Michigan Hospital Service [Blue Cross] v Sharpe*, 339 Mich 357, 370; 63 NW2d 638 (1954). Under its enabling legislation, BCBSM is not "subject to the

---

[5] For an excellent review of the founding of Blue Cross plans in general and Michigan Blue Cross in particular, see Payton & Powsner, *Regulation through the looking glass: Hospitals, Blue Cross, and certificate-of-need*, 79 Mich L R 203, 214-232 (1980).

[6] See n 1.

[7] MCL 550.309a; MSA 24.599(1) and MCL 550.503b; MSA 24.623(2).

laws of this state with respect to insurance corporations, except as provided in [the] act . . . [nor] with respect to corporations generally." § 201(4). Rather, BCBSM is, by legislative declaration, a nonprofit "charitable and benevolent institution, and its funds and property shall be exempt from taxation by this state or any political subdivision of this state." §§ 105(2), 201(5). In part by virtue of its favored status, in part by virtue of its health care delivery concept, and in part by virtue of the expertise and aggressiveness of its management, BCBSM has achieved a dominant position in the health care market, currently providing health care coverage to nearly sixty percent of the state's population.[8] It has participation contracts with all but four of the non-state-owned hospitals in the state and with approximately seventy percent of all the physicians. It also administers the federal Medicare program.[9] BCBSM has no shareholders and is managed by corporate officers and a board of directors.[10] The board of directors has in the past been nominated from the corporate members and elected by the same body with the exception of two public appointees of the Insurance Commissioner.[11] Historically, provider members on the board of directors have far outnumbered subscribers.[12] Only in recent years has the number of consumer representatives on the board increased.

During the past twenty years, national and statewide expenditures on medical care increased at a rapid rate almost double the rate of inflation. In 1960, national health care expenditures were

[8] See Circuit Court's Findings of Relevant Facts, No. 3(a).

[9] See Circuit Court's Findings of Relevant Facts, No. 3(a).

[10] See Circuit Court's Findings of Relevant Facts, No. 86.

[11] MCL 550.308, 550.502; MSA 24.598, 24.622; see Circuit Court's Findings of Relevant Facts, Nos. 73, 75, 95, 96.

[12] See *Blue Cross & Blue Shield of Michigan v Ins Comm'r*, 403 Mich 399, 418; 270 NW2d 845 (1978).

5.2 percent of the gross national product. By 1978, the proportion had jumped to 9.1 percent, an overall increase of seventy-five percent. Michigan's figures for health care expenditures over the same years paralleled those of the nation.[13] While a combination of market forces is responsible for the spiraling costs, some of which are not within BCBSM's control, BCBSM can nonetheless have a significant influence in determining market prices because of its virtual dominance over delivery of the state's health care.[14] To some degree BCBSM has, through its policies, implemented cost containment programs; yet despite these efforts, Michigan's health care costs are among the highest in the country.[15] The elderly, low income, and business sectors of this state have been especially burdened by the ever-increasing costs.[16]

As health care costs were mounting, BCBSM became the target of considerable controversy. The circuit court reported that much of the criticism voiced against BCBSM was centered on its secretive and closed system of board operation, its unresponsiveness to consumer interests and its ineffectiveness in containing the rapid escalation of health care costs.[17]

In the midst of the concern with escalating health care costs, this Court issued its opinion in

[13] See Circuit Court's Findings of Relevant Facts, Nos. 10, 12, 259, citing defendant's Exhibit 33, State Health Plan for Michigan 1979-1983.

[14] See Circuit Court's Findings of Relevant Facts, Nos. 3(a), 173, 216.

[15] See Circuit Court's Findings of Relevant Facts, Nos. 15, 18, 245.

[16] See Circuit Court's Findings of Relevant Facts, Nos. 3(b), (c), (d), (f), 257.

[17] See Circuit Court's Findings of Relevant Facts, No. 3(e); defendant's Exhibit 96, "SAS" Senate Analysis Section report on House Bill 4555 (Substitute S-1); see also Hollister & Drake, *The Nonprofit Health Care Corporation Reform Act of 1980,* 14 U Mich J L Ref 433 (1981); Law, *Blue Cross: What Went Wrong?* (New Haven: Yale University Press, 1974).

*Blue Cross & Blue Shield of Michigan v Ins Comm'r,* 403 Mich 399; 270 NW2d 845 (1978), which addressed the issue whether and to what extent the Insurance Commissioner had the power to control costs pursuant to his or her regulatory authority over BCBSM. In noting that the commissioner's regulatory authority was not inherent but was derived solely from statute, this Court held that under 1939 PA 108 and 109 the commissioner possessed continuing statutory authority over BCBSM to approve or to disapprove "rates of payment by the corporation to hospitals that provide service to the corporation's subscribers," but not to physicians. *Id.,* p 431. This Court observed that the statute empowering the commissioner to regulate such rates did not set forth standards to guide the commissioner in exercising that power. *Id.,* p 428. This Court filled the gap by construing the enabling legislation broadly, finding that the Legislature intended the commissioner to regulate such rates only according to a "fair and reasonable" standard. *Id.,* pp 428-429. This Court concluded that while the commissioner could consider wasteful expenditures in determining whether an increase in the rates of payment by BCBSM to hospitals was fair and reasonable, the commissioner did not have the authority under the forty-year-old enabling acts to require specific cost containment programs. *Id.,* pp 413, 429. Thus, the commissioner's hands were tied against effectively combating the rising costs of health care services.

The Legislature responded quickly, and within two years of the *Blue Cross* decision 1980 PA 350 was passed and signed into law on December 29, 1980. One of the groups instrumental in developing the legislation was BCBSM.

The legislative history of the act indicates that it is designed to meet and remedy the problems

raised by *Blue Cross, supra,* in that it broadens the commissioner's power to regulate BCBSM's rates for both hospital and physician services and clarifies the standards to be followed by the commissioner in exercising this power.[18] Moreover, the act is intended to increase subscriber and public representation on the board of directors and to reorganize the internal operations of BCBSM so as to ensure its accountability to the public it was created to serve. Further, the primary objective of the act is to check rising health care costs by implementing definite cost containment goals with respect to provider reimbursement arrangements and providing greater incentives for BCBSM to develop cost-efficient programs, all subject to the supervisory powers of the Insurance Commissioner.[19] Overall, the act represents an effort of the Legislature aimed at curbing the rise in health care costs by a unique statutory scheme which combines both free-market and government regulatory methods of control.[20]

## II. QUESTION 1

"I. DOES PA 350 UNCONSTITUTIONALLY IMPAIR THE

---

[18] See Hollister & Drake, n 17, for a general discussion of the legislative history surrounding the enactment of 1980 PA 350.

[19] See n 18.

[20] The tension between increased government intervention on the one hand and free market forces on the other as means to achieve containment of health care costs has been the topic of current debate among health care analysts and commentators. See Havighurst, *Deregulating the Health Care Industry* (Ballinger Publishing Co: Cambridge, Mass, 1982); Yaggy & Anlyan, Eds., *Financing Health Care: Competition versus Regulation* (Ballinger Publishing Co: Cambridge, Mass, 1982); Lynk, *Regulation & Competition: An Examination of "The Consumer Choice Health Plan,"* 6 J Health, Politics, Policy & L 625 (1982); *A special symposium: Market-oriented approaches to achieving health policy goals,* 34 Van L R 849 (1981); Wing & Craige, *Health care regulation: Dilemma of a partially developed public policy,* 57 NC L R 1165 (1979); *Symposium: Health Care: Parts I & II,* 35 Law & Contemporary Problems 229, 667 (1970).

EXISTING CONTRACT BETWEEN BCBSM AND THE STATE
OF MICHIGAN?"

BCBSM claims that numerous sections of the act, when considered together, impair the public contract existing between the State of Michigan and BCBSM, as embodied in 1939 PA 108 and 109, its 1975 restated articles of incorporation, and its bylaws, in violation of US Const, art I, § 10 and Const 1963, art 1, § 10.[21]

### A. BCBSM's Reliance on Dartmouth College Is Misplaced

BCBSM bases its claim of 1980 PA 350's unconstitutionality in no small part on the premise that it is a private corporation and that any intrusion on its operations by the provisions of 1980 PA 350 impairs its contract with the state. The Attorney General, on the other hand, contends that BCBSM is a quasi-public corporation and, as such, has the responsibility to act in the public interest.

In support of its claim, BCBSM places great reliance on the well-known case of *Trustees of Dartmouth College v Woodward*, 17 US (4 Wheat) 518; 4 L Ed 629 (1819). The *Dartmouth College* case stands for the principle that the charter of a private corporation is a contract and any modification of a corporation charter by a state in the absence of a specific reservation of power violates the Contract Clause.

We find BCBSM's reliance to be misplaced. *Dart-*

---

[21] The charter of a corporation, whether conferred by special act or under the general incorporation laws, is a contract between the state and the corporation, the corporation and the stockholders, and the stockholders and the state. *Bruun v Cook*, 280 Mich 484, 491; 273 NW 774 (1937); *Harsha v Detroit*, 261 Mich 586, 590; 246 NW 849 (1933). We are concerned here with the contractual relation between the state and the corporation. The latter two contractual relations are the subject of our discussion in Part V addressing BCBSM's impairment of private contracts claims.

*mouth College* reflects an earlier era of Contract Clause analysis. *Allied Structural Steel Co v Spannaus,* 438 US 234, 241; 98 S Ct 2716; 57 L Ed 2d 727 (1978). Beginning with the landmark case of *Home Building & Loan Ass'n v Blaisdell,* 290 US 398; 54 S Ct 231; 78 L Ed 413 (1934), the modern United States Supreme Court has construed the Contract Clause as not prohibiting a state from exercising its police power to abrogate private or public contracts if reasonably related to remedying a social or economic need of the community. Under modern Contract Clause analysis, a balancing approach has been adopted by the courts, weighing the degree of the impairment of the contractual rights and obligations of the parties against the justification for the impairment as an act of the state's police power to implement legislation for a legitimate public purpose. Michigan courts have followed this lead. See *Van Slooten v Larsen,* 410 Mich 21; 299 NW2d 704 (1980) (see in particular Justice LEVIN's dissenting opinion); *Metropolitan Funeral System Ass'n v Ins Comm'r,* 331 Mich 185, 194 ff.; 49 NW2d 131 (1951), and federal cases cited therein.[22]

This balancing test applies whether BCBSM is a private or quasi-public entity. Consequently, the question of BCBSM's corporate nature is not paramount to our resolution of the Contract Clause challenge, but, rather, as will be set forth below, the critical issue is whether and to what extent

---

[22] Because this balancing approach directs our focus upon the permissible exercise of the state's police power in resolving the impairment of contract claim to 1980 PA 350, we need not reach the question raised by BCBSM whether the state possessed the reserved power to so modify BCBSM's 1975 corporate charter. See Conard, Ogders & Scanlon, *Corporations and the Michigan Constitution* (Constitutional Convention Preparatory Commission, State of Michigan, 1961), p 5, to the effect that "it is becoming increasingly clear that the state's police power can accomplish everything that the reserved power clause can where the 'public interest' is concerned."

BCBSM has been regulated in the past. The more heavily regulated the industry, the less severe the impairment, if any, effected by state regulation since further regulation in the area should have been expected.

### B. *The Constitutional Impairment of Contracts Standard Is Now a Balancing Approach*

The new test for unconstitutional impairment of contracts is a balancing approach, weighing the extent of the impairment on the rights and obligations of the contracting parties against the state's police power to regulate in the public interest. A recent example of this balancing approach is found in the United States Supreme Court case of *Energy Reserves Group, Inc v Kansas Power & Light Co,* 459 US 400; 103 S Ct 697; 74 L Ed 2d 569 (1983), involving a federal Contract Clause challenge to the 1979 Kansas Natural Gas Price Protection Act which imposed price controls on the intrastate gas market. In its opinion upholding the statute, the Court noted the significance of the fact that the natural gas industry was heavily regulated at both the state and federal levels. *Id.,* p 413. We find particularly instructive the Court's clarification of the standard to be used for adjudicating contract impairment claims:

> The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co,* 438 US 244. See *United States Trust Co [v New Jersey],* 431 US [1,] 17 [97 S Ct 1505; 52 L Ed 2d 92 (1977)]. The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected. *Allied Structural Steel Co,* 438 US 245. . . . In determining the extent of the impairment, we are to consider

whether the industry the complaining party has entered has been regulated in the past. *Allied Structural Steel Co,* 438 US 242, n 13, citing *Veix v Sixth Ward Bldg & Loan Ass'n,* 310 US 32, 38 [60 S Ct 792; 84 L Ed 1061] (1940). ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic"). The Court long ago observed: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson Water Co v McCarter,* 209 US 349, 357 [28 S Ct 529; 52 L Ed 828] (1908).

If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, *United States Trust Co,* 431 US 22, such as the remedying of a broad and general social or economic problem. *Allied Structural Steel Co,* 438 US 247, 249. Furthermore, since *Blaisdell,* the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation. *United States Trust Co,* 431 US 22, n 19; *Veix v Sixth Ward Bldg & Loan Ass'n,* 310 US 39-40. . . .

Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *United States Trust Co,* 431 US 22. [*Id.,* pp 411-412.]

The federal balancing approach has been adopted by our Court for purposes of adjudicating state Contract Clause claims as well as federal Contract Clause claims. See *Van Slooten v Larsen, supra; Metropolitan Funeral System Ass'n v Ins Comm'r, supra.* Thus, in scrutinizing Contract

Clause claims under the state and federal constitutions, the aforementioned cases establish the following standard:

1—The first inquiry is "whether the state law has, in fact, operated as a *substantial* impairment of a contractual relationship" (emphasis added). *Allied Structural Steel Co v Spannaus,* 438 US 244.

2—A critical factor to be considered in determining the extent of the impairment is "whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves, supra.*

3—If the impairment is minimal, then there is no unconstitutional impairment of contract and our inquiry may end at this step.

4—If, however, the impairment is severe, then there are two further inquiries, both of which must be affirmatively shown to justify the legislative impairment:

a) Is there a significant and legitimate public purpose behind the regulation, *and*

b) If there is a legitimate public purpose, are the means adopted to implement the legislation reasonably related to the public purpose?

## C. *Application of Standard to Challenged Statutory Schemata of the Act*

As we apply the aforementioned balancing test to the legislation at hand, we begin by analyzing the individual sections of 1980 PA 350 which BCBSM challenges. Once we analyze the sections individually, we can then determine whether collectively they fundamentally alter BCBSM's existing contract with the state.

The features of the act relevant here to BCBSM's impairment of public contract challenge follow.[23]

(1) *§§ 202(1)(d) and 401(1)—Corporate Duties*

In its attack on 1980 PA 350, BCBSM alleges that §§ 202(1)(d) and 401(1) of the act thrust upon it "[p]ublic welfare responsibilities . . . , as corporate duties, without its consent: *i.e.,* the duty to supply health care coverage to *all* residents of the State of Michigan and the duty to assure all subscribers access to quality health care services at a reasonable cost." (Emphasis in original.) BCBSM argues that 1980 PA 350, by imposing what are essentially governmental purposes on a private corporation, fundamentally alters its contract with the state, as embodied in 1939 PA 108 and 109 and its restated articles of incorporation.

We disagree.

Section 202(1)(d) states, in pertinent part, that a nonprofit health care corporation shall include among its corporate purposes:

*(ii)* To secure for all of the people of this state

---

[23] BCBSM provides an inclusive list of those sections of 1980 PA 350 which are claimed to impair BCBSM's contract with the state. We address ourselves only to those sections of 1980 PA 350 specifically listed in plaintiff's appendix and will not therefore consider BCBSM's random reference to other sections of 1980 PA 350. For example, BCBSM, in a shotgun approach, mentions 1980 PA 350's statutory restrictions on packaging, § 206(4), ASO arrangements, § 211, per case participation, § 502(1)(b), and mandated subsidization of tax dollar supported and government owned mental health facilities, § 401(7), in connection with its impairment of public contract argument. Because none of these sections appear in plaintiff's appendix, we do not address them under this constitutional challenge.

Moreover, although BCBSM lists in its appendix § 304(1), which mandates that upon the request of a director, a subscriber shall receive a copy of the minutes of one or more meetings of the board, its committee, or the corporate body, as one of many sections which fundamentally alter BCBSM's contract with the state and also constitute a taking without due process, we do not address this section because whether such a request will ever be made is pure conjecture at this time and, thus, there is no "actual controversy" as to this challenge. See n 50 for discussion of the "actual controversy" requirement.

*who apply for a certificate,* the opportunity for access to coverage for health care services at a fair and reasonable price.

*(iii)* To assure for nongroup and group *subscribers,* reasonable access to, and reasonable cost and quality of, health care services. [Emphasis added.]

Section 401 provides, in relevant part:

(1) A health care corporation established, maintained, or operating in this state shall *offer* health care benefits to all residents of this state . . . . [Emphasis added.]

We point out that BCBSM bases its argument that 1980 PA 350 imposes governmental purposes on a private corporation on its misinterpretation of the statutory language. Specifically, BCBSM misconstrues the above provisions by stating that it forces upon BCBSM the duty to supply health care services to *all* people of this state. A careful reading of the provisions leads us to a far different construction. Contrary to BCBSM's contention, only those state residents "who apply for a certificate," *i.e.,* its own customers, need be given the opportunity for access to health care services at a fair and reasonable price. The goal of assuring reasonable access to, and reasonable cost and quality of, health care services is limited to "subscribers" of the corporation. BCBSM is required only to *offer,* not to supply, health care benefits to all residents of this state. The act goes on to expressly provide that BCBSM is not prevented from denying coverage to an "individual [who] does not meet requirements for coverage contained in a certificate." § 401(4)(c).

We fail to see how these provisions thrust upon BCBSM public welfare responsibilities. Rather, they

place upon BCBSM nothing more than duties which
BCBSM already owed to its own customers and to
the public. Although under the former enabling
acts, 1939 PA 108 and 109, BCBSM was not required
to include legislated corporate purposes in its arti-
cles of incorporation, see 1939 PA 108, § 3, 1939
PA 109, § 4, it was subject to carry out the de-
clared policy of 1939 PA 108, § 1, which was "to
promote a wider distribution of medical care . . .
in this state."

We find that the provisions of 1980 PA 350 here
in question are not so dissimilar to the expressed
legislative policy of the former enabling acts as to
constitute a substantial impairment of BCBSM's
existing contract with the state. Because we find
that (1) the impairment, if any, is minimal, and (2)
BCBSM has been regulated in the past, we need not
further inquire as to whether the state has a
legitimate purpose and has employed means both
reasonable and of a character appropriate to that
purpose. See Part II(B).

*(2) § 203—Power to Amend Articles of Incorpora-
tion*

BCBSM further argues that § 203 operates to
impair its contract with the state as embodied in
Article VIII of its restated articles of incorpora-
tion, § 4 of 1939 PA 108 and § 5 of 1939 PA 109.
Article VIII of the restated articles of incorpora-
tion, § 4 of 1939 PA 108, and § 5 of 1939 PA 109
empower the corporate membership of BCBSM to
amend the restated articles of incorporation sub-
ject to the approval of the Attorney General and
the Commissioner of Insurance. Section 203 of
1980 PA 350 places the power to amend and
integrate the articles in the board of directors,
subject to the approval of the Attorney General.
BCBSM contends that this shifting of authority

from the corporate membership to the board of directors impairs its contract with the state.

We disagree.

In analyzing a Contract Clause claim, we must first ascertain whether the challenged legislative enactment works a substantial impairment of an existing contractual relationship. While we find that the provision in question transfers the power to amend BCBSM's articles of incorporation from the members to the directors, we fail to see how this is a substantial impairment of BCBSM's contract with the state where the industry has been subject to extensive state regulation in this area.

Under 1939 PA 108 and 109, the initial filing of BCBSM's articles of incorporation and any alteration of said articles thereafter was always subject to the regulatory authority of the commissioner and the Attorney General. See 1939 PA 108, §§ 3 and 4; 1939 PA 109, §§ 4 and 5. In light of this past extensive state regulation over BCBSM's articles, we deem the impairment, if any, under Act 350 to be unsubstantial.

Even had we found that § 203 is a substantial impairment of BCBSM's contract with the state, we still would have upheld its constitutionality under 4(a) and 4(b) of the balancing test. See Part II(B). To the extent § 203 impairs BCBSM's contractual interests, that section rests upon and is prompted by significant and legitimate state interests.

In recent years BCBSM has been the subject of considerable controversy. The evidence indicates that BCBSM has been unresponsive to consumers' interest. Additionally, critics have charged that BCBSM has not been vigorous in its cost containment efforts. The main reason alleged for these deficiencies is that BCBSM has been subject to undue and excessive provider and management influence. It is alleged that the providers and

management have gained control of the corporate membership. Because the power to elect the corporate members and the directors is derived from the restated articles of incorporation and articles I and IV of the bylaws, which the corporate members have the *sole authority* to amend, the providers and management have been able to perpetuate their positions. Section 203 seeks to ensure the equitable control of BCBSM by all interested parties.

To accomplish this purpose, the Legislature eliminated the corporate membership's sole power to amend the articles and has thereby reduced the possibility that any one group will dominate and control BCBSM. We believe that the means chosen to implement the legitimate public purpose are "reasonable . . . and . . . of a character appropriate to [that] purpose . . . ." Thus, we reject BCBSM's contention that by virtue of § 203 its contract with the state has been impaired within the meaning of the state or federal Contract Clause.

(3) *§§ 205(5), (10), 607, and 608—Power of the Commissioner Over Lines of Business and Risk Factors, Contingency Reserves, Issuance of New Certificates and Rates*

BCBSM next contends that §§ 205(5) and (10), 607, and 608 (which basically give the Commissioner of Insurance approval power over BCBSM's lines of business, the risk factors assigned to those lines of business, contingency reserves, issuance of new certificates, rates, and rating methods) impair BCBSM's contract with the state as embodied in 1939 PA 108 and 109, the restated articles of incorporation and the bylaws. BCBSM asserts that under these new sections the Commissioner of Insurance is now vested with "dictatorial powers over virtually every meaningful aspect of BCBSM's

business." BCBSM, however, fails to cite any section or provision of its existing contract with the state that has purportedly been impaired by these new sections. Nor is it clear from a review of the relevant sources which provisions BCBSM is relying upon.

In this light, we disagree with BCBSM's argument.

Again, the threshold question is whether the challenged provisions substantially impair BCBSM's existing contract with the state. Under BCBSM's existing contract with the state, the commissioner is given extensive approval power over contingency reserves, 1939 PA 108, § 11, 1939 PA 109, § 9, issuance of certificates, 1939 PA 108, § 5, 1939 PA 109, § 6, and rates, 1939 PA 109, § 3. See generally *Blue Cross & Blue Shield of Michigan v Ins Comm'r, supra*. Moreover, supervisory power is also exercised over risk factors and lines of business.[24] The authority exercised over BCBSM under the above provisions of 1980 PA 350 will be for all intents and purposes coextensive with that exercised under this existing system.[25] Consequently, (1) we are unable to find a substantial impairment, and (2) we recognize that health care corporations have always been subject to extensive regulation. We deem this conclusion so manifest that we need

[24] See Circuit Court's Findings of Relevant Facts Nos. 471-479; Testimony of Steven Henry, Tr Vol 18 pp 2949-2959; Defendant's Exhibit 72; BCBSM's Lines of Business.

[25] We recognize that to some degree the relevant sections of 1980 PA 350 give the commissioner more power than under the former system. For example, under § 205(5)(b) the commissioner is now empowered to define additional lines of business, and under § 205(10) the commissioner is empowered to formulate a plan to adjust the contingency reserve to the statutorily mandated level where the corporation is unable to formulate a satisfactory plan after two years. Nevertheless, in light of the commissioner's extensive approval power under the existing system and the fact that BCBSM has always been subject to broad and intrusive regulation, there is no substantial impairment.

not address the question whether the state has a legitimate purpose and has employed means both reasonable and of a character appropriate to that purpose. See Part II(B). We reject BCBSM's claim.

(4) *§§ 301(1)-(5), (7) and 305(1)—Corporate Board and Membership Structure*

Section 301(1)-(5) establishes the size of the board of directors and the composition thereof which includes four appointees of the Governor. Section 301(7) restricts the right of the corporate body, the incumbent board, the management, and members of each, to participate as such in the selection of the board, allowing participation only to the extent that the individual is a subscriber or to the extent that participation does not involve nomination, endorsement, approval, or confirmation of a candidate or director. Section 301(7) additionally provides that the method of selection of subscriber representatives on the board "shall maximize subscriber participation to the extent reasonably practicable." Section 305(1) declares that the non-public corporate membership shall be selected in the same fashion as the non-public members of the board as set forth in § 301. That section also states that there shall be two non-public members for each non-public director. As to the public members, the four appointed directors are public members, and the Governor is authorized to appoint four additional public members, making a total of eight gubernatorially appointed public members.

As to all of the above sections, BCBSM argues that its contract with the state, consisting of 1939 PA 108 and 109, the restated articles of incorporation, and the bylaws, has been substantially impaired. Again, BCBSM makes a broad statement that "PA 350 deprives BCBSM of the right to select its own directors and corporate members and

thereby deprives BCBSM of the fundamental right
to select its own management . . . [and that]
[t]hese changes substantially impair the object of
BCBSM's charter and deprive BCBSM . . . of vested
rights thereunder." Again, however, BCBSM fails to
cite to this Court the provisions of its contract
with the state that have been purportedly im-
paired. Nonetheless, for purposes of the discussion
that follows, we will assume that BCBSM is refer-
ring to: Article V of the restated articles of incor-
poration, which states that directors shall be cho-
sen in accordance with the bylaws; Article IV of
the restated articles of incorporation which states
that the members shall be chosen in accordance
with the bylaws; and the relevant articles and
sections of the bylaws pertaining to the selection
of the board of directors and corporate member-
ship. See Articles I and IV of BCBSM's bylaws.

In any event, we disagree with BCBSM's conten-
tions.

Although to a certain extent the provisions in
question impair BCBSM's right to select its own
corporate management, we do not find this impair-
ment to be substantial.

Under the existing contract with the state, the
method of selection of BCBSM's directors and mem-
bers were specified in the bylaws, the establish-
ment of which was in the corporate members'
exclusive domain, subject, however, to the ap-
proval of the commissioner and the Attorney Gen-
eral. Sections 301(6) and 305(1) of PA 350 state
that the authority to establish the method of
selection of the non-public directors and members
shall be specified in the bylaws, which, in turn,
has been placed in the control of the board of
directors, subject as before to the Attorney Gener-
al's approval. See § 302.

While it is conceivable that under the new act

the newly constituted board of directors could again vest the members with the power to select the non-public corporate members and directors, it is also conceivable that the members could be dispossessed of such power by the board of directors. What 1980 PA 350 has in effect done is divest the members of the *sole authority* they previously possessed to determine the method of selection of BCBSM's corporate management by transferring the locus of control over the bylaws from the members to the directors. We do not perceive this change to be substantial especially given the fact that BCBSM's bylaws have always been subject to extensive state regulation. The members took their position with knowledge of the regulatory powers of the state over the corporation's bylaws.

BCBSM further contends that 1980 PA 350's legislatively mandated structure of the board of directors and corporate members has impaired BCBSM's contractual right to "control its own corporate structure . . . and to thereby control its own corporate destiny." We assume that by this BCBSM means that it does not have the right to control its destiny because to a significant extent it does not have the right to determine the composition and size of its board and corporate body. While we agree that BCBSM's right to determine the size and composition of its board and corporate body has been limited, we do not think that such limitation substantially impairs any existing contractual right.

Section 301(1) states that the board shall have thirty-five directors. Article IV of BCBSM's bylaws provides that the board shall consist of forty-seven members. We fail to see how this substantially impairs the state's contract with BCBSM. Significantly, the health care industry is and always has been subject to heavy regulation. See *Blue Cross &*

*Blue Shield of Michigan v Ins Comm'r, supra.* See also *Energy Reserves Group, Inc v Kansas Power & Light Co, supra.* Supervision of the industry has been extensive and intrusive. Moreover, the provision in question does not divest BCBSM of any previously possessed power, nor does it impede BCBSM's ability to conduct its affairs. Nor, by the same token, has the basic structure of BCBSM or its board of directors been unreasonably altered. In this light, the mere reduction in the size of the board of directors can hardly be considered a substantial impairment.

A similar analysis is applicable to § 301(2), which authorizes the Governor to appoint four directors, and § 301(3)-(5), which requires that a certain number of directors be chosen from various enumerated groups. Again, it is significant that the health care industry has been heavily regulated. Additionally, § 301(2)-(5) is substantially the same as Article IV of BCBSM's bylaws. See also 1939 PA 108, § 8; 1939 PA 109, § 2. That article specifies a board composition much the same as that required by § 301(2)-(5).

The only real differences are that under § 301 the state is given four appointees as opposed to two under Article IV, and that § 301 mandates a slightly higher percentage of consumer representation on the board than is required under Article IV. We do not perceive either of these differences as crucial. Four appointees on a thirty-five member board as opposed to two on a forty-seven member board cannot substantially change BCBSM's ability to operate. There are still thirty-one non-public board members, who can, needless to say, override any opposition from the four public members. Hence, we find it difficult to say that BCBSM's corporate structure has been substantially altered or that the ability of the board to indepen-

dently manage BCBSM has to any significant degree been impaired.

With respect to the increase in consumer representation, we again perceive the difference as insignificant. On the old board twenty-seven of forty-seven directors represented consumers. On the board established under 1980 PA 350, consumers must occupy approximately twenty-six of the thirty-five positions. While consumer representation has been increased accordingly (in the boards under both laws, consumers are a majority), we are unable to see how this change would substantially impede BCBSM's ability to manage its affairs. By the same token, we are unable to see how such an increase substantially impairs the corporate structure of BCBSM. Although the composition of the board has been changed, the basic operation thereof has not been substantially impeded.

Section 305(1) is no more intrusive than the sections previously discussed. That section merely requires that the corporate body be twice the size of the board, that the members be selected in the same manner as the directors, and that there be eight government appointees, four of whom must be the appointed directors.

Again, we must keep in mind the fact that this industry has been subject to broad and intrusive regulation. While the size of the corporate body was set at ninety-three under Article I of the bylaws, twice the size of the board established under those same bylaws, we do not perceive the reduction in corporate body size to seventy to be significant for the reasons discussed in connection with the board size. Finally, we note that the state's authority to appoint eight members to the corporate body rather than the four it was empowered to appoint under Article I of the bylaws does not significantly affect the corporation's power to

govern itself and that, for the reasons discussed in connection with board appointees, we are unable to find any substantial impairment.

Even had we found that §§ 301(1)-(5), (7), and 305(1) substantially impaired BCBSM's contract with the state, we still would have upheld their constitutionality under the latter part of the balancing test. See Part II(B). To the extent that it can be argued that §§ 301(1)-(5), (7), and 305(1) impair BCBSM's contractual interests, those sections rest upon and are prompted by significant and legitimate state interests. See *Energy Reserves Group, Inc v Kansas Power & Light Co, supra.*

As noted in the preceding section, in recent years BCBSM has been the subject of considerable controversy. There is evidence that BCBSM has been unresponsive to consumers' interests. Moreover, critics have charged that BCBSM has not been vigorous in its cost containment efforts.[26] The primary reason for these deficiencies is alleged to be that BCBSM has been subject to undue and excessive provider and management influence.[27] Sections 301(1)-(5), (7), and 305(1) were designed to ensure a responsive and accountable corporate membership and board, and to prevent the undue influence of certain groups.

We find these interests both legitimate and significant. BCBSM has an enormous effect on the lives of the people of this state and on the operation of the state's business, by virtue of its dominant share of the health care market.[28] Hence, its commitment, accountability, and responsiveness to the people it serves should be unwavering. In this

[26] See n 17.

[27] See Circuit Court's Findings of Relevant Facts, Nos. 3(h), (i); Defendant's Exhibit 96, "SAS" Senate Analysis Section report on House Bill 4555 (Substitute S-1).

[28] See Circuit Court's Findings of Relevant Facts, No. 3(a).

light, we hold that the state has demonstrated both a legitimate and significant interest in securing a membership and board selection and composition that is more representative of the interests to be served.

Finally, we believe that the means chosen to implement these purposes were reasonable and of a character appropriate to the legitimate public purpose noted above. See *Energy Reserves Group, Inc v Kansas Power & Light Co, supra;* see also *Van Slooten v Larsen, supra; Metropolitan Funeral System Ass'n v Ins Comm'r, supra.* The Legislature has sought to reduce the ability of providers and management to dominate BCBSM and perpetuate their position by requiring broad-based representation and limiting incumbent members' right to participate in elections. In addition, the Legislature has sought to set the framework for a more responsive BCBSM by increasing the representation of the individuals BCBSM was designed to serve, the consumers. In seeking these objectives, the Legislature has moved to provide all interested parties with an equitable opportunity to influence the selection process and subsequent managerial policies by providing for the participation of all component groups. While the predominance of management and provider groups in the corporation was the source of the perceived problem, their participation has not been eliminated, but rather reduced and more closely regulated. Thus, the state has sought to control the root of the problem and, without excluding individuals with an interest in BCBSM's operations, devise a system to ensure the representation of all interests BCBSM was designed to serve.

We thus determine that with respect to the above provisions there is not an unconstitutional

impairment of the public contract as claimed by
BCBSM.

(5) *§§ 504(1), 505-513—Power of the Commissioner Over Provider Reimbursement Contracts*

BCBSM finally asserts that §§ 504(1) and 505-513
of 1980 PA 350, pertaining to regulation of provider reimbursement contracts, unconstitutionally
impair its contract with the state as embodied in
1939 PA 108 and 109 by giving the Commissioner
of Insurance dictatorial power over BCBSM's provider contracts and methods of provider reimbursement and by imposing vague[29] and unachievable
goals upon BCBSM.

With the passage of 1980 PA 350, the Legislature sought to remedy the crisis of spiraling health
care costs by establishing the following goals:

Sec. 504. (1) A health care corporation shall,
with respect to providers, contract with or enter
into a reimbursement arrangement to assure subscribers reasonable access to, and reasonable cost
and quality of, health care services, in accordance
with the following goals:

(a) There will be an appropriate number of
providers throughout this state to assure the availability of certificate-covered health care services to
each subscriber.

(b) Providers will meet and abide by reasonable
standards of health care quality.

(c) Providers will be subject to reimbursement
arrangements that will assure a rate of change in
the total corporation payment per member to each
provider class that is not higher than the compound rate of inflation and real economic growth.

Pursuant to 1980 PA 350, a health care corporation, such as BCBSM, negotiates and enters into

---

[29] For a discussion of these sections in relation to BCBSM's vagueness
challenge see Part IX.

provider class plans which must at a minimum address the access, quality, and cost goals of § 504(1). The plan is allowed to operate free of government interference for the first two years (three years, forty-five days, if the provider is reimbursed on a prospective basis, *i.e.*, hospitals), §§ 506, 509(1). If after this period of time the commissioner determines that the goals have been substantially met or that failure to satisfy any one of the goals is reasonably excused, BCBSM is permitted to negotiate new plans or continue existing plans for another two years without government involvement, §§ 509, 510. If, however, the commissioner determines the goals have not been satisfied, the commissioner's power to review and correct any deficiencies in the plan is triggered, §§ 510-513. BCBSM then has the right to appeal the commissioner's ruling to an independent hearing officer, § 515. The act provides for greater input and participation by providers and subscribers from the negotiation to the review stages of the provider class plan, §§ 505, 507, 508, 511, and 515.[30]

Under the former enabling acts, 1939 PA 108 and 109, the commissioner's continuing regulatory authority over BCBSM was limited to approving or disapproving rates for hospital services, not for physician services, according to a "fair and reasonable" standard. See *Blue Cross & Blue Shield of Michigan, supra,* pp 431-432. By contrast, 1980 PA 350 expands the commissioner's statutory authority to review rates of physician as well as hospital services and expressly delineates the factors and criteria to guide the commissioner in exercising

---

[30] BCBSM asserts that it cannot even begin to assess the increased regulatory and administrative expenses it will incur in order to comply with these provisions mandating provider and subscriber input procedures. However, because BCBSM is unable to substantiate this assertion by any concrete proof on the record, we reject it as too speculative.

this power. Additionally, the new act not only empowers the commissioner to approve or disapprove BCBSM's provider class plans, but also to prepare a provider class plan which meets the § 504(1) goals where the corporation fails to overcome the plan's deficiencies within a specified time. The commissioner's proposed plan will then be placed in effect unless BCBSM invokes its right to appeal the commissioner's ruling to an independent hearing officer. See § 513(2)(a). The statute further provides for judicial review of the hearing officer's decision. See §§ 501(2), 502(7), and 518.

Although 1980 PA 350 broadens and clarifies the commissioner's statutory powers from those possessed under 1939 PA 108 and 109 in the above respects, it limits the commissioner's powers in other respects. For instance, the commissioner cannot exercise these regulatory powers for two years (three years, forty-five days, for hospitals), and, if BCBSM in that time sets up a satisfactory provider reimbursement system, the commissioner has no occasion to exercise these powers at all. This is far short of the BCBSM alleged dictatorial powers of the commissioner.

In light of the above and especially given the fact that BCBSM's provider reimbursement arrangements at least as to hospital charges have always been subject to the commissioner's continuing statutory authority, we find that 1980 PA 350's broadening of the commissioner's scope of authority over provider class plans does not substantially impair BCBSM's contract with the state.

Even had we found a substantial impairment, we would nevertheless uphold these sections because they are prompted by a significant and legitimate public purpose and the means chosen are reasonably tailored to achieve the legitimate public purpose. See Part II(B).

As previously indicated, the provider reimbursement sections of 1980 PA 350 were implemented for the primary purpose of ensuring all subscribers reasonable access to, and reasonable cost and quality of, health care services. The promotion of the health and general welfare of citizens is a matter of unquestionable state concern. See Const 1963, art 4, § 51; *W A Foote Memorial Hospital, Inc v City of Jackson Hospital Authority,* 390 Mich 193, 209-210; 211 NW2d 649 (1973), quoting from *Ecorse v Peoples Community Hospital Authority,* 336 Mich 490, 501; 58 NW2d 159 (1953); *Birth Control Centers, Inc v Reizen,* 508 F Supp 1366, 1386 (ED Mich, 1981). Hence, the purpose behind these provisions of 1980 PA 350 is both a significant and legitimate one.

Further, we believe that the means chosen to implement this public purpose are reasonable and of a character appropriate to that purpose. To support this conclusion, the circuit court found that an estimated $137 million would have been saved, a saving of approximately eight percent, if over the past four years the rate of health care costs had been capped at the rate of real economic growth multiplied by the rate of inflation as provided for in 1980 PA 350.[31] Both parties acknowledge the fact that one of the principal causes of skyrocketing health care costs is over-utilization of services. Although BCBSM does not have control over some of the factors which drive up health care costs, it does have the ability, at least in part, to reduce utilization.[32] It is widely recognized that

[31] See Circuit Court's Findings of Relevant Facts, No. 522.

[32] In the past few years, BCBSM has voluntarily implemented programs which attempt to control the utilization of health care services. Among BCBSM's cost containment programs is the replacement of the fee-for-service system, a method which in effect rewarded providers for increased utilization, with the prospective reimbursement system for hospitals' services and the Michigan Variable Fee system for

the health care system does not, and has not, operated as a competitive market. The lack of a competitive market results in less incentive to reduce costs.[33] What 1980 PA 350 attempts to do is provide greater incentives for BCBSM to use its dominant market position to engage in more effective cost containment programs.

As noted earlier, the regulatory structure of 1980 PA 350 is far short of a totally government-controlled system. Rather, it employs means which combine both free market and government intervention systems. Pursuant to 1980 PA 350, BCBSM is given the opportunity to formulate its own cost containment programs in accordance with the goals of the act. Only if BCBSM is unsuccessful in its efforts will the government step in. We find these means to be reasonable and necessary to accomplish the valid public purpose of the act.

For these reasons, we sustain 1980 PA 350's provider reimbursement regulatory scheme against the challenge on impairment of contract grounds.

### D. Conclusion as to Cumulative Effect of Challenged Sections

Thus, having concluded that the challenged sections of 1980 PA 350, when considered separately, do not unconstitutionally impair BCBSM's existing contract with the state, we further hold that the cumulative effect of these sections does not amount to a substantial impairment of the public contract here in question.

physicians' services. However, the testimony and the exhibits presented are conflicting as to whether BCBSM has been successful in its efforts to control utilization. See Circuit Court's Findings of Relevant Facts, Nos. 178, 188, 192, 196, 205, 206, 216-223.

[33] See Circuit Court's Findings of Relevant Facts, Nos. 175, 176; Testimony of Professor Paul J. Feldstein, Tr Vol 12, pp 2132-2135.

With respect to §§ 202(1)(d) and 401(2), BCBSM merely misinterpreted the statute; these sections add nothing to any cumulative effect. Sections 203, 301(2)-(5), (7) and 305 relate to the corporate structure and internal affairs of BCBSM. The net practical change effected by these sections is a change in degree, rather than a change in concept. Thus, there is no drastic change in regard to BCBSM's contract with the state. Sections 205(5), 504(1), 505-513, 607, and 608 relate to the commissioner's regulation of a health care corporation's way of doing business. While 1980 PA 350 extends the area of regulation over 1939 PA 108 and 109, the cumulative effect does not take away the corporation's initiation of its own business practices, but merely empowers the commissioner to regulate a somewhat broader area. The fact is that BCBSM has been subject to past government regulation since its inception. In consideration of these factors, we find that the cumulative effect of all the sections complained of does not create a degree of impairment sufficient to be considered substantial.

Even were we to find a substantial impairment, we would still uphold 1980 PA 350 because it was enacted for a legitimate and significant public purpose, namely "to promote an appropriate distribution of health care services for all residents of this state, . . . and to assure for nongroup and group subscribers, reasonable access to, and reasonable cost and quality of, health care services, in recognition that the health care financing system is an essential part of the general health, safety, and welfare of the people of this state," § 102(1). Indeed, the Legislature is constitutionally mandated to adopt appropriate measures to safeguard the public health. See Const 1963, art 4, § 51.

Finally, as evidenced by our analyses with respect to the individual sections, the means adopted

by the Legislature are reasonably related to the legitimate public purpose of the act. See Part II(B).

We thus reject BCBSM's claim that the challenged sections of 1980 PA 350, as a whole, fundamentally alter BCBSM's existing contract with the state so as to violate the state or federal Contract Clause.

### III. QUESTION 2

"II. DOES PA 350 DEPRIVE BCBSM OF LIBERTY AND PROPERTY WITHOUT DUE PROCESS OF LAW BY EFFECTIVELY CONVERTING A HERETOFORE PRIVATE CORPORATION INTO A PUBLIC, GOVERNMENTAL CORPORATION?"

BCBSM attacks 1980 PA 350 on the ground that certain mandatory provisions of the act, in effect, constitute a government takeover of BCBSM by transforming it from a "private" corporation into an agency of the state government in violation of due process of law.[34] The crux of BCBSM's takeover argument is that:

By PA 350, the Michigan Legislature has charged BCBSM [A] with the responsibility for formulating and managing a health care system for the state under the superintending control of the Commissioner of Insurance. [B] It has created a legislatively mandated board of directors, with some seats guaranteed to various legislatively determined constituencies and others to political

---

[34] BCBSM cites many of the same sections of 1980 PA 350 in relation to its takeover claim as it challenged under its impairment of public contract claim. Because of this, our discussion will inevitably involve a certain amount of overlap. However, to avoid redundancy, we will refer to our previous discussion of these sections where appropriate.

In addition, nearly all the same sections BCBSM lists under its takeover argument of Question 2 are also encompassed under its due process claim of Question 5, with a few exceptions. In fact, Questions 2 and 5 are merely parts of the same due process challenge to 1980 PA 350.

appointees. [C] It has removed from BCBSM control over its composition, structure and corporate direction. [D] It has imposed on BCBSM the governmental responsibility of ensuring for *all people in the state* access to health care benefits at a fair and reasonable cost. [E] The Commissioner of Insurance is given peremptory power and authority over the managerial affairs of BCBSM, controlling: what lines of business it writes; what kinds of certificates it writes; all charges for those certificates; BCBSM's contracts with its participating providers; and all methods of provider reimbursement. These provisions of 1980 PA 350, when considered *en masse,* amount to a governmental coup. [Emphasis in the original.]

We reject BCBSM's argument on the ground that BCBSM's construction of the act is overblown and unsubstantiated as compared with what the statute actually provides. By examining BCBSM's allegations line by line against the exact statutory language of the act, the fallacy in BCBSM's interpretation becomes clear.

## [A]

After a thorough perusal of the numerous provisions of the act, we are unable to find any language, nor has BCBSM cited any, which delegates to BCBSM the responsibility for formulating and managing the state's health care system. We therefore dismiss BCBSM's first argument on the basis of our analysis under Part II(C)(1).

## [B]

We find BCBSM's next allegation that 1980 PA 350's legislatively mandated board of directors has removed from BCBSM control over its board structure and composition without due process of law to

be equally unfounded. BCBSM cites §§ 301(2) and 305(1), which permit the Governor to appoint members to BCBSM's governing bodies as indicia of a governmental taking. BCBSM argues that these provisions and the remaining sections of § 301 are onerous and interfere with managerial prerogatives. Hence, BCBSM concludes that there has been a taking without due process of law.

We disagree.

First we note that the mere fact that a regulation imposes a burden or expense upon the corporation, or subjects it to loss or inconvenience, does not make it a taking. See *Chesapeake & O R Co v Public Service Comm of West Virginia,* 242 US 603; 37 S Ct 234; 61 L Ed 520 (1917); *Southern Wisconsin R Co v City of Madison,* 240 US 457; 36 S Ct 400; 60 L Ed 739 (1916); *Missouri Pacific R Co v City of Omaha,* 235 US 121; 35 S Ct 82; 59 L Ed 157 (1914). We do not think that the action taken here constitutes a taking.

The state appointees constitute only a small voice on BCBSM's governing bodies, and the remainder of the requirements in no sense interfere with managerial discretion. The fact that some members and directors are required to be selected from certain groups is not so onerous as to constitute a taking. To require a membership and board of directors that is more representative of all component groups interested in BCBSM's operations does not amount to a government takeover of the corporation.

Moreover, for the very reasons discussed in Part II(C)(4), we find that §§ 301(1)-(5), (7) and 305(1) are reasonably related to a legitimate legislative objective. See *Shavers v Attorney General,* 402 Mich 554, 612-613; 267 NW2d 72 (1978). We uphold the constitutionality of those sections as against BCBSM's due process claim.

[C]

BCBSM alleges that 1980 PA 350 has effectively removed from BCBSM control over its corporate direction. Specifically, BCBSM argues that by stripping its corporate members of the power and authority they formerly had to amend, adopt, or repeal the bylaws and placing this power in the board of directors, § 302(1) of 1980 PA 350 constitutes a taking of BCBSM's property without due process of law.

We disagree.

Contrary to BCBSM's contention, the act does not remove control from BCBSM over its corporate direction, but instead shifts it from BCBSM's corporate members to its board of directors. While in some sense this can be deemed a loss of the members' unqualified right to control the corporation, it is clear that losses incident to the lawful exercise of the police power are noncompensable. See Nowak, Rotunda & Young, Constitutional Law (2d ed), pp 483-485; Sax, *Takings and the police power,* 74 Yale L J 36 (1964). The United States Supreme Court has consistently upheld government regulation which may result in the loss of use or economic exploitation of property of a private owner without requiring compensation where such regulation was justified as promoting the health, safety, morals, or general welfare of the public. See *Andrus v Allard,* 444 US 51, 64-68; 100 S Ct 318; 62 L Ed 2d 210 (1979); *Penn Central Transportation Co v New York City,* 438 US 104, 123-129; 98 S Ct 2646; 57 L Ed 2d 631 (1978).

In *Penn Central, supra,* p 124, the Court identified several factors to determine when a regulatory measure rises to a "taking" in violation of the Fifth Amendment:

The economic impact of the regulation on the

claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good. [Citations omitted.]

Under the circumstances in the instant case, the regulation in question does not amount to a "taking." The members of BCBSM, unlike stockholders of a corporation, have no "investment-backed expectations" in their unqualified right to control BCBSM. BCBSM points to no discernible monetary or other equitable interest of the members in BCBSM, which give rise to an investment-backed expectation. While several hospitals and the Michigan Medical Society did advance money for working capital for the predecessors of BCBSM, this money was advanced in the form of a loan and it seems has in fact been repaid. Further, the regulation cannot be characterized as a "physical invasion by government" over BCBSM's corporate direction. The purpose of this provision transferring control over BCBSM's bylaws from the members to the directors is to promote the interests of all component groups BCBSM was designed to serve and to reduce the possibility of any one group gaining unassailable dominance over the corporation. We fail to see how this provision constitutes a governmental "taking" of BCBSM's property.

### [D]

BCBSM's fourth allegation that the act burdens it

with the duty to ensure access to health care benefits at a fair and reasonable cost for all people of the state is another example of BCBSM's misinterpretation of the applicable statutory language. A proper interpretation of the act indicates that the Legislature intended BCBSM to secure the opportunity for access to health care services at a fair and reasonable price "for all of the people of this state *who apply for a certificate,"* § 202(1)(d)(ii). We are unable to discern how this provision imposes upon BCBSM an exclusively governmental function. See Part II(C)(1).

[E]

We also reject BCBSM's final allegation that 1980 PA 350 gives the Insurance Commissioner peremptory power over the managerial affairs of BCBSM with respect to what lines of business it writes, types of and rates for subscriber certificates, participating provider contracts, and methods of provider reimbursement. Again, BCBSM presents a distorted view of the actual statutory provisions. Under our interpretation of the act, BCBSM's managerial power over its lines of business, subscriber certificates, and provider reimbursement contracts has not been preempted by the Insurance Commissioner. BCBSM still has the power to establish its lines of business, § 205(4), to establish and set rates for subscriber certificates, § 607(1), to enter into provider class plans, § 502(1), and to formulate its methods of provider reimbursement in accordance with the "access," "quality," and "cost" goals of the act, § 504(1). The Insurance Commissioner's authority under 1980 PA 350 with respect to the affairs of BCBSM is regulatory not peremptory.[35]

---

[35] For the commissioner's statutory authority with respect to a health care corporation's lines of business, see § 205(5); rates of

We note that under 1939 PA 108 and 109, the commissioner exercised regulatory power over issuance of subscriber certificates, 1939 PA 108, § 5, 1939 PA 109, § 6, rates of those certificates, 1939 PA 109, § 3, and hospital reimbursement arrangements, 1939 PA 109, § 3. See generally *Blue Cross & Blue Shield of Michigan, supra.* Moreover, regulatory power was also exercised over lines of business.[36] While in certain respects the commissioner's regulatory powers over BCBSM have been broadened and clarified under 1980 PA 350,[37] they are for all intents and purposes coextensive with those the commissioner previously possessed under 1939 PA 108 and 109. Management of the corporation, however, continues to be entrusted to BCBSM's board of directors, subject as always to the regulatory authority of the Insurance Commissioner. See § 301(1); see also *Blue Cross & Blue Shield of Michigan, supra,* p 429.

Thus, we find BCBSM's claim that the challenged provisions of 1980 PA 350, in whole or in part, constitute a takeover of BCBSM by transforming it from a "private" corporation into a government entity without due process of law to be completely unsound.

## IV. QUESTION 3

"III. DOES PA 350 CONSTITUTE AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY TO BCBSM AND OTHER PRIVATE PERSONS?"

BCBSM further challenges 1980 PA 350 as an unconstitutional attempt by the Legislature to delegate legislative power to BCBSM and private

subscriber certificates, see § 607(3); provider class plans, see §§ 509-513.

[36] See n 24.

[37] See n 35.

individuals. Bcbsm claims that three areas in the statute permit such a delegation: the alleged directive to bcbsm to establish a statewide health care financing system, the creation of a panel of three actuaries to resolve risk factor disputes, and the appointment of independent hearing officers to settle rate challenges. We find only § 205(6), which establishes the actuary panel, to be constitutionally infirm.

### A. *Statewide Health Care Financing System*

As a threshold matter, bcbsm asserts that the essential purpose of the statute is to thrust upon bcbsm the "legislative task of formulating a health care finance system for *all* persons in the State of Michigan." Bcbsm argues that the policy formulation entailed in the establishment of a statewide health care financing program may not be delegated to a private corporation.[38]

However, we may speedily dispose of this delegation challenge for the simple reason that the statute makes no attempt to establish a statewide health program, much less delegate the development and administration of the program to bcbsm. See Part II(C)(1).

### B. *Actuary Panel—§ 205(6)*

Bcbsm next challenges § 205(6), which estab-

[38] As evidence of this delegation, bcbsm primarily relies on § 202(1)(d)(*iii*) which directs a health care corporation to include in its articles of incorporation a provision assuring all subscribers "reasonable access to, and reasonable cost and quality of, health care services."

Bcbsm also alludes to many of part 5 of the act's provisions regarding contracts between bcbsm and health care facilities and professionals. However, these sections' references to reasonable cost, quality, and access have no bearing on the creation *vel non* of a health care system to encompass the entire state. The articulated goals only apply to bcbsm's relationship with its subscribers.

lishes a panel of three actuaries to resolve risk factor disputes. BCBSM charges that § 205(6) is an unconstitutional delegation of legislative authority in that it lacks adequate standards to guide the panel's action.[39]

Challenges of unconstitutional delegation of legislative power are generally framed in terms of the adequacy of the standards fashioned by the Legislature to channel the agency's or individual's exercise of the delegated power. See, *e.g., Osius v St Clair Shores,* 344 Mich 693, 698; 75 NW2d 25 (1956). Although for many years this and other courts evaluated delegation challenges in terms of whether a legislative (policymaking) or administrative (factfinding) function was the subject of the delegation, this analysis was replaced by the "standards" test as it became apparent that the essential purpose of the delegation doctrine was to protect the public from misuses of the delegated power. The Court reasoned that if sufficient standards and safeguards directed and checked the exercise of delegated power, the Legislature could safely avail itself of the resources and expertise of agencies and individuals to assist the formulation and execution of legislative policy.

The criteria this Court has utilized in evaluating legislative standards are set forth in *Dep't of Natural Resources v Seaman,* 396 Mich 299, 309; 240 NW2d 206 (1976): 1) the act must be read as a whole; 2) the act carries a presumption of constitutionality; and 3) the standards must be as reasonably precise as the subject matter requires or permits. The preciseness required of the standards will depend on the complexity of the subject. *Argo*

[39] BCBSM further alleges that § 205(6) delegates legislative policymaking power to unaccountable private persons. However, our analysis of the standard's challenge obviates the need to address BCBSM's accountability argument.

*Oil Corp v Atwood,* 274 Mich 47, 53; 264 NW 285 (1935). Additionally, due process requirements must be satisfied for the statute to pass constitutional muster. *State Highway Comm v Vanderkloot,* 392 Mich 159, 174; 220 NW2d 416 (1974). Using these guidelines, the Court evaluates the statute's safeguards to ensure against excessive delegation and misuse of delegated power.

BCBSM complains that § 205(6) contains "absolutely no standards" to guide the actuaries in their determination of risk factors. We generally agree.

(1) *The Statute*

"Risk factor" is defined in § 205(13)(c) as "the relative probability of loss associated with a given line of business, expressed as a percentage of incurred claims and incurred expenses for a calendar year." Sections 205(4), (5), and (6) establish a three-part procedure to formulate risk factors.

First, the health care corporation must assign a risk factor for each line of the corporation's business. Section 205(4) directs that the risk factor "shall be established in accordance with sound actuarial practices. . . ."

Second, the Insurance Commissioner must either "approve" or "disapprove" the factors proposed by the health care corporation, § 205(5). No guidelines are provided to direct the Insurance Commissioner's response.[40]

Third, if the risk factors are disapproved, a panel of three actuaries "shall determine a risk

---

[40] Section 205(5) provides:

"Within 30 days after receipt of the risk factors filed pursuant to subsection (4), the commissioner shall do 1 of the following:

"(a) Approve the factors and proceed under subsection (7).

"(b) Define 1 or more additional lines of business, transmit the definitions to the health care corporation, and request that the corporation establish risk factors for those additional lines. . . .

"(c) Disapprove the factors, and proceed under subsection (6)."

factor for each line of business," § 205(6). No fur-
ther directions are set forth to guide the panel.

The act provides no administrative or judicial
review to challenge either the Insurance Commis-
sioner's or the actuary panel's decision.

(2) *Adequacy of the Standards*

In order to properly evaluate BCBSM's contention
that the act provides "absolutely no standards to
guide these ad hoc actuaries," each of the interre-
lated procedures must be examined.

The only direction given to the health care
corporations is that "sound actuarial practices"
shall be used. Yet this apparently broad, general
directive in fact invokes a body of guidelines.

Determination of risk factors is an integral part
of actuarial science. Guidelines to standardize this
statistical determination are published by the soci-
ety of actuaries and the casualty actuarial society.
Of course, determination of risk factors is not a
mechanical calculation; there is no *one* correct
risk factor because there is no *one* correct actuari-
ally sound method of computation. See Beard,
Pentikainen & Pesonen, *Risk Theory* (London:
Methuen & Co Ltd., 1969); *cf. Kosa v State Trea-
surer,* 408 Mich 356, 372-373; 292 NW2d 452
(1980). Nonetheless, given the technical nature of
actuarial science and the body of guidelines pro-
mulgated by the professional associations, the sec-
tion provides a set of concrete standards to guide
and constrain the health care corporations' ac-
tions.

In contrast, the power delegated to the Insur-
ance Commissioner is completely open-ended. The
commissioner is starkly directed to "approve" or
"disapprove" the proposed risk factors; the basis of
the evaluation is not addressed. In fact, it is impos-
sible to determine even the nature of the Insur-
ance Commissioner's inquiry—whether the com-

missioner is deciding (1) that the health care corporation's proposed risk factors are actuarially sound, or (2) that, although the proposed factors are actuarially sound, a different set of actuarially sound risk factors are preferred by the commissioner.[41]

This ambiguity is central to the dispute; the nature of the inquiry considerably alters the standards required to prevent an abuse of discretion. For instance, if the Insurance Commissioner merely reviews the proposed factors to ensure that they are in accordance with sound actuarial practices, it is unlikely that any further standard is required. If, however, the Insurance Commissioner may reject actuarially sound risk factors proposed by the health care corporation simply because of a preference for alternate risk factors, some criteria must be included to guide the Insurance Commissioner's preference of one risk factor over another. Without additional standards, the Insurance Commissioner has de facto veto power over the health care corporation's risk factors. This lack of clarity regarding the Insurance Commissioner's function permits the Insurance Commissioner to define the authority of the commissioner. Finally, the ambiguous nature of the Insurance Commissioner's inquiry affects the function of the actuary panel. If the commissioner's power is confined to vetoing actuarially unsound risk factors, the directive to the panel to establish actuarially sound risk factors, without more, may sufficiently tailor the panel's inquiry to pass constitutional muster. On

_____

[41] We note that the requirement of actuarially sound practices is not included in § 205(5). However, a reasonable reading of the act as a whole warrants the incorporation of the requirement. It is unrealistic to expect the Legislature to require actuarially sound risk factors of the health care corporation, but to omit this practical, and fiscally sound, requirement with regards to the Insurance Commissioner and the actuary panel.

the other hand, it is equally plausible to read the panel's function as an arbitration procedure: the panel must choose between the factors proposed by the corporation and the Insurance Commissioner, or reject both and choose a third risk factor. If this is the function delegated to the panel, the standards provided are wholly inadequate. The act is completely devoid of any indication why one factor should be preferred over another; no underlying policy has been articulated, nor has the Legislature detailed the criteria to be employed by the panel in making this determination.[42] This complete lack of standards is constitutionally impermissible. *Osius v St Clair Shores, supra.*

Thus, the lack of standards defining and directing the Insurance Commissioner's and the actuary panel's authority renders this dispute resolution mechanism constitutionally defective.

### C. *Hearing Officers—§§ 514 and 613*

Finally, BCBSM argues that the Legislature unconstitutionally delegated authority to the hearing officers who resolve part 5 rate disputes, § 514, and rate filing disputes, § 613, because they are "wholly unaccountable to anyone." We disagree.

### (1) *§ 514*

Very briefly, § 514 provides that all appeals under part 5 of the act (which deals with contracts between the health care corporation and health care facilities and professionals) shall be held before an independent hearing officer. The appeals may be brought to review various actions or determinations of the Insurance Commissioner.

The selection of the hearing officers is quite detailed. Section 514 directs the State Court Ad-

---

[42] Nor does the defendant offer any suggestion. In fact, defendant agreed at one hearing that the section was unconstitutional.

ministrator to compile a list of possible officers who meet certain qualifications: the hearing officer must be a retired circuit court judge, a Michigan resident not involved in the provision of health care services and not an employee or officer of a health care provider or health care corporation or an employee of the state. The hearing officers are randomly selected from the compiled list by the Insurance Commissioner; they serve per appeal.

BCBSM articulates its challenge to the section:

> Basic determinations with respect to provider class plans, which control BCBSM's contracts and reimbursement arrangements with health care providers, are placed in the hands of hit and run "independent hearing officers" (§ 514) who are again wholly unaccountable to anyone, who are not members of any public body, and who are not removable by any public representative.

We must disagree with BCBSM's claim. The hearing officers' fidelity to the statutory role assigned them is monitored in several ways. First, § 514(4) requires the Insurance Commissioner to report to the appropriate legislative standing committees information on the hearing officers' performance. The data include: the number of appeals heard; the nature of the controversy; the disposition of the appeal; the existence of a judicial appeal, and its result. One may safely assume that the legislative committee will review this information and alter the statute if the hearing officers do not act in conformity with the statute.

Second, the list of possible hearing officers is compiled by the State Court Administrator, a person appointed by and thus responsible to the Supreme Court, an elected body. One may assume that the State Court Administrator will thus carefully select the hearing officer candidates and

attentively monitor their performance. Also, contrary to BCBSM's contention, the individuals may be removed from the list of potential hearing officers at the discretion of the State Court Administrator.

Third, the hearing officers' decisions are not immune from challenge. The statute specifically provides for judicial review of the hearing officers' decisions, §§ 501(2), 502(7). Section 518 provides:

> An appeal from a final determination of an independent hearing officer shall be conducted pursuant to chapter 6 of the administrative procedures act, except that the appeal shall be taken within 30 days after the final determination, upon leave granted, in the court of appeals.

Chapter 6 of the Administrative Procedures Act, MCL 24.301-24.306; MSA 3.560(201)-3.560(206), sets forth the procedures to be followed for direct review by the courts of an administrative decision. The court's standard of review is carefully delineated:

> (1) Except when a statute or the constitution provides for a different scope of review, the court shall hold unlawful and set aside a decision or order of an agency if substantial rights of the petitioner have been prejudiced because the decision or order is any of the following:
> (a) In violation of the constitution or a statute.
> (b) In excess of the statutory authority or jurisdiction of the agency.
> (c) Made upon unlawful procedure resulting in material prejudice to a party.
> (d) Not supported by competent, material and substantial evidence on the whole record.
> (e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion.
> (f) Affected by other substantial and material error of law. [MCL 24.306; MSA 3.506(206).]

This provision ensures that the reviewing court has broad enough authority to rectify a decision of a hearing officer which is repugnant to or in contravention of the statute.

This avenue of judicial review, in conjunction with the Legislature's express intent to review the hearing officers' performance and the State Court Administrator's interest in recommending only qualified individuals, contradicts BCBSM's assertion that the hearing officers are "wholly unaccountable"; the hearing officers' decisions will be measured against the statutory requirements to ensure against abuse of the delegated authority.

*(2) § 613*

Finally, BCBSM focuses on § 613 which provides for independent hearing officers to conduct hearings between the health care corporation and the requesting party on whether proposed rate filings meet the requirements of the act. Again, BCBSM alleges that the independent hearing officers are wholly unaccountable. We disagree.

Section 613(1) directs that the independent hearing officer shall be appointed by the Insurance Commissioner, an appointee of the Governor with the consent of the Senate. MCL 500.202; MSA 24.1202. The individual appointee must meet certain criteria:

> In appointing an independent hearing officer, the commissioner shall select a person qualified to conduct hearings, who has experience or education in the area of health care corporation or insurance rate determination and finance, and who is not otherwise associated financially with a health care corporation or a health care provider. The person selected shall not be currently or actively employed by this state.

The independent hearing officer must conduct the

hearing according to the Administrative Proce-
dures Act, § 613(2). Within thirty days after re-
ceipt of the hearing officer's proposed decision, the
Insurance Commissioner shall render a decision
which includes a statement of findings, § 613(4).
The commissioner's decision may be reviewed di-
rectly by the courts, § 615. Thus, the hearing
officers' decisions are filtered through the politi-
cally and judicially accountable Insurance Com-
missioner. This procedure provides sufficient
checks on the delegation of legislative power. The
Legislature has included adequate safeguards to
restrain the hearing officers from abusing or mis-
using the delegated power.

## V. QUESTION 4

"IV. DO SECTIONS 203, 206(4), 211, 301(7), 302(1),
305(1), 509(4)(b), 510 AND/OR 516(2)(b) OF PA 350
UNCONSTITUTIONALLY IMPAIR PRIVATE, VESTED CON-
TRACT RIGHTS BETWEEN BCBSM AND ITS MEMBERS,
PARTICIPATING PROVIDERS AND CUSTOMERS?"[43]

BCBSM also contends that certain sections of
1980 PA 350 unconstitutionally impair the private
contract rights between BCBSM and its corporate
members, its subscribers, and providers.

We note that the test stated in Part II(B), for
analyzing BCBSM's impairment of public contract
claim is equally applicable for adjudicating this
impairment of private contract challenge. See

---

[43] We note that BCBSM's use of the phrase "and/or" in this certified
question and the succeeding questions 6 through 8, Parts VII-IX, does
not necessarily require us to address the cumulative effect of the
particular sections challenged as to each question since BCBSM does
not specifically argue this point in its brief. Rather, we take this
phrase to mean that some or all of the challenged sections may be
unconstitutional but we need not consider whether cumulatively they
are constitutionally infirm. Only with respect to questions 1 and 2,
Parts II and III, does BCBSM make this cumulative effect argument in
its brief.

*United States Trust Co v New Jersey,* 431 US 1, 25-26; 47 S Ct 1505; 52 L Ed 2d 92 (1977).

## A. *§§ 203, 302(1)*

BCBSM argues that § 203, which places the *power to amend the restated articles of incorporation in the board of directors,* impairs the corporate members' contract with the state and corporation as embodied in 1939 PA 108 and 109 and the restated articles of incorporation. Under 1939 PA 108, § 4, 1939 PA 109, § 5 and Article VIII of the restated articles of incorporation, the corporate members are empowered *to amend the restated articles of incorporation.* BCBSM contends that this shifting of authority from the corporate membership to the board of directors operates to impair the members' contract with BCBSM and the state.

BCBSM similarly argues that § 302(1), which places the *power to adopt, repeal, and amend the bylaws in the board of directors,* violates the members' contract with the state and corporation as embodied in the restated articles of incorporation and the bylaws. Article VII of the restated articles empowers the board of directors to adopt, amend, and repeal the bylaws as provided therein. Article IX of the bylaws states that the board has such power except as to *Articles I, II, IV, and IX of the bylaws which can only be amended or repealed by the corporate members.* Consequently, BCBSM contends that as to those articles this shifting of authority from the corporate members to the board divests the former of their previously held authority and thereby impairs the corporate members' contract with the state and the corporation.

In scrutinizing Contract Clause claims under the state and federal constitutions, our first inquiry is whether the enactment operates to substantially

impair a contractual relationship. Second, in determining the severity of the impairment, a critical factor is whether the industry has been regulated in the past. Third, if the impairment is minimal, our inquiry ends. Fourth, if, however, we find a substantial impairment, we must ascertain, (a) whether there is a significant and legitimate public purpose behind the regulation and, (b) if so, whether the means adopted are reasonably related to the public purpose. See *Energy Reserves Group, Inc v Kansas Power & Light Co, supra,* pp 411-412. See also Part II(B).[44]

As to whether §§ 203 and 302(1) *substantially* impair the members' contract with the state and the corporation, we are not convinced that they do. We acknowledge that the corporate members have been divested of the direct power they formerly held to alter the articles and bylaws, and that this is a considerable impairment. Nevertheless, we are unpersuaded that this impairment is substantial where the industry has been state regulated.

It is a fact that BCBSM is and always has been subject to regulation by the commissioner and Attorney General over its articles and bylaws. See 1939 PA 108, §§ 3-5; 1939 PA 109 §§ 4-6. This regulation has been extensive and intrusive. The members of BCBSM became members with the knowledge that BCBSM has been so regulated. We thus find it difficult to qualify the impairment here as substantial.

Even had we found that §§ 203 and 302(1) operated to substantially impair the corporate members' contract with BCBSM and the state, we still would have upheld their constitutionality under 4(a) and (b) of our test. To whatever extent §§ 203

---

[44] We do not consider for purposes of determining whether there is a case or controversy the fact that the corporate members as such are not a party to this suit.

and 302(1) impair the corporate members' contractual interests, the impairment created by those sections rests upon and is prompted by significant and legitimate state interests.

As previously noted in Part II(C)(4), in recent years BCBSM has been the subject of considerable controversy. The evidence indicates that BCBSM has been unresponsive to consumers' interests. In addition, critics have charged that BCBSM has not been vigorous in its cost containment efforts. The main reason alleged for these deficiencies is that BCBSM has been subject to undue and excessive provider and management influence. Allegedly, management and provider influence has been primarily fortified in the corporate membership.

The corporate membership under 1939 PA 108 and 109 elects not only the board of directors, but new corporate members as well. See BCBSM's Restated Articles of Incorporation, Articles IV and V; BCBSM's Bylaws, Articles I and IV. By thus gaining control of the corporate membership, the providers and management have allegedly been able to improperly perpetuate their positions and effectively control BCBSM in derogation of other interests. Since the power to elect the corporate body and board is derived from the restated articles of incorporation and Articles I and IV of the bylaws, which only the corporate members have the authority to alter, no one has been able to overcome the influence of the providers and management. Sections 203 and 302(1) indicate, first, a legislative determination that it is unwise to vest one body with such control over elections and the power to alter the bylaws and articles and, second, a legislative purpose to change that.

We find that the legislative purpose is both legitimate and significant. Sections 203 and 302(1) operate to reduce the possibility that any one

group will dominate BCBSM in the future. Thus, they help to ensure the fair and equitable control of BCBSM by all interested parties. In this light, we hold that the state has demonstrated both a legitimate and significant purpose.

Finally, we believe that the means of implementation chosen were reasonable and of a character appropriate to the legitimate public purpose noted above. The Legislature has sought to reduce the ability of any one group to dominate and control BCBSM. Past experience is said to have shown that one group has been able to accomplish such domination because it was able to gain control of the corporate membership which possessed monopoly power over elections and the right to amend the bylaws and articles. The Legislature has eliminated the corporate membership's sole power to amend the bylaws and articles and has thereby reduced the opportunity for any one group to control BCBSM. Even if one group were able to again obtain control over the corporate membership, they would be unable to control BCBSM since any authority they possessed could be held in check by the board of directors' power to amend the bylaws and articles. However, we point out that the Legislature has not removed all of the corporate members' previously held authority, but merely the right to amend the articles and bylaws. Thus, we think that the means chosen to implement the legitimate governmental purpose are reasonable and of a character appropriate to that purpose.

We thus determine that with respect to the above provisions there is not an unconstitutional impairment of contract as claimed by BCBSM.

## B. §§ 301(7), 305(1)

BCBSM asserts that the restated articles of incor-

poration and the bylaws endowed the corporate membership *with the authority to select* BCBSM's *corporate membership and board of directors.* See BCBSM's Restated Articles of Incorporation, Articles IV and V; BCBSM's Bylaws, Articles I and IV. BCBSM further asserts that the articles of incorporation and the bylaws confer those rights upon the *corporate members* as a contractual right which the state has substantially impaired through the enactment of §§ 301(7) and 305(1).[45]

Section 301(7) restricts the right of the incumbent board of directors, corporate membership, management, and members of each, to participate as such in the board of directors' selection, allowing participation only to the extent that the individual is a subscriber or to the extent that participation does not involve nomination, endorsement, approval, or confirmation of a candidate or director. Section 305(1) declares that the non-public corporate membership shall be selected in the same fashion as the non-public members of the board as set forth in § 301.

Section 301 establishes the size and composition of the board of directors and provides that the method of selection shall be specified in BCBSM's bylaws. In addition to the foregoing, § 305(1) states that there shall be two non-public members for each non-public director. As to the public members, the four appointed directors under § 301(2) are also public members, and the Governor is authorized to appoint four additional public members, making a total of eight gubernatorially appointed public members.

Again, the first inquiry here is whether §§ 301(7) and 305(1) substantially impair the members' contractual relationship with BCBSM and the state.

---

[45] BCBSM does not make this argument with respect to § 301(1)-(5).

With respect to § 305(1), we recognize that it has in effect dispossessed the members of the *sole authority* they previously held to determine the method of selecting BCBSM's corporate membership since under 1980 PA 350 the method of selection is to be specified in the bylaws which are now in the control of the directors. As noted in the preceding section, BCBSM's bylaws have always been subject to extensive state regulation. The members acquired their positions with knowledge of this state regulation. In this light, we do not, therefore, find that this impairment of the members' direct power to control the method of selection to be substantial.

Another aspect of § 305(1) which could in any sense be labeled an impairment of the corporate members' right to select the corporate body is that portion which authorizes the appointment of eight public members, instead of four under the current system. The difference, however, between the number of appointments formerly authorized and the number now authorized is only four. The corporate body consists of seventy members. See 1980 PA 350, §§ 301(1) and 305(1). We again note that BCBSM has always been subject to broad and intrusive regulation. The members joined BCBSM with this knowledge. We therefore deem the impairment, if any, unsubstantial. In fact, we deem this conclusion so manifest that we need not address the question whether the state has a legitimate purpose and has employed means both reasonable and of a character appropriate to that purpose.

With respect to § 301(7), which limits participation of corporate members, board members, and management in the selection, we are again unpersuaded that a substantial impairment exists. Section 301(7) specifically exempts from its ambit of participation in the election the officer or em-

ployee of BCBSM who is authorized to serve as a member of the board of directors. See 1980 PA 350, § 301(4). In addition, the corporate members in their capacity as subscribers are permitted to participate in the election to the same extent as any other subscriber. As a matter of fact, corporate members are permitted to participate in the election in any capacity other than as one of the enumerated corporate officials. Finally, we note that even the proscription against participation by members only applies to the "nomination, endorsement, approval, or confirmation of a candidate or director." See Part X. In view of these limitations, and the fact that the members joined BCBSM with the knowledge that BCBSM has always been subject to broad and intrusive regulation, we are not convinced of the existence of a substantial impairment.

Nevertheless, even if we were convinced that a substantial impairment existed, we would still have upheld the constitutionality of § 301(7) under 4(a) and (b) of our test.

As to 4(a), to the degree that it can be argued that § 301(7) substantially impairs the members' contractual interests, that section rests upon and is prompted by significant and legitimate state interests. The corporate members of BCBSM are in a powerful position with regard to board elections. They are in a position to sway the election through the use of their corporate titles and the corporate facilities and resources. In an election, the mode of use typically takes the form of endorsement, nomination, approval, or confirmation. In this way corporate members may manipulate the election of a particular candidate, and in return acquire political debts from candidates who are aided by the members' support. This tends to directly undermine the integrity of the election,

and the responsibility of all those concerned for the successful functioning of that process. We think that the state's interest in preventing this possibility mandates a finding that § 301(7) rests upon and is prompted by a significant and legitimate state interest. See Part X.

Lastly, we find that the means chosen to implement these purposes were reasonable and of a character appropriate to the legitimate public purpose noted above. The Legislature perceived the problem to be the potential for misuse of the corporate members' position as corporate members in the election. This potential emanated from the position of corporate members as corporate members combined with their active participation in the election. The Legislature has curtailed the members', as corporate members (instead of as subscribers), ability to actively campaign in those elections, which should reduce the possibility that corporate titles, facilities, and resources will be used to ensure the election of any particular candidate. In employing these reasonable means to achieve its legitimate purpose, however, the state has not unduly restricted the rights of the corporate members. As previously noted, the right of the corporate members to participate in the election has merely been curtailed, not eliminated. Hence, we hold that the means chosen to implement the legitimate governmental purposes are both reasonable and of a character appropriate to that purpose.

We reject BCBSM's claim.

## C. § 206(4)

BCBSM assails § 206(4), which prohibits health care corporations from transacting or marketing insurance in addition to delivering health care, on

the ground that it substantially impairs its contractual relationships with those to whom BCBSM has issued insurance.

In the 1950s, BCBSM began to market insurance with its health care services. This was primarily accomplished by having an agent from an insurance company call on BCBSM's customers with BCBSM's agents to present a complete package.[46] In the face of an increased demand, in the early 1960s BCBSM entered into an informal agreement with Phoenix Mutual Insurance Company whereby the latter's agents would accompany BCBSM's sales representatives to present individual proposals at the same time. By the late 1970s, the arrangement with Phoenix was proving insufficient to meet market demands.[47]

The inability to satisfy market demands led to a series of events that eventually culminated in an arrangement between BCBSM and American Bankers Life Assurance Company (ABL), whereby BCBSM's sales representatives became licensed agents to sell ABL insurance in conjunction with BCBSM coverage. Subsequently, in the spring of 1981, BCBSM's subsidiary acquired a fifty percent interest in Associated Insurance Agency, an existing insurance agency. Associated licensed BCBSM's sales representative to sell the insurance of ABL or other companies in conjunction with BCBSM's health care coverage. The underwriting company or ABL pays standard agency commissions to Associated, which in turn pays agent commissions to BCBSM sales representatives. Apparently, it was felt that it would be more economical for ABL to

[46] "Packaging refers to an arrangement whereby a subscriber group purchases related lines of insurance, such as group life insurance, from a single representative." See Circuit Court's Findings of Relevant Facts, No. 301.

[47] See Circuit Court's Findings of Relevant Facts, Nos. 311-313.

pay a standard commission to Associated rather than maintain a branch office in Michigan. All insurance premiums are paid directly to the insurance company and the company likewise directly underwrites and processes claims. Presently, BCBSM sales representatives who are licensed by the state to engage in the marketing of insurance are authorized to sell group life, accidental death and dismemberment, short- and long-term disability, dependent life, and travel accident insurance along with BCBSM health care coverage.[48]

BCBSM points out that it currently has 973 groups on a packaged arrangement, whereby BCBSM services the health care, and Associated services insurance. BCBSM contends that § 206(4)'s prohibition against such arrangements will substantially impair its existing 973 packaging arrangements by extinguishing them. BCBSM concludes that § 206(4) must be struck down as violative of the Contract Clause.

We disagree.

The health care industry in Michigan has been heavily regulated from its inception. In fact, BCBSM has operated under 1939 PA 108 and 109, which extensively controlled BCBSM's operations from its inception. Those acts specifically proscribe the execution of a contract, by or on behalf of a health care corporation, which provides "for the payment of cash or other material benefit by that corporation to the subscriber or his or her estate on account of death, illness, or injury, . . . *[or is] in any way related to the payment of a benefit by any other agency,"* 1939 PA 108, § 2(1); 1939 PA 109, § 11 (emphasis added). See 1939 PA 108, § 3; 1939 PA 109, §§ 1, 4.

Clearly, the above provisions from 1939 PA 108

---

[48] See Circuit Court's Findings of Relevant Facts, Nos. 313-338.

and 109 expressly prohibit BCBSM's actions here. It is axiomatic that "[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Energy Reserves Group, Inc v Kansas Power & Light Co, supra,* p 411, quoting from *Hudson Water Co v McCarter,* 209 US 349, 357; 28 S Ct 529; 52 L Ed 828 (1908). BCBSM never had the right to enter packaging contractual obligations, and thus there can be no impairment of contract as to these illegal contracts.

We express no opinion as to the availability or form of relief which may be sought by the 973 groups currently operating under such illegal packaged arrangements. However, we order the trial court on remand to require BCBSM to give each of these groups prompt and adequate notice that such arrangements were entered into without authority.

## D. *§ 211*

BCBSM attacks § 211, which restricts BCBSM's power to enter into administrative services only contracts (ASO), on several grounds. In addition to BCBSM's claim that this section substantially impairs BCBSM's private contractual relationships with its ASO customers, BCBSM claims that it violates due process and equal protection. Because we find this provision violates BCBSM's right to equal protection of law, see Part VII(A), we need not address BCBSM's impairment of private contract claim.

## E. *§§ 509(4)(b), 516(2)(b), 510*

BCBSM claims that §§ 509(4)(b), 516(2)(b), and

510[49] impair existing private contracts between
BCBSM and its participating providers by vesting in
the Insurance Commissioner the power to deter-
mine the share of provider reimbursement costs
BCBSM must pay its providers. We quote from
BCBSM's reply brief, wherein it states that:

> BCBSM makes no esoteric claim of right to con-
> tract with providers free from appropriate govern-
> mental oversight. The fact is, however, that BCBSM
> has *existing* participating contracts with providers
> which cannot be willy-nilly impaired by either the
> Legislature *or* the Commissioner of Insurance.
> Settled authority establishes that vesting the
> power to annul these contracts in the commis-
> sioner impairs the contractual rights of BCBSM *vis-
> à-vis* participating providers.

[49] Section 509(4)(b) provides, in pertinent part:
"The commissioner shall give weight to each of the goals provided
in section 504, shall not focus on 1 goal independently of the other
goals of the corporation, and shall assure that no portion of the
corporation's fair share of reasonable costs to the provider are borne
by other health care purchasers."

Section 516(2)(b), the hospital costs counterpart of § 509(4)(b), pro-
vides:
"(b) No portion of the health care corporation's fair share of
hospitals' reasonable financial requirements shall be borne by other
health care purchasers. However, this subdivision shall not preclude
reimbursement arrangements which include financial incentives and
disincentives."

Section 510 sets forth the commissioner's review power, which by
reference includes consideration of the above two provisions, and
states, in relevant part:
"(1) After considering the information and factors described in
section 509(4), the goals of a health care corporation as provided in
section 504, and the objectives contained in the provider class plan,
the commissioner shall determined [sic] 1 of the following:
"(a) That the provider class plan achieves the goals of the corpora-
tion as provided in section 504.
"(b) That although the provider class plan does not substantially
achieve 1 or more of the goals of the corporation, a change in the
provider class plan is not required because there has been competent,
material, and substantial information obtained or submitted to sup-
port a determination that the failure to achieve 1 or more of the goals
was reasonable due to factors listed in section 509(4).
"(c) That a provider class plan does not substantially achieve 1 or
more of the goals of the corporation as provided in section 504."

It is clear from this language that BCBSM is contesting the Insurance Commissioner's power under §§ 509(4)(b), 516(2)(b), and 510 of 1980 PA 350 only in relation to existing provider contracts at the time the act goes into effect and not to any future contracts BCBSM may enter into after that date. The act, however, specifically provides that "a provider contract or a reimbursement arrangement that was in effect prior to the effective date of this act" is to continue in effect for a period of two years (three years and forty-five days if the provider is reimbursed on a prospective basis) before the commissioner may exercise authority under the challenged sections of the act. See § 509(1)(a).

Therefore, in order for BCBSM to prevail on its impairment of private contract claim as to the provisions in question, we would have to assume that BCBSM's existing provider contracts will not expire nor be modified within the grace period. The possibility of this occurring is highly remote and too speculative. Because the circumstances of the contracting parties may change before the commissioner is authorized to invoke any powers under 1980 PA 350, there is at the present time no actual controversy as to BCBSM's impairment of contract claim. We therefore decline to address this constitutional issue given its basis upon an entirely speculative and remote situation. GCR 1963, 797.1(a). See *Shavers v Attorney General, supra,* 402 Mich 589; *Merkel v Long,* 368 Mich 1, 13; 117 NW2d 130 (1962).[50]

---

[50] This case is before the Court as certified questions from a declaratory judgment action. The certified question rule, GCR 1963, 797.1, requires "a pending case or controversy." The declaratory judgment rule, GCR 1963, 521.1, requires "a case of actual controversy." The cases applying these standards treat the terms similarly. See *Foote Memorial Hospital v Jackson Hospital Authority,* 390 Mich 193, 228-233; 211 NW2d 649 (1973) (LEVIN, J., *dissenting in part and concur-*

## VI. QUESTION 5

"V. DO SECTIONS 104(3), 206(4), 211, 217, 401(7), 414a, 415, 502(1)(b) AND/OR 607(1) OF PA 350 DEPRIVE BCBSM OF LIBERTY AND PROPERTY WITHOUT DUE PROCESS OF LAW BY REGULATING BCBSM IN AN ARBITRARY AND DISCRIMINATORY MANNER WHICH BEARS NO REAL AND SUBSTANTIAL RELATIONSHIP TO THE OBJECTS OF PA 350 OR TO THE GENERAL HEALTH AND WELFARE OF THE PEOPLE OF THIS STATE?"

As with BCBSM's impairment of contract challenge, the central issue underlying its due process challenge is whether the legislation represents a valid exercise of the state's police power. It has been long recognized that the state, pursuant to its inherent police power, may enact regulations to promote the public health, safety, and welfare. *Michigan Canners & Freezers Ass'n, Inc v Agricultural Marketing & Bargaining Board,* 397 Mich 337, 343; 245 NW2d 1 (1976); *Grocers Dairy Co v Dep't of Agriculture Director,* 377 Mich 71, 75-76; 138 NW2d 767 (1966). Such regulations passed pursuant to the police power carry with them a strong presumption of constitutionality. *Shavers v Attorney General, supra,* p 613; *Michigan Canners, supra,* pp 343-344; *Grocers Dairy, supra,* p 76.

To overcome this presumption, the party challenging the act has the burden to show that no reasonable state of facts can be ascertained which would justify the enactment or, concomitantly, that the legislation bears no reasonable relationship to a legitimate governmental interest. *Shavers, supra,* pp 613-618; *Michigan Canners, supra,* pp 343-344.

In *Shavers, supra,* pp 612-613, this Court articulated the appropriate standard to be used when

ring in part) (certified question); *Shavers v Attorney General,* 402 Mich 554, 588-589; 267 NW2d 72 (1978) (declaratory judgment).

faced with a due process challenge to Michigan's no-fault act:

> The test to determine whether legislation enacted pursuant to the police power comports with due process is whether the legislation bears a reasonable relation to a permissible legislative objective. See *Michigan Canners v Agricultural Board,* 397 Mich 337, 343-344; 245 NW2d 1 (1976).

### A. §§ 104(3), 211, 414a, 415, and 607(1)

As mentioned, BCBSM attacks these sections of 1980 PA 350 which restrict BCBSM's power to enter into ASO contracts on three separate constitutional grounds: impairment of private contract, violations of due process, and violations of equal protection. Because we find that these sections violate BCBSM's right to equal protection of law, see Part VII(A), we need not address BCBSM's due process argument.

### B. § 206(4)

BCBSM attacks § 206(4), which prohibits the packaging of health care services with lines of insurance, as violating due process of law.

We disagree.

In resolving this issue, we must determine whether § 206(4) bears a reasonable relation to a permissible legislative objective.

The life insurance market in Michigan has historically been very competitive, with the largest company today holding only about 9.56 percent of the market. One of the proffered objectives of § 206(4) is to protect the competitive nature of that

market.[51] It is feared that BCBSM's enormous resources and power would be used to destroy the competitive nature of the life insurance market. Eventually BCBSM would monopolize that market much as it dominates the health care market.

The other proffered objective of § 206(4) is to prevent BCBSM from monopolizing the health care market.[52] With its already dominant position, BCBSM could make its services even more attractive through packaging and thereby increase its share of that market.

We find these objectives or interests to be both legitimate and permissible. Free and fair competition is of unquestionable importance. See *Arlan's Department Stores, Inc v Attorney General,* 374 Mich 70, 75; 130 NW2d 892 (1964).

We also find that § 206(4) is both rationally and reasonably related to the demonstrated interests. If BCBSM were permitted to enter the life insurance market, there is evidence indicating that BCBSM could potentially capture a position in that market equal to the share it controls in the health care market.[53] This would obviously force out many other insurers or at least substantially reduce their share of the market and thereby reduce competition. Under BCBSM's present arrangement with ABL, BCBSM has already enabled ABL to capture a significant share of the life insurance market. ABL ranks 24th out of 323 companies selling such insurance in Michigan. In Oregon, Indiana, Wisconsin, and Utah, where BCBSM has packaging arrangements with ABL, in only a few short years

[51] See Circuit Court's Findings of Relevant Facts, Nos. 306-309, 322-323, 348-353.

[52] See Circuit Court's Findings of Relevant Facts, Nos. 309-310, 344-347.

[53] See Circuit Court's Findings of Relevant Facts, Nos. 306-309, 322-323, 348-353.

ABL has captured sizeable portions of the group life insurance market.[54]

With respect to the health care market, it should be noted that life insurance companies are only able to compete with BCBSM by packaging health care coverage with other lines of coverage.[55] If BCBSM were also permitted to package, this advantage held by the insurance companies would be effectively eliminated, and they would be unable to compete with BCBSM.

In accordance with the foregoing discussion, we reject BCBSM's attack on § 206(4) as being violative of the Due Process Clause.

### C. § 401(7)

BCBSM contends that by compelling it to now participate with state-owned psychiatric hospitals, § 401(7) of the act violates due process in that it forces BCBSM's subscribers to subsidize such institutions.

We disagree.

In the past, BCBSM's refusal to participate with state-owned psychiatric hospitals was based on the ground that those hospitals were taxpayer supported, unlicensed institutions, not subject to need planning restraints and without adequate cost accounting methods, a peer review system, or a community governing board. BCBSM further justified its policy of nonparticipation on the basis that more than adequate acute care beds were available at private psychiatric facilities to serve the needs of its subscribers and that participation would result in adding substantial costs to its operating expenses.[56]

---

[54] See Circuit Court's Findings of Relevant Facts, Nos. 352-353.

[55] See Circuit Court's Findings of Relevant Facts, No. 310.

[56] See Circuit Court's Findings of Relevant Facts, Nos. 368-370, 378.

By enacting § 401(7), the Legislature sought to correct the past discriminatory policies of BCBSM with respect to state-run mental hospitals. Simply stated, § 401(7) requires a health care corporation to accept, as a participating facility, any facility operated by the state or a political subdivision of the state which otherwise meets certain specified criteria for participation. The criteria specified in the act approximate the very reasons stated above for BCBSM's denial of participation status to state-owned mental hospitals.[57]

We find that the legislative response is reasonably related to the purpose of rectifying the discriminatory practice of BCBSM, which we note was specifically prohibited by the section of the Insurance Code regulating commercial health insurers.[58] Furthermore, this provision does nothing more than assure BCBSM's subscribers the unrestricted choice of treatment in any hospital which otherwise would qualify for participation, a duty which BCBSM owed its subscribers under the former enabling acts.[59] We therefore sustain this provision on due process grounds.

---

[57] Section 401(7) provides in relevant part:

"To qualify for participation and reimbursement, a facility shall, at a minimum, meet all of the following requirements, which shall apply to all similar facilities:

"(a) Be accredited by the joint commission on accreditation of hospitals.

"(b) Meet the certification standards of the medicare program and the medicaid program.

"(c) Meet all statutory requirements for certificate of need.

"(d) Follow generally accepted accounting principles and practices.

"(e) Have a community advisory board.

"(f) Have a program of utilization and peer review to assure that patient care is appropriate and at an acute level.

"(g) Designate that portion of the facility which is to be used for acute care."

[58] Insurance Code, MCL 500.2237; MSA 24.12237 added by 1961 PA 133.

[59] MCL 550.503; MSA 24.623; see also *Blue Cross & Blue Shield of Michigan, supra,* pp 454-455 (LEVIN, J., *dissenting*).

### D. § 217

BCBSM contends that § 217, which states that upon dissolution and after the payment of debts the remaining assets shall escheat to the state, constitutes a taking without due process of law. Without knowing if or when BCBSM's assets will escheat to the state, the matter is too hypothetical or speculative to create an actual controversy. We do not consider this issue. See *Shavers v Attorney General, supra,* p 589; *Merkel v Long, supra,* p 13; *Evans Products Co v State Board of Escheats,* 307 Mich 506, 528-529; 12 NW2d 448 (1943).

### E. § 502(1)(b)

BCBSM finally argues that § 502(1)(b) which restricts "per case participation" by providers annually violates due process of law. There is no concrete proof on the record that this provision will definitely result in the reduction of per case participation claims by twelve and one-half to twenty-five percent, as alleged by BCBSM. The anticipated reaction of physicians to this provision and its effect on BCBSM and its subscribers is too speculative to determine now. Again, because BCBSM has failed to establish an actual controversy as to this issue, we do not address this constitutional challenge. See *Shavers v Attorney General, supra,* p 589; *Merkel v Long, supra,* p 13.

In sum, except for §§ 104(3), 211, 414a, 415, and 607(1) relating to ASOs, which we find violative of equal protection, and §§ 217 and 502(1)(b), which do not constitute an actual controversy, we do not find that any of these sections constitutes a due process violation.

### VII. QUESTION 6

"VI. Do SECTIONS 104(3), 206(4), 211, 414a, 515

AND/OR 607(1) OF PA 350 DEPRIVE BCBSM OF THE
EQUAL PROTECTION OF THE LAWS BY REGULATING
BCBSM IN AN ARBITRARY AND DISCRIMINATORY MAN-
NER WHICH BEARS NO RATIONAL RELATIONSHIP TO
THE OBJECTS OF PA 350?"

BCBSM argues that certain statutory classifica-
tions of 1980 PA 350 unreasonably and arbitrarily
discriminate against BCBSM vis-à-vis its competitors
in deprivation of equal protection.

In *Shavers, supra*, pp 612-613, we observed that
the test to determine whether legislation enacted
pursuant to the police power comports with equal
protection is essentially the same as that for due
process. Consequently,

> "Under traditional equal protection analysis, a
> legislative classification must be sustained, if the
> classification itself is rationally related to a legiti-
> mate governmental interest." [Quoting from
> *United States Dep't of Agriculture v Moreno*, 413
> US 528, 533; 93 S Ct 2821; 37 L Ed 2d 782 (1973).]

### A. §§ 104(3), 211, 414a, 415, and 607(1)— Administrative Services Only Contracts

BCBSM attacks §§ 104(3), 211, 414a, 415, and
607(1), which restrict BCBSM's power to enter into
ASOs,[60] on the ground that these sections violate
BCBSM's right to equal protection. US Const, Am
XIV; Const 1963, art 1, § 2.

The features of the act relevant here to BCBSM's
equal protection challenges are as follows:

1. "Certificate" is defined to include ASO con-
tracts, § 104(3).

---

[60] Administrative Services Only (ASO) contracts "refer to an ar-
rangement whereby a health care coverage customer elects to be self-
insured and pays the actual cost of claims, plus an administrative fee,
instead of a flat insurance premium." See Circuit Court's Findings of
Relevant Facts, No. 261.

2. Health care corporations may not enter into or continue in ASO arrangements with groups of less than five hundred subscribers, unless the arrangement was in existence in September of 1980, § 211.

3. Health care corporations are required to provide substance abuse and prosthetic device coverage to "certificate" holders. Substance abuse coverage must be provided upon issuance or renewal of a certificate and prosthetic device coverage must be provided on all certificates within twelve months after the effective date of the act, §§ 414a, 415.

4. Health care corporations must submit a copy of any new or revised "certificate" along with proposed rates to the Commissioner of Insurance for approval, § 607(1).

BCBSM attacks the above provisions only as they apply to ASO contracts. It contends that these sections result in a "grossly discriminatory treatment of BCBSM vis-à-vis its competitors." Furthermore, BCBSM argues that there is no logical or reasonable basis for this disparate treatment, because "ASO business practices are virtually *identical,* whether conducted by BCBSM or commercial insurers."

We agree.

In resolving BCBSM's equal protection challenge, we must determine whether the classification itself is rationally related to a legitimate governmental interest.

Sections 104(3), 414a, and 415 combine to mandate that BCBSM include substance abuse and prosthetic device coverage in its ASO contracts. There is no such requirement with respect to commercial insurers' marketing of ASO contracts. See MCL 500.5208, 500.5208a; MSA 24.15208, 24.15208(1). See also MCL 500.3425, 500.3609; MSA 24.13425,

24.13609. Sections 104(3) and 607(1) operate to require prior approval of the commissioner before BCBSM enters into an ASO arrangement. Again, there is no such requirement for commercial insurers. See MCL 500.5208, 500.5208a; MSA 24.15208, 24.15208(1). Finally, § 211 prohibits BCBSM from offering ASO contracts to groups of under five hundred employees. BCBSM's competitors are permitted to offer ASO contracts to groups of five hundred "employees and members." See MCL 500.5208(2)(c); MSA 24.15208(2)(c). There are generally two and one-half members per employee. Hence, BCBSM's competitors are allowed to enter into ASO contracts with groups of considerably less than five hundred "employees."

The Attorney General attempts to justify the discriminatory treatment of §§ 414a and 415 by pointing to need for substance abuse and prosthetic device coverage. We do not doubt the need for such coverage. However, we fail to understand why the need for such coverage is any greater with respect to BCBSM than it is with respect to BCBSM's competitors. See *Hartford Steam Boiler Inspection & Ins Co v Harrison,* 301 US 459, 461-463; 57 S Ct 838; 81 L Ed 1223 (1937). The Attorney General offers us no explanation, and we are unable to conceive of one.

The Attorney General, however, goes on to argue that all of the sections are constitutionally sound because the Legislature may approach a problem in a piecemeal fashion. In support of this contention, the Attorney General cites *Metropolitan Funeral System Ass'n v Ins Comm'r,* 331 Mich 185, 194; 49 NW2d 131 (1951), where this Court stated:

"A State may properly direct its legislation against what it deems an existing evil without

covering the whole field of possible abuses. . . .
The statute must be presumed to be aimed at an
evil where experience shows it to be most felt, and
to be deemed by the legislature coextensive with
the practical need; and is not to be overthrown
merely because other instances may be suggested
to which also it might have been applied." [Quot-
ing *Kelly v Recorder's Court Judge,* 239 Mich 204,
215; 214 NW 316 (1927), quoting *Whitney v Cali-
fornia,* 274 US 357, 369-370; 47 S Ct 641; 7 L Ed
1095 (1927).]

We still concur in the foregoing reasoning.
Nonetheless, all evidence indicates that the evils
associated with ASOs are the same regardless of
who is marketing them. For example, it seems to
be conceded that the risk factor varies with the
size of the group. It seems that the smaller the
group, the greater the possibility that there will be
a larger variation in the claims that must be
borne by that group. With groups of under five
hundred, this fluctuation is most likely. Hence five
hundred or more seems to be the optimum size.
But if five hundred or more is the optimum size, it
is so regardless of who is marketing the ASOs. This
risk factor has no correlation with the discrimina-
tory treatment of BCBSM here. The classification
still must have an adequate or reasonable basis.
*Van Slooten v Larsen, supra,* 410 Mich 55-56;
*Metropolitan Funeral System Ass'n v Ins Comm'r,
supra,* p 194, quoting *Kelly v Recorder's Court
Judge, supra,* p 215, quoting *Whitney v California,
supra,* pp 369-370. The Attorney General · has
failed to present such a basis, and we are unable
to think of one.

Moreover, we note that § 211's requirement that
BCBSM not offer ASO contracts to groups of under
five hundred employees is in fact contrary to the
noted facts. Since there are generally two and one-

half members per employee, BCBSM is only allowed to contract with groups of considerably larger than five hundred. If five hundred or more is the optimum number, then we see little reason why BCBSM should be permitted to enter ASO arrangements only with groups much larger than five hundred.

Next, the Attorney General argues that BCBSM never had the right under the old acts, 1939 PA 108 and 109, to enter into ASO arrangements. See 1939 PA 108, § 2(1); 1939 PA 109, § 1. Even assuming that this is true, however, this has no bearing upon BCBSM's equal protection argument challenging the relevant sections of 1980 PA 350, which allow BCBSM to enter into ASO contracts, but under restraints not imposed on BCBSM's competitors. The state still must treat BCBSM and its competitors equally, unless the classification is rationally related to a legitimate governmental interest. As stated, this it has failed to do.

Finally, the Attorney General attempts to justify § 607(1), which gives the commissioner approval power over BCBSM's ASO contracts, by stating that the commissioner has always had such power. We are unable to locate any provision so empowering the commissioner. In any event, just because the commissioner was so empowered before does not make such power as authorized by § 607(1) any less violative of the Equal Protection Clause.

In sum, we hold that insofar as §§ 104(3), 211, 414a, 415, and 607(1) result in the arbitrary and discriminatory treatment of BCBSM's ASO arrangements, they are unconstitutional.

### B. *§ 206(4)*

BCBSM asserts that § 206(4) violates its right to equal protection by forbidding BCBSM to engage in packaging while BCBSM's commercial competitors

are not similarly restricted. Although § 206(4) denies BCBSM the right to package, it is not an unreasonable classification. BCBSM is a health care corporation and not an insurance company. The state may create separate classifications for regulating various kinds of corporations where the regulation directly relates to the inherent differences between the corporations. See *Metropolitan Funeral System Ass'n v Ins Comm'r, supra,* pp 193-194 (wherein this Court held that the inherent differences between insurance companies and funeral benefit associations justified the statutory prohibitions on the former and not on the latter).

The restrictions on packaging, unlike those on ASOS, arise out of the inherent differences between insurance companies and health care corporations. The function of health care corporations is to market health care and not insurance. Packaging here involves the marketing of insurance, whereas ASOS involve the marketing of health care. Therefore, the differences between insurance companies and health care corporations justify the restrictions on packaging, but not on ASOS. We thus find that § 206(4) is neither arbitrary nor unreasonable and sustain it on equal protection grounds.

## VIII. QUESTION 7

"VII. DO SECTIONS 402(7), 404(5), 605 AND/OR 701(5) OF PA 350 DEPRIVE BCBSM OF LIBERTY AND PROPERTY WITHOUT DUE PROCESS OF LAW BY PROVIDING FOR ADMINISTRATIVE PROCEDURES LACKING IN FUNDAMENTAL DUE PROCESS GUARANTEES?"

BCBSM next challenges several sections of 1980 PA 350 on procedural due process grounds. BCBSM alleges three areas of deficiency—failure to provide an impartial decisionmaker, improper burden of proof, and failure to provide notice and hearing— in several sections.

A. *Failure to Provide an Impartial Decisionmaker*
*—§§ 402(7), 404(5), and 605*

BCBSM asserts that two statutory provisions im-properly grant the Insurance Commissioner the authority to review, in a judicial capacity, deci-sions previously made in a prosecutorial capacity, and that a third section allows the Insurance Commissioner to review judicial decisions by the commissioner. BCBSM complains that these statuto-rily assigned dual roles of the Insurance Commis-sioner violate the corporation's constitutional guarantee of a fair hearing before an impartial tribunal.[61] BCBSM challenges the dual functions as inherently defective situations only; no allegation of actual bias is directed at the Insurance Commis-sioner. We find that these issues present no actual controversy at this time.

BCBSM alleges that §§ 402(7) and 605 improperly combine prosecutorial and adjudicative functions.

Section 402(6) authorizes the Insurance Commis-sioner to bring a complaint against the health care corporation upon probable cause that the corpora-tion has violated the act. If an informal conference cannot resolve the dispute, a hearing is held pur-suant to MCL 500.2030; MSA 24.12030 and in accordance with the Administrative Procedures Act. MCL 500.2030; MSA 24.12030, part of the uniform trade practices act, directs that "[t]he commissioner or his designate shall preside over the hearing, except that an independent hearing officer shall be designated by the commissioner if requested by the person who is the subject of the proceedings." If after the hearing the commis-sioner determines that the health care corporation has violated the act, the commissioner may issue a cease and desist order (§ 402[7]).

---

[61] US Const, Am XIV; Const 1963, art 1, § 17.

Section 605(2) permits the Insurance Commissioner to order a summary suspension or limitation of the corporation's certificate of authority. The section continues: "The corporation shall have the right to an administrative hearing within 5 days to show why the summary suspension or limitation should be terminated."

We find nothing in these sections presenting an actual controversy. It is not at all apparent that the same individuals will ever assume both prosecutorial and adjudicative roles.

The act provides that the Insurance Commissioner may delegate authority. Section 104(5) defines "commissioner" to include "an authorized designee of the commissioner, if written notice of the delegation of authority has been given as provided in section 601." Thus, it is quite possible that the dual role situation hypothesized by BCBSM will never materialize. This Court declines to address such speculative questions.

Additionally, BCBSM attacks § 404(5), complaining that this section improperly allows the Insurance Commissioner to review prior adjudication by the commissioner (as opposed to prosecutorial decisions), again in flagrant violation of the right to an impartial decisionmaker.

Section 404(4) directs the Insurance Commissioner to establish by rule a procedure for informal dispute resolution.

> The commissioner *shall* by rule establish a procedure for determination under this section, which shall be reasonably calculated to resolve these matters informally and as rapidly as possible, *while protecting the interests of both the person and the health care corporation.* [Emphasis added.]

This statute thus delegates rulemaking author-

ity to the Insurance Commissioner. Such delegation withstands constitutional scrutiny if sufficient standards are incorporated to direct the agency's action. *Dep't of Natural Resources v Seaman,* 396 Mich 299, 309; 240 NW2d 206 (1976). Here, the Insurance Commissioner is directed to "[protect] the interests of both the person and the health care corporation." Subsumed under the direction to protect the parties' "interests" must be the duty to protect the parties' fundamental due process guarantees which include an impartial decision-maker.

At the present time, because of the injunction, the Insurance Commissioner has not exercised her authority under this statute; she has promulgated no rules to establish an informal dispute resolution procedure. We have no reason to believe that when this power is exercised individual constitutional rights will not be respected. Therefore at the present time there is no actual controversy. See *Sullivan v Board of Dentistry,* 268 Mich 427, 429; 256 NW 471 (1934).[62]

---

[62] In *Sullivan v Board of Dentistry, supra,* the Court dismissed plaintiff's action seeking a declaration that the statute delegating to the Board of Dentistry the power to promulgate rules governing the practice of dentistry was unconstitutional. The Court held that the case presented no actual controversy, explaining:

"No rules or regulations have thus far been promulgated by the board, nor is it shown that any have been submitted to the attorney general to establish their legality. It is not to be presumed that the board will adopt any rules and regulations for the practice of dentistry that do not meet the test of constitutionality. It is not our duty to pass on moot questions or abstract propositions. As no unconstitutional rule has been pointed out, the presumption of the constitutionality of the act remains."

Accord *Evans Products Co v State Board of Escheats,* 307 Mich 506, 529; 12 NW2d 448 (1943). Likewise, BCBSM's challenge to § 404(4) poses the same type of hypothetical premature issue.

In contrast, BCBSM's challenge that the actuary panel has been unconstitutionally delegated legislative power (see Part IV[B]) does not present a hypothetical issue. If the act had merely permitted the Insurance Commissioner to develop regulations to guide an inquiry, we would have presumed that the commissioner would act constitutionally and judged the issue premature.

## B. *Burden of Proof—§ 402(7)*

BCBSM next complains that §§ 402(6) and (7) establish too low a burden of proof upon which the Insurance Commissioner may issue an order regarding statutory violations. Section 402(6) provides that the Insurance Commissioner may bring a complaint against the corporation when the Insurance Commissioner has "probable cause to believe" that the health care corporation has violated the provisions of § 402. Section 402(7) provides that after notice of the complaint is given, a hearing will be held, then continues:

> If, after the hearing, the commissioner determines that the health care corporation is violating, or has violated subsection (1), indicating a persistent tendency to engage in conduct prohibited by that subsection, *or has probable cause to believe* that the corporation is violating, or has violated subsection (2), the commissioner shall reduce his or her findings and decision to writing, and shall issue and cause to be served upon the corporation a copy of the findings and an order requiring the corporation to cease and desist from engaging in the prohibited activity. [Emphasis added.]

BCBSM argues that the issuance of an order solely on the basis of a finding of probable cause is improper. We agree.[63]

However, the delegation challenge is more concrete. The Insurance Commissioner is given an open, unrestricted grant of authority to approve or disapprove the proposed risk factors. The Legislature must provide *some* standards or policy articulation, even if quite minimal, in order to constitutionally delegate power. No agency action can rectify this constitutional defect. Thus, the issue is not premature; an actual controversy is presented.

[63] BCBSM frames its argument in terms of a denial of due process. However, plaintiff fails to demonstrate the constitutional underpinnings of this claim. Therefore, rather than address this claim as one of constitutional dimension, we will consider it as a purely evidentiary question.

It is generally well established that issues of fact in civil cases are to be determined in accordance with the preponderance of the evidence with the burden of persuasion placed upon the party asserting the claim. McCormick, Evidence (2d ed), § 339, p 793; 30 Am Jur 2d, Evidence, § 1163, p 337; *Stone v Earp,* 331 Mich 606, 611; 50 NW2d 172 (1951); *Martucci v Detroit Police Comm'r,* 322 Mich 270, 274; 33 NW2d 789 (1948). In *Aquilina v General Motors Corp,* 403 Mich 206, 210; 267 NW2d 923 (1978), this Court stated that the same burden of persuasion applies to proceedings before an administrative agency. Accord Cooper, State Administrative Law, p 355.

Proof by a preponderance of the evidence requires that the factfinder believe that the evidence supporting the existence of the contested fact outweighs the evidence supporting its nonexistence. *Martucci v Detroit Police Comm'r, supra,* p 274.

Under § 402, the Insurance Bureau is authorized to bring a complaint charging BCBSM with a violation of § 402. The Insurance Commissioner must therefore prove its allegations at the subsequent hearing by a preponderance of the evidence. The statute, however, requires only a probable cause standard.

A probable cause determination does not involve the comparing and weighing of facts as required by the preponderance of evidence standard. A probable cause finding requires only facts which would induce a fair-minded person of average intelligence and judgment to believe that the statute was violated. *People v Oliver,* 417 Mich 366, 374; 338 NW2d 167 (1983). Thus we agree with BCBSM that the statute directs the application of

an inappropriate standard in the § 402 administrative proceeding.[64]

### C. *Failure to Provide Notice or Hearing—§ 701(5)*

Finally, BCBSM asserts that § 701(5) of the act completely ignores the due process guarantee of notice and an opportunity to be heard. Section 701 allows an existing health care corporation 120 days to amend its articles of incorporation and bylaws and to restructure its board of directors and thereby achieve compliance with the act. The corporation may continue to operate under its old structure during this 120-day grace period. However, if at the completion of the 120 days the corporation has failed to comply with the act, § 701(5) provides:

> If a health care corporation fails to comply with this section the commissioner may issue an order suspending the right and privilege of the corporation to sell or issue new certificates until this section has been fully complied with.

BCBSM argues that because this section fails to provide for notice and hearing, due process is denied.

However, a statute must be read in its entirety, *Metropolitan Council No 23, AFSCME v Oakland County Prosecutor,* 409 Mich 299, 317; 294 NW2d 578 (1980), with a presumption of constitutionality. *Johnson v Harnischfeger Corp,* 414 Mich 102, 112; 323 NW2d 912 (1982); *Workman v Detroit Automobile Inter-Ins Exchange,* 404 Mich 477, 507-508; 274 NW2d 373 (1979).

---

[64] Although the Court is not presented with an actual § 402(6) determination based upon probable cause at this time, we nonetheless find this issue to be an actual controversy. The statute sets forth a burden of proof which is blatantly incorrect; no further development of facts is necessary to expose the problem; no action of the Insurance Commissioner could erase this incorrect burden of proof from the statute.

Thus, while § 701(5) itself contains no reference to required procedural protections regarding the commissioner's right to suspend certificates of authority, § 605(1) supplies the necessary procedures with reference to the specific instance involved in § 701. Section 605(1) reads:

> *Upon due notice and an opportunity for an evidentiary hearing pursuant to the administrative procedures act,* the commissioner may suspend or limit the certificate of authority of a health care corporation if the commissioner determines that any of the following circumstances exist:
>
> * * *
>
> (c) The health care corporation refuses or fails to comply with this act or with a lawful order of the commissioner. [Emphasis added.]

Thus, when § 701(5) is read in conjunction with § 605(1), due process is fully satisfied.[65]

---

[65] BCBSM also briefly alludes to possible notice and hearing deficiencies with regard to § 605(2), which provides that upon a finding "that the public health, safety, or welfare requires emergency action" the Insurance Commissioner may order a summary suspension or limitation of a certificate of authority. The section also states: "The corporation shall have the right to an administrative hearing within 5 days to show why the summary suspension or limitation should be terminated."

BCBSM's full discussion of its challenge to § 605(2) reads:

"If the commissioner finds that 'emergency action' is required, he/she can summarily suspend BCBSM's certificate of authority, *without notice or hearing.*" (Emphasis in original.)

The short answer to this claim is that due process does not require notice and hearing prior to deprivation of a property right in every case. *Miller v Dep't of Treasury,* 385 Mich 296, 334; 188 NW2d 795 (1971); *Rockwell v Crestwood School Dist Board of Education,* 393 Mich 616, 633; 227 NW2d 736 (1975); 1 Davis, Administrative Law, § 7.08, pp 438-444. In *Miller,* this Court explained:

" ' "Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry *before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and judicial determination.* . . ." (Emphasis added.)' " Quoting *Ewing*

IX. QUESTION 8

"VIII. DO SECTIONS 106(5), 205(4), 205(5), 310(1), 401(1), 503, 504(1), 509(1), 509(4)(b), 510(1), 511(1) AND/OR 513(1) OF PA 350 DEPRIVE BCBSM OF LIBERTY AND PROPERTY WITHOUT DUE PROCESS OF LAW BY IMPOSING UNCONSTITUTIONALLY VAGUE AND ILLUSORY DUTIES ON BCBSM AND THE COMMISSIONER OF INSURANCE?"

BCBSM argues that various sections of the act include vague and illusory terms, and thus unconstitutionally deny BCBSM sufficient warning of its duties under the act. For instance, BCBSM challenges § 205(4) which directs:

> A health care corporation, for purposes of this section, shall define at least 5 lines of business and shall assign a risk factor to each line of business.

BCBSM correctly points out that "lines of business" is nowhere defined in the statute, and concludes: "The assignment of risk factors and ultimate determination of BCBSM's contingency reserves would be greatly altered depending on the meaning attributed to the term 'lines of business.'" BCBSM also specifically challenges the terms: "fiduciary [duty] toward the health care corporation and the subscribers," § 310(1); "health care benefits," § 401(1); "address the issue of uniform reporting," § 503 and "reasonable access, cost and quality" in relation to health care services, §§ 106(5), 504(1), 509, 510, 511, 513.

It is a general principle of constitutional law that statutory language must be sufficiently clear

---

v *Mytinger & Casselberry, Inc,* 339 US 594, 599; 70 S Ct 870; 94 L Ed 1088 (1950).

Under § 605(2) summary action is prompted by an emergency situation; the action is reviewed in an adversarial hearing within five days. While future application of this statute might expose latent deficiencies, in the present posture we find no due process violation.

and definite to provide fair warning of proscribed conduct. *People v Dempster,* 396 Mich 700, 715; 242 NW2d 381 (1976). However, as noted by this Court in *People v Howell,* 396 Mich 16, 21; 238 NW2d 148 (1976), statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand. The *Howell* Court cited *United States v National Dairy Products Corp,* 372 US 29, 32; 83 S Ct 594; 9 L Ed 2d 561 (1963), which further elucidates the problem associated with insubstantial vagueness challenges:

> "The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases . . . . [A] limiting construction could be given to the statute by the court responsible for its construction if an application of doubtful constitutionality were . . . presented. We might add that application of this rule frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." [Quoting *United States v Raines,* 362 US 17, 22; 80 S Ct 519; 4 L Ed 2d 24 (1960).]

The present statute has not yet brought BCBSM and the Insurance Commissioner into an actual adversarial relationship over the statutory terms. BCBSM is not yet defending its definition against a conflicting position asserted by the Insurance Commissioner. BCBSM hypothesizes areas of possible future confrontation, but on the present record we do not have an actual controversy to justify a constitutional analysis.

## X. QUESTION 9

"IX. DOES SECTION 301(7) OF PA 350 DEPRIVE

BCBSM, ITS DIRECTORS, OFFICERS AND MEMBERS OF
GUARANTEED RIGHTS OF FREE SPEECH?"

BCBSM attacks § 301(7) of 1980 PA 350, MCL
550.1301(7); MSA 24.660(301)(7), under US Const,
Am I, and Const 1963, art 1, § 5, which guarantee
the right of free speech. BCBSM argues that "[t]his
section deprives BCBSM, its directors, officers and
corporate members of guaranteed rights of free
speech and clearly violates" art 1, § 5 of the Michi-
gan Constitution and the First Amendment of the
United States Constitution.

The act vests authority to amend the bylaws in
the board of directors (§ 301[1]). It then sets forth
the membership of the board, limits the number of
provider directors to not more than twenty-five
percent (§ 301[3]) and provides that the remaining
members shall include representatives of sub-
scriber groups in proportions which fairly repre-
sent the total subscriber population of the health
care population (§ 301[5]).

Section 301(6) then provides that the method of
selection of the directors shall be specified in the
bylaws.

Section 301(7) provides that the method of selec-
tion of subscribers shall maximize subscriber par-
ticipation, and that:

> The method of selection [established by the by-
> laws] shall neither permit nor require nomination,
> endorsement, approval, or confirmation of a candi-
> date or director by the corporate body, the board
> of directors, or the management of the health care
> corporation, or any member or members of any of
> these. This subsection shall not apply to the selec-
> tion of an officer or employee as a director pursu-
> ant to subsection (4). This subsection shall not
> limit the rights of any director, member of the
> corporate body, or employee or officer of the health
> care corporation to participate in the selection

process in his or her capacity as a subscriber, to the same extent as any other subscriber may participate.[66]

There are two plausible constructions of subsection (7). The section could be read in conjunction with subsection (5) as precluding the bylaws from permitting or requiring the named groups from promoting or inhibiting the selection of *subscriber* members, or it could be read more broadly to limit these entities with respect to the selection of all members of the board (other than the public members, § 301[6], and the single officer/employee director authorized in § 301[4]).

Since neither party has briefed this issue, we do not need to resolve which interpretation is correct. Neither view is a direct limitation on any individual, management, or corporate right of expression. Properly viewed, subsection (7) is a limitation on the method of selection to be ultimately adopted by the board of directors in the bylaws; that is, a directive that the selection process may not be impeded by a provision *in the bylaws* which either requires or permits the named entities to nominate, endorse, approve, or confirm "a candidate or director." Since the bylaws relating to the selection process have not yet been amended, nor is there a suggestion as to how the board wishes to revise the bylaws, there is no actual case or controversy at this time.

If subsection (7) is subsequently interpreted by the Insurance Commissioner to impose a limitation on corporate expenditures or other expressions of influence which conflicts with the bylaws adopted by the board of directors, then a free exercise challenge would be presented. That, of course, is a

---

[66] Subsection (4), MCL 550.1301(4); MSA 24.660(301)(4), authorizes not more than one officer or employee of the health care corporation to serve as a voting or nonvoting director.

wholly speculative matter, to be resolved when a case or controversy is presented. In short, we hold that subsection (7) is not a limitation of expression, but rather a limitation on the method of selection which the board through its bylaws may adopt. We therefore conclude that no cognizable constitutional challenge has here been advanced.

## Conclusion

For the reasons more fully discussed in our analyses of the questions certified to this Court, we uphold the constitutionality of the challenged sections of 1980 PA 350 except as follows:

First, we agree that the act is unconstitutional in the following three particulars:

(1) the act's provision for an actuary panel to resolve risk factor disputes is an unconstitutional delegation of legislative authority in that it lacks adequate standards, § 205(6) (Question 3);

(2) the statutory restrictions on ASO contracts violate equal protection of the laws insofar as they result in arbitrary and discriminatory treatment of health care corporations vis-à-vis commercial insurers, §§ 104(3), 211, 414a, 415, and 607(1) (Questions 4, 5 and 6);

(3) the commissioner's authority to issue a cease and desist order based on probable cause against a health care corporation for noncompliance with the act establishes an improper burden of proof, § 402(7) (Question 7).

Our ruling on these three areas of 1980 PA 350 does not affect the constitutionality of the remainder of the act. Where, as here, the unconstitutional provisions are easily severable, the remainder of the act need not be affected. *People v McMurchy*, 249 Mich 147, 157-159; 228 NW 723 (1930).

Second, we do not consider whether the act is
unconstitutional in the following five particulars
because there was no actual case or controversy
established:

(1) whether §§ 509(4)(b), 516(2)(b), and 510 impair
the private existing contracts between BCBSM and
its participating providers (Question 4);

(2) whether § 217 relating to BCBSM's assets es-
cheating to the state upon dissolution, and
§ 502(1)(b), relating to per case participation, de-
prive BCBSM of due process of law (Question 5);

(3) whether §§ 402(7), 404(5), and 605 fail to
provide for an impartial decisionmaker in viola-
tion of due process of law (Question 7);

(4) whether §§ 106(5), 205(4), 205(5), 310(1),
401(1), 503, 504(1), 509(1), 509(4)(b), 510(1), 511(1),
or 513(1) impose unconstitutionally vague and illu-
sory duties on BCBSM and the commissioner (Ques-
tion 8);

(5) whether § 301(7) deprives BCBSM, its directors,
officers, and members of free speech (Question 9).

Accordingly, we remand this matter to the trial
court with instructions to dissolve the injunction
and to take such further action as is consistent
with this opinion.

No costs, a public question being involved.

BRICKLEY, CAVANAGH, and BOYLE, JJ., concurred
with WILLIAMS, C.J.

RYAN, J., concurred in the result only.

LEVIN, J. My principal disagreement with the
majority concerns the validity of the provisions of
1980 PA 350 requiring Blue Cross and Blue Shield
of Michigan to reincorporate under that act and to
thereby transfer control of BCBSM from the mem-
bers of that corporation, who theretofore elected

the directors of BCBSM, to BCBSM subscribers and others who are empowered by that act to elect or appoint seventy-five percent of the directors. I would hold that those provisions effect a taking of "private property"[1] within the meaning of the Constitutions of the United States[2] and of this state[3] and that the failure of the act to provide for the making or securing of just compensation therefor renders those provisions of the act invalid under the Michigan Constitution.[4]

## A

The governance issue is primary. If the provisions of Act 350 transforming the governance of BCBSM are valid, it is of less importance whether the other provisions challenged by BCBSM are valid. If the governance of BCBSM can be changed by legislative fiat, then those who would—now or in the future—challenge the validity of other provisions of the act or further amendatory legislation or regulations or orders promulgated by the Commissioner of Insurance or the opinions of the Attorney General regarding the meaning of the act may, by further amendatory legislative decree, find that their tenure is at an end. The rationale

---

[1] As set forth in n 24 and the accompanying text, there is no need in the instant case to reach the question whether the taking is for a public use.

[2] Fifth Amendment of the Constitution of the United States as applied to the states through the Fourteenth Amendment. See *Webb's Fabulous Pharmacies, Inc v Beckwith,* 449 US 155, 160; 101 S Ct 446; 66 L Ed 2d 358 (1980).

[3] Const 1963, art 10, § 2.

[4] The remedy question, see *San Diego Gas & Electric Co v City of San Diego,* 450 US 621; 101 S Ct 1287; 67 L Ed 2d 551 (1981), need not be addressed because BCBSM is not seeking compensation for an inverse condemnation. The state has not offered to pay compensation, and the Michigan Constitution, in contrast with the Fifth Amendment of the Constitution of the United States, requires that before private property is taken for a public use just compensation therefor must be *"first* made or secured in a manner prescribed by law."

of the opinion of the Court means, in effect, that all the members of the BCBSM board serve under the Sword of Damocles at the pleasure of the Legislature and Governor.

## B

BCBSM asserts that implementation of Act 350 would constitute a government takeover of BCBSM, its business, and its property. I agree.

All agree that a purpose of Act 350 is to eliminate control of BCBSM, and hence of its business and properties, by the persons presently in control and to transfer control to others, persons appointed by the Governor and elected by providers and subscribers.

To be sure, there has been no change in legal title. BCBSM, the corporation, remains the owner of all the assets that it formerly owned. Bare legal title without control, however, might well be meaningless. The law does not necessarily treat the holder of bare legal title as the owner. The person who has the power to possess, use, control, and acquire the property may be treated as the owner.

In the instant case, although the state does not take title to or possession of the assets of BCBSM, it would exercise control by means of a legislative enactment which designates who shall exercise control; BCBSM has in effect become a controlled subsidiary of the State of Michigan.[5]

The state has, in effect, asserted the right to own a majority of the voting interest in BCBSM. The state has arrogated to itself the powers (i) to designate or confer on persons designated by it the

---

[5] A parent corporation does not directly own the assets of a subsidiary corporation; it nevertheless is in control through the ownership of a majority of the capital stock.

power to elect a majority of the directors, (ii) to change the purposes of the corporation, and (iii) upon a dissolution (which its designees could bring about), to have the assets of BCBSM turned over to the state.

All who hold office and power pursuant to Act 350 do so at the sufferance of the Legislature and Governor. Control of BCBSM and of its business and properties is now subject to legislative directive. Having so arrogated to itself the power to control the use of the properties of BCBSM, the properties of BCBSM have ceased to be private property and have, by legislative fiat, become public property.

## C

The majority rely on *Penn Central Transportation Co v City of New York,* 438 US 104; 98 S Ct 2646; 57 L Ed 2d 631 (1978). Suppose the New York Legislature had not passed the air-rights legislation considered in *Penn Central,* but rather a law stating that the use of the properties known as Grand Central Station shall henceforth be controlled by a committee appointed by the Governor of New York and elected by persons (voting by classes, if you will) who use the station, commuters, long-distance travelers, persons who work and shop there. There would be no change in title, the asset known as Grand Central Station would remain in the name of Penn Central. It would retain the right to receive whatever income was derived. But the use and operation of Grand Central Station would be subject to the directives of the committee appointed pursuant to the legislation. Surely, it could not then be said that Grand Central Station remained private property. The State of New York would surely have been held to have taken Grand Central Station.

So too here. The use and operation of the properties of BCBSM will henceforth be subject to the directives of a committee, called a board of directors, appointed pursuant to Act 350. Although title to the assets and properties of BCBSM remain in its corporate name, that committee, which serves at the sufferance of the Legislature and Governor, will henceforth run BCBSM. It can no more be said that the business and properties of BCBSM remain private property than it could be said that Grand Central Station would have remained private property. The assets and properties of BCBSM will have been taken over by the State of Michigan.

## D

The challenged provisions of Act 350 cannot be justified on the basis that the state has taken over control of the BCBSM assets, properties, and business with a view to better serve the purposes for which BCBSM was organized or that BCBSM is organized as a not-for-profit corporation. Conceding that the assets, properties, and business of BCBSM might be subject to fiduciary obligations of some sort, those assets, properties, and business are nevertheless private property. Absent a judicial finding that directors or officers of BCBSM have misused the assets and properties of BCBSM, the state cannot lawfully put BCBSM into receivership.

In focusing on the purpose for which BCBSM was organized and that is a not-for-profit corporation, the Court confuses the purpose for which control or ownership must be exercised with the questions whether control and the assets, properties, and business subject to control are private property and whether the state can purport to separate legal title and control without effectuating a taking of the assets, properties, and business subject

to that control. I would hold that it cannot. The assets, properties, and business of a corporation, profit or not-for-profit, are taken if the power to elect a majority of the directors is taken. The power to direct the use and disposition of assets and property and the business are at least a substantial strand, perhaps the core strand, of the property interests in those assets.

Whether the assets, properties, and business of BCBSM and control thereof belong to the members of the corporation or to the corporation or are superimposed with a fiduciary obligation requiring that they be used to further the corporate purpose or the public interest or even the interest of subscribers need not be decided. The central point is that those interests in property are private property, and neither the property interest in control nor the assets, property, or business subject to that control belongs to the state. When the state redistributes control, it has gone beyond mere regulation and has taken *both* control and the assets, properties, and business subject to control.

Nor is it material that the members would not have the right to use for themselves just compensation paid pursuant to the Takings Clause were it to be paid. Neither would the directors of the United Foundation nor the Kellogg nor Ford Foundations have the right to do so if property of those foundations were to be taken. Surely, the fact that no member or officer of a not-for-profit corporation would have the right personally to use just compensation paid for the taking of property or interest in property respecting the not-for-profit corporation does not justify a court holding that the failure to pay just compensation for the taking of the property of a not-for-profit corporation is harmless error.

In sum, the assets, properties, and business of
BCBSM, including control, are private property pro-
tected by the Takings Clause. BCBSM cannot be
made a subsidiary of the State of Michigan with-
out exercise of the power of eminent domain.[6]

## I

BCBSM commenced this action seeking a declara-
tory judgment that Act 350 is unconstitutional.
The circuit judge enjoined enforcement of the act
and ordered the parties to comply with the origi-
nal enabling acts under which BCBSM was incorpo-
rated, 1939 PA 108 and 109.[7] The controversy is
now before us on certified questions of public
moment[8] following an evidentiary hearing and the
filing by the judge of findings of fact.

In parts III-XIII of this opinion, I consider chal-
lenges to provisions of the act including provisions
imposing limitations concerning BCBSM provider
contracts, marketing practices, and rates charged
subscribers. In part III, I set forth my conclusions
in summary form. I now turn to a consideration of
the fundamental governance issue.

[6] It has been suggested at conference that BCBSM does not have
standing to raise the issue of the members' loss of control, that they
alone can raise this issue, and that the failure of any member to join
in the complaint forecloses a decision predicated on member loss of
control. It is now established that majority stockholders of a profit
corporation hold the property interest in control for the benefit of the
corporation and minority stockholders. Henn, Corporations (2d ed),
§ 188, pp 490 ff. On the same principle, the property interest in
control of a not-for-profit corporation belongs to the corporation and
possibly all the members, those in the minority as well as those in the
majority. Further, under the circumstances that this litigation has
been pending for a number of years and the Legislature and the
people need a decision on the fundamental takeover issue and the
Attorney General does not contest the standing of BCBSM to raise the
takeover issue, the Court should decide it on the merits. Otherwise
that fundamental issue would remain undecided awaiting still further
litigation.

[7] MCL 550.301; MSA 24.591, MCL 550.501; MSA 24.621.

[8] GCR 1963, 797.1.

II

BCBSM, like most not-for-profit corporations,[9] is organized as a membership corporation.[10] The members generally control the enterprise through the power to elect directors and the powers, generally retained, to perpetuate control by electing new members, adopting and amending bylaws, and amending the articles of incorporation.

Act 350 requires BCBSM to reincorporate under that act.[11] The act retains the form of a membership corporation, but eliminates the substance by (i) eliminating the powers of members (or of directors elected by members)[12] to elect directors and amend the articles and bylaws, and (ii) providing that seventy-five percent of the directors and members shall be elected or appointed by BCBSM subscribers and other persons who are not now members of BCBSM.

The act provides that the board of directors shall not exceed thirty-five persons. Four of the directors shall be appointed by the Governor. Not more than twenty-five percent may be providers (physicians and hospitals). One may be an officer of BCBSM. The remaining twenty-two directors shall be elected by subscribers. Six of the eight provider directors shall be "as broadly representative of provider classes as possible." The "method of selection of each category of subscribers . . . shall maximize subscriber participation to the extent reasonably practicable."[13]

---

[9] MCL 450.117 *et seq.;* MSA 21.118 *et seq.*

[10] MCL 550.302-550.303; MSA 24.592-24.593, MCL 550.501; MSA 24.621, MCL 550.504; MSA 24.624.

[11] MCL 550.1701; MSA 24.660(701).

[12] The validity of a self-perpetuity board of directors is not in issue and I express no opinion thereon.

[13] "Sec. 301. (1) The property and lawful business of a health care corporation existing and authorized to do business under this act

A purpose of this legislation, as set forth in the opinion of the Court,[14] is to reduce or eliminate control of BCBSM by the providers who originally organized BCBSM[15] and who have largely influenced

shall be held and managed by a board of directors to consist of *not more than 35 members* . . . .

"(2) *Four* voting members of the board shall be representatives of the public appointed *by the Governor* by and with the advice and consent of the senate. . . .

"(3) The board of directors shall consist of *not more than 25% provider directors.* In addition to physician and hospital provider directors, not less than 1 provider director shall be a registered professional *nurse* who shall be representative of licensees under part 172 of Act No. 368 of the Public Acts of 1978, as amended, being sections 333.17201 to 333.17242 of the Michigan Compiled Laws, and not less than 1 provider director shall be representative of the provider whose services, in the calendar year immediately preceding the effective date of this act in the case of an existing health care corporation, or, in the calendar year immediately following incorporation in the case of a newly-formed health care corporation, generated the largest number of benefit claims received by the corporation from its subscribers. Other provider directors shall be as *broadly representative of provider classes* as possible.

"(4) The bylaws of a health care corporation may authorize not more than 1 officer or employee of the corporation to serve as a voting or nonvoting director.

"(5) The *remaining members of the board* of directors shall include representatives of large subscriber groups, medium subscriber groups, small subscriber groups, and nongroup subscribers, in proportions which fairly represent the total subscriber population of the health care corporation. However, at least 3 directors shall represent nongroup subscribers, at least 1 of whom shall be a retired individual 62 years of age or older, and at least 3 directors shall represent small subscriber groups. Large and medium subscriber groups shall be represented, to the greatest extent possible, by an equal number of labor and management representatives and shall be categorized as labor subscriber representatives or management subscriber representatives.

"(6) The method of selection of the directors, other than the directors who are representatives of the public, and additional provisions and requirements for further refinement or specification regarding the number of directors comprising each component shall be specified in the bylaws. . . .

"(7) The method of selection of each category of subscribers entitled to representation on the board under subsection (5) shall *maximize subscriber participation to the extent reasonably practicable.* " MCL 550.1301(1)-(7); MSA 24.660(301)(1)-(7). (Emphasis supplied.)

[14] *Ante,* pp 35, 47, 62.

[15] See Hollister & Drake, *The Nonprofit Health Care Corporation Reform Act of 1980,* 14 U Mich J L Ref 433, 435-436 (1981).

and may still dominate and control BCBSM;[16] and to transfer from the current members of BCBSM to subscribers and providers—elected in the manner provided in Act 350 and not in the manner provided by the articles of incorporation and bylaws of BCBSM—and the persons elected by them and to the four appointees of the Governor the power to control the business of BCBSM.[17]

Because BCBSM—like other not-for-profit corporations—must be operated solely for the not-for-profit purpose for which it was organized, the current members of BCBSM, their successors—the directors they elect—not subscribers or the people —have the established property right to determine how that purpose shall be achieved.

A

The opinion of the Court indicates that the change in the governance of BCBSM is a governmental regulation enacted in the exercise of the "police power"[18] to promote "health, safety, mor-

[16] The circuit judge found that there was no competent evidence that "the current board of directors of BCBSM is, or is not, provider dominated."

[17] The act further provides for the establishment of a membership of BCBSM composed of subscribers, providers, and appointees of the Governor selected in essentially the same manner and proportions as are directors:

"Sec. 305. (1) A health care corporation may establish a corporate body. The corporate body shall consist of individuals *selected in the same manner as individuals are selected to serve as nonpublic members on the board of directors.* The size of the corporate body shall be such that, for each nonpublic voting director on the board of directors of the corporation, there are 2 members of the corporate body. The 4 public members selected pursuant to section 301(2) shall be considered to be members of the corporate body as well as members of the board of directors. An additional 4 public members shall be appointed to the corporate body by the governor by and with the advice and consent of the senate . . . ." MCL 550.1305; MSA 24.660(305). (Emphasis supplied.)

[18] *Ante,* p 46.

als, or general welfare of the public,"[19] and that this "regulation" does not constitute a taking of private property because "[t]he members of BCBSM, unlike stockholders of a corporation, have no 'investment-backed expectations' in their unqualified right to control BCBSM" and because there has been no " 'physical invasion by *government*' over BCBSM's corporate direction" or "*governmental* 'taking' of BCBSM's property."[20]

The opinion of the Court does not state why the majority have concluded that the members of BCBSM do not have "investment-backed expectations" other than that BCBSM is a membership, rather than a stock, corporation. Presumably the distinction drawn by the majority rests on something more substantial than whether the interests of the incorporators and the successor members are embodied in a piece of paper called a stock certificate. Because the majority fails to state the basis of the distinction, I am left to surmise that they have concluded either that the members of BCBSM do not have an "investment" in BCBSM or an "expectation" that the Legislature would not eliminate their power to elect directors of their choice, or both.

## B

Since the Legislature has never sought to transfer the control of any corporation, including of a membership corporation, from the persons in control to others and, as far as I can determine, this is without precedent in this country,[21] the members of BCBSM had a reasonable and substantial "expec-

[19] *Ante,* p 46.

[20] *Ante,* p 47.

[21] See *Board of Regents of the University of Maryland v Trustees of the Endowment Fund of the University of Maryland,* 206 Md 559, 569-571; 112 A2d 678 (1955), discussed in text accompanying n 23.

tation" that the Legislature would not eliminate their power to elect the overwhelming majority of the directors.

## C

Before turning to the question whether the members of BCBSM had either an "investment" in BCBSM or an "investment-backed expectation," it should be noted that the United States Supreme Court has said "[t]here is no set formula to determine where regulation ends and taking begins." *Goldblatt v Town of Hempstead,* 369 US 590, 594; 82 S Ct 987; 8 L Ed 2d 130 (1962). Preceding the statement by the Court in *Penn Central Transportation Co v City of New York,* 438 US 104; 98 S Ct 2646; 57 L Ed 2d 631 (1978), that "the extent to which the regulation has interfered with distinct investment-backed expectations" is a "relevant consideration," the Court acknowledged that, in deciding whether a regulation will be deemed to be a noncompensable adjustment of the "benefits and burdens of economic life to promote the common good" or a compensable taking, it had engaged in "essentially ad hoc, factual inquiries." *Penn Central, supra,* p 124. In holding that a federal regulation requiring public access to a private marina adjoining navigable waters was a taking although the government could have refused to have allowed the dredging that made the marina navigable, the Court said it would not carry the "strict logic" of earlier decisions to their ultimate conclusion, and adverted to the observation of Justice Holmes "in a very different context" that "the life of the law has not been logic, it has been experience." *Kaiser Aetna v United States,* 444 US 164, 177, 179; 100 S Ct 383; 62 L Ed 2d 332 (1979). And in *Pennsylvania Coal Co v Mahon,* 260 US 393,

416; 43 S Ct 158; 67 L Ed 322 (1922), the Court said that because Takings Clause questions are "questions of degree" they "cannot be disposed of by general propositions."

Most of the Court's statements regarding the Takings Clause have been made, as in *Pennsylvania Coal Co, Goldblatt, Penn Central,* and *Kaiser,* in cases challenging land use regulations. The question ordinarily is whether a regulation barring a land owner from exploiting some undeveloped aspect of his property—unmined coal in *Pennsylvania Coal Co, supra,* dredging and pit excavating in *Goldblatt,* air rights over Grand Central Station in *Penn Central,* and the privacy of a marina in *Kaiser*—is a taking.

Act 350 does not seek to preclude the members of BCBSM from exploiting opportunities for changes in the bylaws or control of BCBSM not yet implemented—expectancies not yet exploited[22]—but rather seeks to transfer control of BCBSM, as it has developed as a result of prior exploitations. If the New York Legislature had sought to transfer control of Grand Central Station itself, surely a different result would have been reached in *Penn Central.*

A closer analogy than air rights over Grand Central Station is the marina in *Kaiser.* Although, as the Court acknowledged, the government might have barred the dredging of the marina or might have conditioned its approval of the dredging on compliance with various measures appropriate to the promotion of navigation, the body of water resulting from the dredging was private property

---

[22] The bylaws of BCBSM, approved by the Commissioner of Insurance, permit a majority of the directors to amend the bylaws and thus to reduce the number of representatives on the board of directors of "substantial group purchasers" of BCBSM coverage and representatives of labor unions having "substantial membership representatives" enrolled in BCBSM.

under Hawaii law and was linked to navigable water by a channel dredged with the consent of the government. The Court said that the " 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the government cannot take without compensation." *Kaiser,* pp 179-180. So too here. The Legislature need not have exempted BCBSM from taxation, but, having done so, it cannot now belatedly exact a power to control BCBSM in exchange for the tax exemption.

D

Although most of the Takings Clause cases concern land use regulations, intangible personal property is property within the meaning of the Takings Clause. See *Armstrong v United States,* 364 US 40, 44; 80 S Ct 1563; 4 L Ed 2d 1554 (1960), holding that a materialman's lien was protected property. Nor is it determinative whether there has been a physical occupation of the property (see *Pennsylvania Coal Co* where the proscription of coal mining involved no physical occupation) or whether the state itself has taken over the property or directly benefited from the regulation. See *Loretto v Teleprompter Manhattan CATV Corp,* 458 US 419; 102 S Ct 3164; 73 L Ed 2d 868 (1982), holding that a law requiring landlords to allow cable television facilities on property was a taking, and *Kaiser,* holding that a regulation allowing the public to enter a private marina was a taking. The absence of a " 'physical invasion by *government*' " or of a *"governmental* 'taking' " in the sense of the state itself taking over BCBSM directly, is not determinative.

E

BCBSM, it is complained,[23] has excluded from its
membership and board of directors representatives
of subscribers other than the representatives of
large corporate subscribers and large labor un-
ions[24] with the result that small and medium-sized
subscribers and senior citizens are unrepresented

[23] See ns 14-15 and accompanying text. Neither Act 350 nor any
other act of the Legislature provides for the payment of just compen-
sation for the taking of property resulting from the enactment of Act
350.

[24] BCBSM was organized under restated articles of incorporation as
the successor of Michigan Hospital Service and Michigan Medical
Service. Both prior corporations were organized under the 1939
enabling legislation, see n 33. Blue Cross was incorporated with
$10,000, one-third of which amount was contributed each by Harper,
Grace, and Ford Hospitals. Blue Shield was organized with some
$16,000 contributed by the Michigan State Medical Society, an organi-
zation of physicians. Not surprisingly, representatives of the hospitals
dominated the board of Michigan Hospital Service, and physicians
dominated the membership and board of Michigan Medical Service,
and, not surprisingly, once having obtained those positions, they have
sought to retain the control they had at the outset.

In 1974, the two corporations were merged into the present BCBSM,
and restated articles were filed stating in pertinent part that the
present members of the corporation shall be persons named in accor-
dance with the provisions of the plan of consolidation. Successor
members shall be chosen in accordance with the bylaws. The articles
further provide that the board of directors may adopt, amend, or alter
the bylaws.

The bylaws provided for the present classification of membership,
twenty-eight representatives of substantial group purchasers of Blue
Cross and Blue Shield coverage, ten representatives of labor unions
which have substantial membership segments enrolled in BCBSM,
twelve consumers who shall be subscribers "influential in community
affairs," four consumers named by the Commissioner of Insurance,
fourteen doctors of medicine, four doctors of osteopathy, eighteen
representatives of participating hospitals, two pharmacists, and the
president of the corporation.

The board of directors consists of representatives of each class, but
only half of the members of each class are directors. Thus, there are
fourteen representatives on the board of directors of substantial group
purchasers, five from labor unions which have substantial member-
ship segments enrolled in BCBSM, six consumers influential in commu-
nity affairs, two appointees of the Commissioner of Insurance, seven
doctors of medicine, two doctors of osteopathy, nine representatives of
hospitals, one pharmacist, and the president of the corporation ex
officio.

or inadequately represented and the representatives of providers (hospitals and doctors) dominate BCBSM. In deciding whether the provisions of Act 350 that respond to that complaint by transferring the control of the business of BCBSM now shared by the representatives of providers and the large corporate subscribers and unions to representatives of the Governor and subscribers and providers not represented, is a regulation or a taking, we should bear in mind the admonition of the United States Supreme Court that "a State, by ipse dixit, may not transform private property into public property without compensation . . . ." *Webb's Fabulous Pharmacies, Inc v Beckwith,* 449 US 155, 164; 101 S Ct 446; 66 L Ed 2d 358 (1980). We should also have in mind Justice Holmes' observations in *Pennsylvania Coal Co, supra,* p 415, that "if regulation goes too far it will be recognized as a taking." When the regulation reaches "a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts." *Id.,* p 413. "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we have already said, this is a question of degree—and therefore cannot be disposed of by general propositions. But we regard this as going beyond any of the cases decided by this Court." *Id.,* p 416.

## F

This too goes "beyond any of the cases decided

---

Thus, of the forty-seven directors, nineteen are providers: the nine doctors, nine hospital representatives, and one pharmacist. Thus, if they vote together, they need only the votes of the president and four other persons to have a majority.

[by the United States Supreme Court]" or any other court except the Maryland Court of Appeals which struck down a statute purporting to transfer control of a corporation formed to act as trustee of an endowment funded for the benefit of a state university to the regents of that university. *Board of Regents of the University of Maryland v Trustees of the Endowment Fund of the University of Maryland,* 206 Md 559, 569-571; 112 A2d 678 (1955).[25]

## G

We may assume, without deciding, that the proposed transformation of the governance of BCBSM is for a public use.[26] If it is not and there has been a taking, then Act 350 is invalid on that ground. We therefore need only decide whether the proposed transformation of the governance of BCBSM is a taking.

## H

The property of nonprofit organizations and corporations is private property although the members, directors, and trustees of such organizations are obliged to use the property for the purpose for which the organization or corporation was organized and may not divert the property to their own personal benefit. The property of such an organization or corporation, no less so than the

---

[25] In *In re Mt Sinai Hospital,* 250 NY 103; 164 NE 871 (1928), the challenged legislation sought to preserve the control of the present directors of the hospital against possible interference by members who had no reasonable expectation of obtaining control and would only do so as a result of an unanticipated change in circumstances, a change in the method of financing public philanthropies.

[26] See n 1 and *Berman v Parker,* 348 US 26; 75 S Ct 98; 99 L Ed 27 (1954).

property of a profit corporation, is protected from an uncompensated taking for public use by the Takings Clause.

If the state, through the exercise of the power of eminent domain, purchases the property of a non-profit corporation, the members and directors of the nonprofit corporation would, upon payment of just compensation for the going business value and other assets of the enterprise, be required to hold the proceeds as trustees to be used for the not-for-profit purpose for which the enterprise was organized.

I

Control of a corporation is a property interest[27] and therefore may not be appropriated by the state and transferred from the persons in control to other persons without the payment of just compensation.[28]

[27] In *Board of Regents v Roth,* 408 US 564, 577; 92 S Ct 2701; 33 L Ed 2d 548 (1972), the United States Supreme Court said: "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." See also *Perry v Sindermann,* 408 US 593, 601; 92 S Ct 2694; 33 L Ed 2d 570 (1972); *Geriatrics, Inc v Harris,* 640 F2d 262, 264 (CA 10, 1981); *Baden v Koch,* 638 F2d 486, 489 (CA 2, 1980).

It is established state law that corporate control is a property interest that belongs to the corporation. See *Rowen v Le Mars Mutual Ins Co of Iowa,* 282 NW2d 639, 650 (Iowa, 1979); Berle, *The price of power: Sale of corporate control,* 50 Cornell L Q 628, 635 (1965); Bayne, *A philosophy of corporate control,* 112 U Pa L R 22, 50 (1963); Henn & Alexander, Laws of Corporations (3d ed), § 241, pp 656-661.

Corporate control is not always synonymous with ownership. "[Economists] see [corporate control] as a crucial element in the functioning of society's most important economic institution, the business firm. To them control means planning the firm's long-term strategy; allocating its resources; selecting products, markets, and technology; and making other key decisions." Werner, Book Review, 83 Colum L R 238, 239 (1983).

The stockholders of a stock corporation and the members of a membership corporation elect the directors or trustees of the corporation who, generally by majority vote, exercise that control.

[28] The concept that property cannot be taken by the state except

## J

I turn to a consideration of whether the rule is different where a nonprofit organization or corporation is involved on the ground that the members do not have an investment in the enterprise.

The present members of BCBSM are in the main the successors in interest of the persons who created the original constituent corporations in 1940 following the enactment of the enabling acts.[29]

One of the constituent corporations, Michigan Hospital Service, was organized with a cash contribution from three hospitals of $10,000, and the other, Michigan Medical Service, with a cash contribution of $16,000 from the Michigan State Medical Society. Without those cash investments and the volunteered labor of countless representatives of hospitals and the medical profession, BCBSM would not have grown as it has. That labor and money is an investment. Just as the person who endowed the corporation founded as a trustee of an endowment fund for the state university in *University of Maryland, supra,* had a constitutionally protected right and expectancy to choose the trustees and to provide for their succession, so too did the persons who created Blue Cross and Blue Shield, and by their cash contributions and labors made BCBSM constituent corporations and valuable enterprises, so much so that the state would take them over rather than itself create a health care agency of state government.

Ordinarily, neither the members nor directors or

upon payment of just compensation is "inherent in the definition of due process." Nowak, Rotunda & Young, Constitutional Law (2d ed), p 483, citing *Chicago, B & Q R Co v Chicago,* 166 US 226, 239; 17 S Ct 581; 41 L Ed 979 (1897), and *Webb's Fabulous Pharmacies, Inc v Beckwith,* 449 US 155, 160; 101 S Ct 446; 66 L Ed 2d 358 (1980).

See also Const 1963, art 10, § 2.

[29] See n 24.

trustees of a not-for-profit corporation have a personal financial interest in the property, income, or business of the organization or enterprise.[30] Most members, directors, and trustees serve without any expectation of immediate personal financial gain and with little or no financial commitment other than annual payment of dues or subscriptions to further the purposes of the organization or enterprise along with others who are neither members, directors, nor trustees.

There are countless such voluntary associations, organizations, and enterprises. The reasoning of the Court might permit the Legislature to transfer control of those associations, organizations, and enterprises from the persons who organized them, gave them life, and through their efforts sustained them, to whomever the Legislature chooses to confer that power.

The majority says that this can be done "to promote the interests of all component groups [BCBSM] was designed to serve and to reduce the possibility of any one group gaining unassailable dominance over the corporation." This analysis would mean that the Legislature could change the governance of the United Foundation, a Michigan nonprofit corporation. The United Foundation, like BCBSM, subsists by reason of contributions made by hundreds of thousands, possibly millions, of persons. Some may think that it would be more equitable if the directors were chosen by small contributors voting as a class electing some of the directors, medium-sized contributors electing another class of directors, and large-sized contrib-

---

[30] Some members, directors, or trustees may have made voluntary financial contributions to the organization. Others may have become salaried employees. Others may prosper through legitimate financial dealings with the organization. And still others may wield financial power by providing others with employment or authorizing contracts with providers of goods and services.

utors electing still another class of directors, all
pursuant to rules and regulations established and
administered by a governmental functionary.
Some might even think that it would be more
equitable if the agencies served by the United
Foundation, equivalent in a sense to the providers
in the instant case, could also participate in the
governance. There seems to be nothing in the
Court's analysis of the Takings Clause which
would preclude the Legislature from so transform-
ing the governance of the United Foundation.
Auto Club Insurance Association, formerly Detroit
Automobile Inter-Insurance Exchange, is a volun-
tary association which has been dominated for
many years by persons who are the successors of
those who organized that enterprise. Auto Club,
like BCBSM, has been subjected to regulation by the
Commissioner of Insurance with regard to some of
its underwriting practices. Under the Court's anal-
ysis, the Legislature could by fiat transform the
governance of Auto Club, allow the Governor to
appoint members to its Board of Governors, and
take over the process by which the Governors of
the Auto Club are elected so that no one group
may continue to exercise "unassailable domi-
nance" of that association, and insureds are ade-
quately represented and have adequate input into
the rate structure, the underwriting of risks, and
the payment of claims.

Further, (i) the "substantial group purchasers"
(Chrysler Corporation [which filed a brief amicus
curiae], Ford Motor Company, General Motors
Corporation, Michigan Farm Bureau, Michigan
Bell Telephone Company, and The Bendix Corpo-
ration), each of which corporations have one repre-
sentative on the board of directors and one addi-
tional representative in the membership of BCBSM,
and (ii) the unions (the UAW has three directors

and three additional members, the AFL-CIO two
directors and one additional member) and (iii) the
other large purchasers of BCBSM coverage repre-
sented on the board of directors or in the member-
ship (Michigan National Corporation, Ex Cell-O
Corporation, Burroughs Corporation, National
Bank of Detroit, Dana Corporation, Crowley, Mil-
ner & Company), may have investment-backed
expectations resulting from expenditures of money
and energy to develop prepaid health care con-
tracts with BCBSM providing the coverage they
desire and assurances of continuing good relation-
ships with BCBSM resulting from participation in
its membership and board of directors and the
influence they may thereby exert.

A principal component of the going business
value of BCBSM is its capacity to administer a
system of financing and payment for health care
services between subscribers and providers on a
state-wide basis, at levels of quality established by
subscribers and providers, to the extent they influ-
ence BCBSM decisions, in competition with what-
ever level of quality is or would be provided under
commercially insured prepaid health care plans.
That capacity and going business value is the
result of an investment of money and labor and is
property of value to the corporate and union users
and the providers, whose representatives in the
membership and on the board of directors of
BCBSM do indeed dominate BCBSM.

I am not now questioning the power of the
Legislature to decide upon the manner in which
the governance of organizations such as BCBSM,
United Foundation, and Auto Club, shall be deter-
mined.[31] All three are supported and thrive only

---

[31] Detroit Edison and Consumers Power in contrast with BCBSM are
quasi-public corporations. See *Wenham v Dep't of Public Utilities,* 333
Mass 15, 16; 127 NE2d 791 (1955). Both Detroit Edison and Consum-
ers Power have been intrusively and vigorously regulated.

because of contributions and payments by hundreds of thousands or millions of persons who may not have an effective voice in the governance of those enterprises. The socialization or democratization—choose your idiom—of such organizations may be in the public interest. That is indeed a legislative not a constitutional question.

## K

The opinion of the Court asserts that BCBSM has always been subject to intrusive governmental regulation. In actuality, it has been subject to limited regulation. In *Blue Cross & Blue Shield of Michigan v Ins Comm'r*, 403 Mich 399; 270 NW2d 845 (1978), this Court said, in effect, that the Commissioner of Insurance had only limited regulatory power.[32] He had no power with regard to physician's fees, and the only power that we recognized with regard to hospital charges was the power to eliminate charges that would result in waste.

Nor is it true that the original 1939 enabling acts conferred any significant power on the Attor-

Although no one would question that their stockholders have distinct investment-backed expectations, it might not have an immediate or long-range adverse effect on the value of the common stocks of Consumers Power or Detroit Edison if the Governor were to be empowered to make his political appointees members of the board of directors and allow customers by classes, large, small, medium users, to elect still other directors. In this manner, "all component groups" that Consumers and Detroit Edison "were designed to serve" would be represented more equitably.

Again, I do not question the power of the Legislature to enact laws concerning the governance of private corporations whether they be profit or nonprofit corporations. It is a separate issue, however, whether such a law transforming the governance of a private profit or nonprofit association, corporation, or enterprise constitutes a taking of private property.

[32] See *Westland Convalescent Center v Blue Cross & Blue Shield of Michigan*, 414 Mich 247, 280-282; 324 NW2d 851 (1982) (LEVIN, J., *concurring*).

ney General or the Commissioner of Insurance regarding the governance of the Blue Cross and Blue Shield constituent corporations. While the 1939 enabling acts required that the articles of association be submitted to the Attorney General for his examination, they also provided that if he found the articles "to be in compliance with this act, he *shall* so certify to the Commissioner of Insurance."[33] The Attorney General thus was not empowered to require provisions such as those contained in Act 350 regarding the distribution of the power of governance of Blue Cross or Blue Shield. Michigan Hospital Service was required to have representation from the public, hospitals, and the medical profession on its board of directors,[34] and the Michigan Medical Service to have representatives of the public and the medical profession on its board.[35] It appears that the Attorney General and the Insurance Commissioner were satisfied that those requirements were complied with by, and therefore mean no more than, a board of directors consisting of between twenty and thirty percent nonproviders for Michigan Hospital Service and less than fifteen percent for Michigan Medical Service.

There was no requirement that those public members be representatives of the subscribers or indeed that they be subscribers.

The 1974 amendments, concerning the merger of the constituent corporations, also provided for representation from the "public, the medical profession, and the participating hospitals . . . ."[36] The Commissioner of Insurance was given the power to disapprove the plan of merger or consolidation, but

[33] MCL 550.304; MSA 24.594.
[34] MCL 550.502; MSA 24.622.
[35] MCL 550.308; MSA 24.598.
[36] MCL 550.309a; MSA 24.599(1).

only upon designation of those provisions of the proposed plan or merger or consolidation that did not satisfy the requirements of the amendatory act. Provision was also made for judicial review of such disapproval by the Ingham Circuit Court, and the question was narrowed to whether the plan satisfied the requirements of the amendatory act. Clearly, the Commissioner of Insurance, just as the Attorney General, was denied discretion. There is still other language stating that the articles may be amended "with the approval of the Commissioner of Insurance" but it is stated that she may do so in any manner "not inconsistent with the provisions of this act."[37]

The Legislature thus circumscribed and limited the power of the commissioner and Attorney General to disapprove the provisions of the articles. The statements in the opinion of the Court to the effect that BCBSM has always been subject to intrusive governmental regulation ignore the limitations on the commissioner's power spelled out in the enabling acts and recognized by this Court in *Blue Cross.* Indeed, the Court's analysis or characterization of the history of regulation of BCBSM is inconsistent with the reason why we are here today. If the commissioner or the Attorney General had significant power there would have been no need to enact Act 350. It is because they did not have power that Act 350 was enacted. The Court seeks to justify radical legislation on the basis that there is no substantial change or enlargement of the degree of regulation although the Legislature would have had no occasion to enact Act 350 to bring about no substantial change. The

---

[37] MCL 550.304; MSA 24.594.

The Michigan Hospital Service Corporation enabling act does not contain the "not inconsistent with the provisions of this act" language. MCL 550.305; MSA 24.595.

majority cannot justifiably excuse or ignore the challenges of BCBSM on the basis that there is no substantial change.

In light of the foregoing history, it cannot properly be said that the organizers of the BCBSM constituent corporations and of BCBSM and the members thereof should have anticipated that the Legislature might seek to so transform the governance of BCBSM.

## III

BCBSM challenges the constitutionality of provisions of Act 350 on the grounds that they impair the obligation of contract,[38] deprive BCBSM of property without due process of law[39] and of the equal protection of the laws,[40] and constitute an unconstitutional delegation of legislative authority.[41]

I conclude that the provision(s) of Act 350 that

(1) Transfer from the present members of BCBSM to BCBSM subscribers and others the power to select the members[42] and the directors[43] of BCBSM, and from the members to the newly constituted board of directors the powers to amend the articles of incorporation[44] and bylaws,[45] and that expand the purposes of the corporation to include providing subscribers "reasonable access to, and reasonable cost and quality of, health care services" and achieving the statutory goals "relative to access,

---

[38] Const 1963, art 1, § 10.
[39] Const 1963, art 1, § 17. See also US Const, Am XIV.
[40] Const 1963, art 1, § 2.
[41] Const 1963, art 4, § 1. See also US Const, Am XIV.
[42] MCL 550.1305; MSA 24.660(305). See n 17 for text.
[43] MCL 550.1301; MSA 24.660(301). See n 13 for text.
[44] MCL 550.1202-550.1203; MSA 24.660(202)-24.660(203).
[45] MCL 550.1302; MSA 24.660(302).

quality and cost of health care services,"[46] that impose on directors a fiduciary obligation to BCBSM subscribers as well as to BCBSM[47] and that provide, upon a dissolution of BCBSM, for the escheat to the state of its assets,[48] are violative of the Due Process Clause;

(2) Provide for a panel of three actuaries to review risk factors disapproved by the Commissioner of Insurance,[49] and provide for the appointment of retired circuit court judges[50] to review disapprovals by the commissioner of provider class plans and other appeals arising under part 5 of the act[51] are invalid because they constitute an unconstitutional delegation of legislative authority;

(3) Impose limitations on BCBSM with respect to administrative services only (ASO) contracts[52] different from those imposed on commercial prepaid health insurers[53] are violative of the Equal Protection Clause, and the provisions that impose limitations on BCBSM with respect to packaging life insurance[54] different from those imposed on commercial prepaid health insurers[55] may be violative of the Equal Protection Clause;

---

[46] MCL 550.1202(d); MSA 24.660(202)(d). See n 65 for text.

[47] MCL 550.1310; MSA 24.660(310). See n 66 for text.

[48] MCL 550.1217; MSA 24.660(217). See n 67 for text.

[49] MCL 550.1205(5), (6); MSA 24.660(205)(5), (6). See n 71 for text.

[50] MCL 550.1514; MSA 24.660(514). See n 78 for text.

[51] MCL 550.1515; MSA 24.660(515). See also MCL 550.1501; MSA 24.660(501), MCL 550.1502(7); MSA 24.660(502)(7), MCL 550.1508; MSA 24.660(508), MCL 550.1516; MSA 24.660(516), MCL 550.1518; MSA 24.660(518).

[52] MCL 550.1211; MSA 24.660(211).

[53] MCL 500.5208; MSA 24.15208, MCL 500.5208a; MSA 24.15208(1). See also MCL 500.3425; MSA 24.13425, MCL 500.3609a; MSA 24.13609(1).

[54] MCL 550.1206(4); MSA 24.660(206)(4).

[55] No provision of the Insurance Code bars or limits a commercial prepaid health insurer from marketing both health and life insurance.

(4) Bars BCBSM from limiting or denying coverage or reimbursement on the ground that services were rendered while the subscriber was in a health care facility operated by the state[56] is valid, but the provision requiring BCBSM to accord participation status to such a health care facility[57] is violative of the equal protection component[58] of the Due Process Clause;

(5) Empower the commissioner to issue a cease and desist order and exact a fine on a finding of probable cause[59] and authorize the commissioner to suspend BCBSM's certificate of authority summarily without a hearing[60] are violative of the Due Process Clause;

(6) Requires BCBSM to offer to all residents of the state the opportunity to become a subscriber,[61] although somewhat ambiguous, is not facially unconstitutional;

(7) Requires BCBSM to provide an informal procedure for subscriber complaints[62] and requires BCBSM to submit new or revised subscriber certificates to the commissioner for approval[63] is not unconstitutional;

(8) Requires BCBSM to reincorporate under Act 350[64] is unconstitutional because of the constitutional infirmities in the act.

The question whether the valid provisions of Act 350 are severable and enforceable has not been

---

[56] MCL 550.1401(7); MSA 24.660(401)(7). See n 89 for text.

[57] See n 56.

[58] Const 1963, art 1, § 17. 16A Am Jur 2d, Constitutional Law, § 816, p 978. See also 16A Am Jur 2d, Constitutional Law, §§ 740-741, pp 782 ff.

[59] MCL 550.1402(7), (8); MSA 24.660(402)(7), (8).

[60] MCL 550.1605(2); MSA 24.660(605)(2).

[61] MCL 550.1401(1); MSA 24.660(401)(1). See n 95 for text.

[62] MCL 550.1404; MSA 24.660(404).

[63] MCL 550.1607(1); MSA 24.660(607)(1).

[64] See n 12.

briefed and should be remanded to the circuit court for briefing and decision. We should retain jurisdiction.

## IV

The corporate purposes of BCBSM, which was organized to provide a means of *financing* payment for health care benefits, are enlarged by the act to impose on BCBSM the corporate obligations

(i) to provide residents of this state and subscribers the opportunity for "reasonable access to, and reasonable cost and quality of, health care services," and

(ii) to achieve the statutory goals of providing the state with a health care system that assures residents and subscribers such access to health care services with

(a) "an appropriate number of providers throughout this state,"

(b) providers that meet and abide by reasonable standards of health care quality, and

(c) a rate of change in reimbursement "to each provider class" that is not higher "than the compound rate of inflation and real economic growth."

BCBSM was organized to provide a means of financing payment for health care services, not to provide health care.[65] BCBSM is not a provider. It

---

[65] "(d) The purposes of the corporation, which shall be:

"(i) To provide health care benefits.

"(ii) To secure for all of the people of this state who apply for a certificate, the opportunity for access to coverage for health care services at a fair and reasonable price.

"(iii) To assure for nongroup and group subscribers, *reasonable access to, and reasonable cost and quality of,* health care services.

"(iv) To *achieve the goals of the corporation relative to access, quality, and cost of health care services,* as prescribed in section 504. . . ." MCL 550.1202(d); MSA 24.660(202)(d). (Emphasis supplied.)

See n 72 for the text of § 504.

cannot, consistent with the Due Process Clause, be required either

(i) to devote its assets to a business which it does not freely enter, or

(ii) to develop and police a quality health care system with an adequate number of providers who both meet and abide by reasonable standards established by it or by the commissioner or, on appeal, by a retired circuit court judge, and who are willing to accept as compensation remuneration subject to a rate of change in reimbursement that does not exceed "the compound rate of inflation and real economic growth."

Bcbsm, although the largest prepaid health carrier, does not have a monopoly of the prepaid health care market. It is in competition with the commercial prepaid health insurers.

The state might seek to develop and police a health care system that seeks to establish standards for providers and to control their compensation at levels of service determined by the state. Such legislation might be valid. The state would then have assumed the responsibility for providing and achieving the goals of assuring all residents of the state, or all who are willing and able to prepay for health care services, "reasonable access to, and reasonable cost and quality of, health care services," "an appropriate number of providers throughout the state," and that providers "meet and abide by reasonable standards of health care quality" and none are compensated at a rate of

The original enabling acts provided that the articles of incorporation shall state "the purposes of corporations." MCL 550.303; MSA 24.593, MCL 550.504; MSA 24.624.

The restated articles of incorporation of bcbsm state that its purpose is to "exercise all of the power" of a medical care corporation organized under 1939 PA 108 and of a hospital service corporation organized under 1939 PA 109.

change in reimbursement higher "than the compound rate of inflation and real economic growth."

*All* prepaid health carriers would, assuming the constitutionality of such legislation, then be prohibited from reimbursing providers at a higher rate and providers would be prohibited from accepting more than the state established level of reimbursement. It would then be the state's responsibility to police the system.

The burden sought to be imposed on BCBSM would deny it due process of law and the equal protection of the laws. BCBSM cannot be required to undertake alone to provide health care services to subscribers or residents of this state or to achieve a lower rate of reimbursement and the other goals of the legislation.

## V

The act also provides that the directors of BCBSM have a fiduciary obligation to the subscribers of BCBSM as well as to BCBSM,[66] and that, upon a dissolution of BCBSM, its assets shall escheat to the state.[67]

As set forth in part II(H), upon a dissolution of BCBSM, its properties would be required to be held and used by the members and directors as trustees

---

[66] "Sec. 310. (1) With respect to management of the affairs and property of the health care corporation, and in the selection, supervision, and control of committees of the board, employees of the health care corporation, and officers, each director and officer, and the composite board, shall exercise the duties of a fiduciary toward the health care corporation *and the subscribers* of the health care corporation as a whole, and shall discharge his or her duties with the degree of diligence, care, and skill which an ordinarily prudent person would exercise under the same or similar circumstances in a like position." MCL 550.1310; MSA 24.660(310). (Emphasis supplied.)

[67] "Sec. 217. Upon dissolution of a health care corporation, the assets remaining after the payment of all debts of the corporation *shall escheat to the state.*" MCL 550.1217; MSA 24.660(217). (Emphasis supplied.)

for the not-for-profit purpose for which BCBSM was organized, and accordingly are not subject to confiscation by escheat.

The fiduciary obligation of BCBSM directors to BCBSM and the fiduciary obligation sought to be imposed by Act 350 on its directors for the benefit of BCBSM subscribers[68] are in conflict. Requiring directors of BCBSM to serve two masters deprives BCBSM of the undivided loyalty of its directors in violation of the Due Process Clause.

Similarly, minutes of meetings of the directors of BCBSM are property which BCBSM may not be required to disclose except for limited purposes.[69]

The foregoing conclusions make it unnecessary to reach BCBSM's Contract Clause claims.

## VI

I agree with the majority[70] that the provisions of the act conferring on three actuaries the power to resolve risk factor disputes[71] constitute an unlawful delegation of legislative power under the cir-

---

[68] See n 67.

[69] Although minutes are property, disclosure might be required to the Commissioner of Insurance or in a lawsuit where the subject covered by the minutes are relevant. Act 350 goes further, however, in making them generally available to subscribers and, thus, readily available to a competitor of BCBSM. MCL 550.1304; MSA 24.660(304).

[70] *Ante,* p 96.

[71] "(5) Within 30 days after receipt of the risk factors filed pursuant to subsection (4), the commissioner shall do 1 of the following:

"(a) Approve the factors and proceed under subsection (7).

"(b) Define 1 or more additional lines of business, transmit the definitions to the health care corporation, and request that the corporation establish risk factors for those additional lines. The corporation shall then have 60 days to submit a risk factor for each line of business defined by either the commissioner or the corporation, which shall be approved or disapproved by the commissioner under this subsection. A health care corporation may revise a previously filed risk factor under this subsection.

"(c) Disapprove the factors, and proceed under subsection (6).

"(6) If the risk factors are disapproved by the commissioner pursuant to subsection (5)(c), the commissioner shall immediately notify the

cumstance that no standard is stated to guide the commissioner in the exercise of the power confided to her with the result that the actuaries are also without guidance.

## VII

The provisions of part 5 of the act concerning provider plans also constitute an unlawful delegation of legislative power to the commissioner and the hearing officers. The goals of an "appropriate number of providers," "reasonable standards of health care quality" and compensation of providers at a rate of change in reimbursement "that is not higher than the compound rate of inflation and real economic growth"[72] coupled with the re-

---

health care corporation of the disapproval. Within 6 months following notification, a panel of 3 actuaries, 1 appointed by the commissioner, 1 by the corporation, and 1 appointed by the 2 previously appointed actuaries, shall determine a risk factor for each line of business. The agreement of any 2 actuaries on the panel shall be sufficient for the determination of the risk factors, and the panel shall transmit a copy of the risk factors to both the commissioner and the corporation." MCL 550.1205; MSA 24.660(205).

[72] "Sec. 504. (1) A health care corporation shall, with respect to providers, contract with or enter into a reimbursement arrangement to assure subscribers reasonable access to, and reasonable cost and quality of, health care services, in accordance with the following *goals:*

"(a) There will be an *appropriate number of providers* throughout this state to assure the availability of certificate-covered *health care services* to each subscriber.

"(b) Providers will meet and abide by reasonable standards of health care quality.

"(c) Providers will be subject to reimbursement arrangements that will assure a rate of change in the total corporation payment per member to each provider class that is not higher than *the compound rate of inflation and real economic growth.*

"(2) As used in this section:

"(a) 'Gross national product in constant dollars' means that term as defined and annually published by the United States department of commerce, bureau of economic analysis.

"(b) 'Implicit price deflator for gross national product' means that term as defined and annually published by the United States department of commerce, bureau of economic analysis.

quirements that there be "responsible cost controls" that "balance quality, accessibility and costs"[73] are undefined. There are no precedents or guides to limit the exercise of discretion. The ultimate decisional authority is vested in a retired circuit judge. The retired judge-hearing officer is empowered to decide that a provider class plan shall not be retained whereupon the commissioner may suspend or limit BCBSM's certificate of author-

---

"(c) 'Inflation' or 'I' means the arithmetic average of the percentage changes in the implicit price deflator for gross national product over the 2 calendar years immediately preceding the year in which the commissioner's determination is being made.

"(d) 'Compound rate of inflation and real economic growth' means the ratio of the quantity '100 plus inflation', multiplied by the quantity '100 plus real economic growth', to 100; minus 100; or as expressed in the following formula:

$$\left[ \frac{(100 + I) \times (100 + REG)}{100} \right] - 100$$

"(e) 'Rate of change in the total corporation payment per member to each provider class' means the arithmetic average of the percentage changes in the corporation payment per member for that provider class over the 2 years immediately preceding the commissioner's determination.

"(f) 'Real economic growth' or 'REG' means the arithmetic average of the percentage changes in the per capita gross national product in constant dollars over the 4 calendar years immediately preceding the year in which the commissioner's determination is being made.

"(3) Nothing in this section shall preclude efforts by a health care corporation supplemental to the goals prescribed in subsection (1)." MCL 550.1504; MSA 24.660(504).

[73] "Sec. 516. (1) All provider class plans retained by the commissioner under section 513 or approved by the hearing officer shall maintain the following standards for all providers:

"(a) Responsible cost controls shall exist that balance quality, accessibility, and cost.

"(b) The health care corporation shall promote programs and policies which encourage cost-effective behavior by providers in accordance with the provisions of this act, and in accordance with all of the following:

"(i) There shall be a reasonable basis for believing that the programs will be effective.

"(ii) The programs applicable to a provider class shall be reviewed to avoid duplication or inconsistency, to the extent practicable." MCL 550.1516; MSA 24.660(516).

ity until BCBSM submits a provider class plan that "the hearing officer determines should be retained."[74]

The retired judge-hearing officers are not full-time governmental officials; here, in contrast with *Detroit v Detroit Police Officers Ass'n,* 408 Mich 410; 294 NW2d 68 (1980),[75] there is no standard of comparable wages, hours, or conditions of employment and traditional practices[76] to guide and limit

---

[74] "(5) After receipt of a provider class plan transmitted by the health care corporation pursuant to subsection (4), the hearing officer shall determine 1 of the following:

"(a) That the provider class plan prepared by the corporation shall be retained as provided in section 506(4).

"(b) That the provider class plan prepared by the corporation should not be retained as provided in section 506(4), and the commissioner may suspend or limit the corporation's certificate of authority until the corporation submits a provider class plan which the hearing officer determines should be retained as provided in section 506(4)." MCL 550.1515(5); MSA 24.660(515)(5).

[75] In this case, the Court held 1969 PA 312, concerning compulsory arbitration of labor disputes in police and fire departments, to be constitutional; I adhere to the views there expressed in dissent.

[76] "Sec. 9. Where there is no agreement between the parties, or where there is an agreement but the parties have begun negotiations or discussions looking to a new agreement or amendment of the existing agreement, and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions and order upon the following factors, as applicable.

\* \* \*

"(d) Comparison of the wages, hours and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours and conditions of employment of other employees performing similar services and with other employees generally:

"(i) In public employment in comparable communities.

"(ii) In private employment in comparable communities.

"(e) The average consumer prices for goods and services, commonly known as the cost of living.

\* \* \*

"(h) Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration or otherwise between the parties, in the public service or in private employment." MCL 423.239; MSA 17.455(39).

the exercise of discretion. Here there is neither comparability nor tradition because the concept of authorizing one prepaid health carrier or a commissioner of insurance or a retired judge-hearing officer to formulate health care policy for the state to achieve such conflicting goals through the mechanism of controlling the rates of payments by one prepaid health carrier to providers without the involvement of any other prepaid health carrier or the providers is unprecedented.

The concept is further flawed in involving the State Court Administrator. I agree with the majority[77] that the Legislature intended that the State Court Administrator would exercise some discretion in compiling the list of retired judges[78] and would have the power to exclude from the list judges whose performance was regarded as unsatisfactory. This means that the State Court Administrator, a person appointed by and who serves at the pleasure of this Court,[79] would be involved in the selection of hearing officers, thereby cloaking the decision reached by the hearing officer with the imprimatur of this Court's authority and possibly embarrassing further review by the Court of

[77] Ante, p 56.

[78] "Sec. 514. (1) All appeals under this part shall be held before an independent hearing officer. The state court administrator shall compile and maintain a list of individuals possessing all of the following qualifications:

"(a) Is a retired circuit court judge.

"(b) Is a resident of this state.

"(c) Is not engaged in the provision of health care services.

"(d) Is not an officer or employee of a health care provider, health care corporation, or an employee of this state. For purposes of this subdivision, an employee of an educational institution shall not be considered to be employed by this state.

"(2) The hearing officer shall be selected at random by the commissioner from the list described in subsection (1), on a per appeal basis. If the individual selected is performing judicial duties, another individual shall be selected." MCL 550.1514(1), (2); MSA 24.660(514)(1), (2).

[79] Const 1963, art 6, § 3; GCR 1963, 901.

Appeals[80] or this Court.[81] While retired judges may become hearing officers, this Court should not be involved, however indirectly, in the selection process.[82]

Since the provisions concerning professional health care providers[83] are subject to the invalid appeal procedure they too are unenforceable.

The foregoing conclusions make it unnecessary to reach BCBSM's Contract Clause claims.

## VIII

An ASO contract is an arrangement whereby a prepaid health carrier provides an employer who desires to be self-insured with administrative services only for a fee; the prepaid health carrier agrees to treat employees of the self-insured employer as if they were subscribers and to pay their providers and thus assumes the risk that the self-insured employer may not be able to reimburse the prepaid health carrier for expenditures to providers for employees of the self-insured employer. The Insurance Code, accordingly, imposes limitations on such arrangements,[84] but Act 350 imposes more onerous limitations on BCBSM[85] than on commercial prepaid health carriers.

I agree with the majority[86] that the ASO limitations set forth in Act 350 deny BCBSM the equal protection of the laws.

---

[80] MCL 550.1518; MSA 24.660(518).

[81] Const 1963, art 6, § 4; GCR 1963, 851.

[82] Const 1963, art 6, §§ 1, 4; art 3, § 2.

[83] MCL 550.1502; MSA 24.660(502).

Paragraph (7) of § 502 provides that "[c]ontracts entered into under this section shall be subject to the provisions of sections 504 to 518."

[84] See n 53.

[85] See n 52.

[86] *Ante,* p 96.

## IX

Act 350 bars BCBSM from marketing life insurance with BCBSM coverage.[87] Such dual marketing is called packaging and is especially attractive to relatively small employers who thereby reduce the number of their insurance relationships and the time they expend in purchasing insurance coverages.

Since 1979, BCBSM sales representatives have marketed packages of BCBSM coverage and life insurance underwritten by American Bankers Life Assurance Company of Florida. BCBSM has no underwriting risk and thus there is no violation of the BCBSM enabling acts.

BCBSM receives no compensation from ABL. BCBSM sales representatives, however, do receive sales commissions from ABL for life insurance sold and BCBSM is able to sell BCBSM coverage that it would not otherwise be able to sell.

It appears that a purpose of this legislation is to protect independent life insurance salesmen from the competition of packaging by BCBSM of health and life insurance. It is not claimed that providing protection from competition to a favored group is itself a legitimate basis for exercise of the police power.[88] It is rather claimed that it is necessary to bar competition to preserve competition; the predicate of that rationale is that BCBSM/ABL packaging will ultimately reduce competition in the life insurance market and reduce the number of life insurers who offer prepaid health insurance. That predicate is of doubtful factual content.

The largest life insurers, and there are quite a number in that category, are financial giants, and

[87] See n 54.

[88] Cf. *Arlan's Dep't Stores, Inc v Attorney General,* 374 Mich 70, 74-75; 130 NW2d 892 (1964) (opinion of ADAMS, J.).

BCBSM, by comparison, is a financial pigmy. Life insurers are likely to remain in the prepaid health insurance business as long as it is profitable. Be that as it may, there has been adequate experience in this and other states with packaging so that it should now be possible to determine whether there is sufficient substance to the proffered bar-competition-to-preserve-competition rationale to provide a rational basis for the classification. I would remand to the circuit court for further findings thereon.

## X

The first sentence of § 401(7) of the act[89] barring BCBSM from limiting or denying coverage to a subscriber limiting or denying reimbursement to a provider on the ground that the service was rendered while the subscriber was in a health care facility operated by the state or a political subdivi-

[89] "(7) A health care corporation shall not limit or deny coverage to a subscriber or limit *or deny reimbursement to a provider* on the ground that services were rendered while the subscriber was in a health care facility operated by this state or a political subdivision of this state. A health care corporation shall not limit *or deny participation status* to a health care facility *on the ground that the health care facility is operated* by this state or a political subdivision of this state, if the facility meets the standards set by the corporation for all other facilities of that type, government-operated or otherwise. To qualify for participation and reimbursement a facility shall, at a minimum, meet all of the following requirements, which shall apply to all similar facilities:

"(a) Be accredited by the joint commission on accreditation of hospitals.

"(b) Meet the certification standards of the medicare program and the medicaid program.

"(c) Meet all statutory requirements for certificate of need.

"(d) Follow generally accepted accounting principles and practices.

"(e) Have a community advisory board.

"(f) Have a program of utilization and peer review to assure that patient care is appropriate and at an acute level.

"(g) Designate that portion of the facility which is to be used for acute care." MCL 550.1401(7); MSA 24.660(401)(7).

sion of this state parallels the provisions of § 2237[90] of the Insurance Code. This provision thus only imposes on BCBSM an obligation similar to that already imposed on commercial insurers and, therefore, is not violative of the Equal Protection Clause.

The second sentence, however, bars BCBSM from limiting or denying participation status to such a facility. This goes beyond what has been imposed on commercial insurers by requiring BCBSM's subscribers to pay for a level of reimbursement to the state not required of commercially insured subscribers. The second sentence denies BCBSM and its subscribers equal protection of the laws.

## XI

I agree with the majority for the reasons stated by them[91] that the provisions of the act that empower the commissioner to issue a cease and desist order on a finding of probable cause[92] denies BCBSM the equal protection of the laws. I also agree that the provision of the act that permits the commissioner to suspend summarily without a hearing[93] BCBSM's certification of authority deprives it of due process of law.

## XII

I agree with the majority[94] that the provisions of

---

[90] MCL 500.2237; MSA 24.12237.

[91] *Ante,* p 90.

[92] See n 59.

[93] See n 58.

[94] *Ante,* pp 24-26.

the act that require BCBSM to offer the opportunity to all residents of the state to become subscribers of BCBSM,[95] although somewhat ambiguous, are not facially unconstitutional.

The provisions of the act requiring the commissioner to establish an informal procedure for subscriber complaints[96] and requiring BCBSM to submit new or revised subscriber certificates to the commissioner for approval[97] appear to parallel similar regulation of commercial insurers and are constitutional.

### XIII

Because of the fundamental infirmities in Act 350, especially the provisions transferring control of BCBSM from its members to subscribers, providers, and appointees of the Governor, the provision of Act 350 requiring BCBSM to reincorporate under Act 350[98] is invalid.

The parties have not briefed the question whether the valid provisions of Act 350 are severable and may govern BCBSM although it remains incorporated under 1939 PA 108 and 109. The cause should be remanded to the circuit court for briefing, argument, and decision thereon. I would retain jurisdiction.

Justice RILEY took no part in the decision of this case.

---

[95] "Sec. 401. (1) A health care corporation established, maintained, or operating in this state shall offer health care benefits to all residents of this state, and may offer other health care benefits as the corporation specifies with the approval of the commissioner." MCL 550.1401(1); MSA 24.660(401)(1).

[96] See n 62.

[97] See n 63.

[98] See n 64.